TUNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMY COHEN, et al.,<br>PLAINTIFFS,<br><br>v.<br><br>BROWN UNIVERSITY, CHRISTINA PAXSON, as successor to VARTAN GREGORIAN, and JACK HAYES, as successor to DAVID ROACH<br>DEFENDANTS | EXPEDITED RELIEF REQUESTED<br><br><br>Case Number: 92-CV-0197 |

**PLAINTIFFS' MEMORANDUM OF FACT AND LAW IN SUPPORT OF THEIR MOTION TO ENFORCE JUDGMENT, TO ADJUDGE IN CONTEMPT AND FOR EMERGENCY RELIEF**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. 2

**INTRODUCTION** .............................................................................. 3

**STATEMENT OF RELEVANT FACTS** ............................................. 4

   A.  Prior Proceedings. ..................................................................... 4

   B.  The Joint Agreement. ................................................................. 9

   C.  History of Enforcement. ........................................................... 10

   D.  Brown's Unilateral Elimination of Women's Sports with No Advance Notice or Consultation. ......................................................................... 11

   E.  Plaintiffs Invoke Section V.E. of the Joint Agreement for Violation but Are Unable to Achieve Resolution Without Court Intervention. ................................. 14

**ARGUMENT** ..................................................................................... 16

**I.  THIS COURT SHOULD ENJOIN BROWN FROM IMPLEMENTING ITS PLAN TO CUT FIVE EXISTING, VIABLE WOMEN'S INTERCOLLEGIATE ATHLETIC VARITY TEAMS BECAUSE THAT PLAN VIOLATES THE JOINT AGREEMENT.** .... 16

   A.  Brown's Announced Elimination of Women's Teams Disproportionately Harms Women Athletes at Brown, in Violation of the Joint Agreement. ........................... 16

      1.  This Court Has the Authority to Enforce the Joint Agreement. ................ 17

      2.  Brown's Proposal Would Violate the Joint Agreement. ........................ 18

3.   Brown's Contention that Its Plan Would Not Violate the Joint Agreement is Based on Imaginary and Unrealistic Numbers..................................................................... 21

B.   Interim Relief is Required to Preserve the Status Quo Ante and Avoid Irreparable Harm. . ............................................................................................................................... 24

C.   The Five Women's Teams and Their Members Slated for Elimination are Highly Accomplished and Will be Irreparably Harmed without Interim Relief. ........................ 27

# TABLE OF AUTHORITIES

**Cases**

*Barrett v. West Chester Univ. of Penn.*, No. 03-cv-4978, 2003 WL 22803477 (E.D. Pa. 2003) . 25

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009)............................................ 25

*Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012) ............................................................ 23

*Choike v. Slippery Rock Univ.*, No. 06-622, 2006, WL 2060576 (W.D. Pa. 2006)...................... 25

*Cohen v. Brown University*, 101 F.3d 155 (1st Cir. 1996) ......................................................... 6, 8

*Cohen v. Brown University,* 809 F. Supp. 978, (D.R.I. 1992) ("*Cohen I*")......................... 4, 5, 25

*Cohen v. Brown University,* 879 F. Supp. 185 (D.R.I. 1995) (*Cohen III*)............................ 6, 7, 22

*Cohen v. Brown University,* 991 F.2d 888 (1st Cir. 1993) ...................................................... 4, 5, 6

*Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 585 (W.D. Pa. 1993)................ 22, 25

*Mayerova v. Eastern Michigan University*, 346 F.Supp.3d 983 (E.D. Mich. 2018) ................... 25

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) ....... 26

*Portz v. St. Cloud State University,* 196 F. Supp. 3d 963 (D. Minn. 2016)............................ 25, 26

**Statutes**

20 U.S.C. §1681......................................................................................................................... 3, 5

**Other Authorities**

Christina Paxson, Addressing

Brown varsity sports decisions (June 6, 2020) https://www.brown.edu/about/administration/president/statements/addressing-brown-varsity-sports-decisions .......................................... 12, 13

Christina Paxson, *Excellence initiative to reshape athletics at Brown* (May 28, 2020) https://www.brown.edu/about/administration/president/statements/excellence-initiative-reshape-athletics-brown ..................................................................................................... 11, 25

Letter from President Paxson: Track and field and cross country (June 10, 2020)

    https://www.brown.edu/news/2020-06-09/track ...................................................................... 13

*New initiative to reshape, improve competitiveness in Brown varsity and club athletics* (May 28,

    2020) https://www.brown.edu/news/2020-05-28/athletics-excellence ..................................... 11

**Regulations**

34 C.F.R. § 668.47 .............................................................................................................. 22

34 C.F.R. §106.41(c)(1) ....................................................................................................... 6

## INTRODUCTION

    Plaintiffs, members of a certified class of women varsity athletes and potential athletes at Brown University, by their undersigned class counsel, hereby move the Court to enforce the Joint Agreement of the parties, incorporated in the Judgment of the Court, entered on October 15, 1998, after notice to the class and hearing. The Joint Agreement constitutes the binding agreement of the parties on Brown's plan for compliance with Title IX of the Education Amendments, 20 U.S.C. §1681, as to its intercollegiate athletic program. Plaintiffs seek to prevent the Defendants from proceeding with actions to eliminate five women's varsity teams, announced on May 28, 2020, as revised on June 9, 2020, which, if allowed to be implemented, would constitute a gross violation of the Joint Agreement, to the immediate and irreparable harm of the class. Defendants Brown University et al. ("Brown") have announced that the actions are "effective immediately."

    Prior to filing the within Motion, in accordance with paragraph V.E. of the Joint Agreement,[1] undersigned counsel notified Defendants on June 10, 2020, that their proposed plan

---

[1]     The Joint Agreement is attached as Exhibit A to the Motion to Enforce. Paragraph V.E. provides that "Plaintiffs may, in the case of an alleged gross violation of this Agreement, seek relief from the Court, *provided* that they have first notified Defendants of the alleged gross violation and spent a reasonable period of time meeting and conferring with Defendants in an attempt to resolve the issue." (Emphasis in original.)

was a gross violation and thereafter conferred with counsel for the Defendants. But we have been unable to achieve a resolution that would avoid this violation and the need for emergency relief.

Plaintiffs seek immediate relief because Brown's decision to eliminate the five women's varsity teams threatens to harm the teams in ways a later order of restoration would not adequately address. These harms include, among other injuries, loss of coaching staff (who may obtain other employment), cessation of recruiting activities (to maintain viable team participants), and removal of these teams from intercollegiate conference and post-season schedules (which may not be remediable once the schedules have been announced). Plaintiffs therefore seek expedited consideration of this motion, including re-assignment to a judge sitting in the District of Rhode Island, issuance of an order prohibiting implementation of the announced team eliminations, expedited discovery, and a prompt hearing on Plaintiffs' motion.

## STATEMENT OF RELEVANT FACTS

### A.  Prior Proceedings.[2]

In May 1991, Brown University announced the elimination of four teams from its university-funded varsity program. Women's gymnastics and volleyball, along with men's golf and water polo, were lowered to "club varsity," later called "intercollegiate club." These teams lost, among other things, university financial support, university-funded coaching staff, access to trainers, varsity equipment and facilities, and preference in admissions for recruited athletes. In this "hybrid" status, the teams were advised that they could continue to compete at the varsity level *if* they self-funded and *if* other institutions were willing to continue to include them in their

---

[2]     The description of prior proceedings which follows is not exhaustive and focuses on the issues, binding findings of fact, and binding conclusions of law pertinent to the matters presently at issue.

schedule. *Cohen v. Brown University,* 809 F. Supp. 978, 981-982 (D.R.I. 1992) ("*Cohen I*"), *aff'd,* 991 F.2d 888 (1st Cir. 1993) ("*Cohen II*").

Plaintiffs, members of the two demoted teams, as well as other women athletes, filed a class action suit in 1992, alleging that Brown had violated Title IX of the Education Amendments, 20 U.S.C. §1681 ("Title IX"), by cutting the teams, by not offering equivalent participation opportunities to other women, and by maintaining programmatic inequities between the men's and women's varsity programs. The Court certified a plaintiff class of "all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown." *Cohen I*, 809 F. Supp. at 979.

Plaintiffs sought a preliminary injunction restoring the two teams to full varsity status. After a lengthy hearing, the Court determined that Plaintiffs had demonstrated a likelihood of success in their claim of a Title IX violation and that Plaintiffs had demonstrated that the class would suffer irreparable harm if the teams were not restored to varsity status pending determination on the merits.

In reaching its decision, the Court found, among other things, that "intercollegiate club status is not equivalent to varsity status." *Id.* at 992. The Court found "a strong likelihood of irreparable harm in three major areas": recruitment, diminution of competitive level and access to varsity competition, and loss of coaching staff. *Id.* at 997-998. As a result of the loss of university funding, each of the women's teams was "struggling not only to remain active in varsity-level competition at Brown, but also to survive as a team at all." *Id.* at 992.

Recognizing a dearth of prior precedent, the Court conducted an extensive analysis of the requirements and history of Title IX and its controlling regulations and agency interpretations, and

granted a preliminary injunction ordering Brown to restore the two women's teams as fully-funded varsity teams, with all levels of support as existed before the cuts, and prohibiting Brown from cutting, or reducing the level of support of, any other women's varsity pending decision on the merits. *Id.* at 1001. On appeal, the First Circuit unanimously affirmed. *Cohen II*, 991 F.2d 888. The Court's decision in *Cohen II* is the first appellate decision addressing the application of Title IX to athletics and the "Three-Part Test" relied upon by the Court below and continues to be extensively cited. *Id.* at 897.

In 1994, the case proceeded to trial on the merits, and a decision in favor of Plaintiffs issued in 1995. *Cohen v. Brown University,* 879 F. Supp. 185 (D.R.I. 1995) (*Cohen III*), *aff'd in part and rev'd in part,* 101 F.3d 155 (1st Cir. 1996) (*Cohen IV*), *cert. denied,* 520 U.S. 1186 (1997). By that time, Brown was using the term "donor-funded" varsity to denote teams which could compete at the varsity level *if* they self-funded. As to true "club" teams, the Court stated that "[i]t was not seriously contended until the eleventh hour, nor did the evidence show, that any of Brown's club teams should be considered to be presently operating as intercollegiate teams" under the controlling standards. *Cohen III*, 879 F. Supp. at 200. While the Court considered the donor-funded teams to fit within the varsity program, it further found that "[a]s a result of their unfunded status, most of the donor-funded teams are prevented from reaching their full athletic potential." *Id.* at 201 (footnote omitted).

The Court once again addressed Brown's compliance with the "Three-Part Test" of the Policy Interpretation issued by the Department of Education to enforce its Athletic Regulations, 34 C.F.R. §106.41(c)(1). Prong One of the Test—relevant to post-judgment enforcement—asks "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." *Cohen III*, 879

F. Supp. at 200 (quoting Three-Part Test, 44 Fed. Reg. at 71,418 (1979)). In response to Brown's argument that it should have substantial leeway in the measurement of Prong One because the composition and size of the program is out of its control, the Court observed that "fluctuations, from year to year, of the gender balance in the athletic program at Brown were minimal," *Id.* at 202, and "Brown does predetermine the gender balance of its athletic program through the selection of the sports it offers…, the size of the teams it maintains…, the quality and number of coaches it hires, and the recruiting and admissions practices it implements." *Id.* (citation omitted). "Most coaches testified that they determine an ideal team size and then recruit the requisite number of athletes to reach that goal." *Id.* Rejecting a number of alternative methods proposed by Brown to quantify "participation opportunities," the Court concluded that "[n]umbers from the *current* or most recent, complete competitive season provide the most representative quantification of participation opportunities *presently* offered." *Id.* at 203-204 (emphasis in original).

The Court found that Brown was not in compliance with any prong of the Three-Part Test. It found that Brown had failed to "fully and effectively accommodate the interests and abilities" of women by offering water polo as a club sport and by offering gymnastics, fencing, and skiing at the "donor-funded" level. *Id.* at 212. Brown was directed to submit a plan to come into compliance with Title IX. *Id.* at 214.

In a separate, unpublished Order of August 17, 1995 ("Remedial Order),[3] the Court rejected Brown's proposed compliance plan. Among other things, Brown proposed to strictly enforce team sizes by (one) imposing maximum team sizes on men's teams by striking excess names from the team roster; and (two) imposing minimum team sizes on the women's teams. In addition, Brown

---

[3]     The Court's Remedial Order of August 17, 1995 is attached to the Motion to Enforce as Exhibit B.

proposed to create new "junior varsity teams" for certain women's sports and to count their members as well.

The Court rejected the proposal in its entirety, as "indicat[ing] a regrettable lack of interest in providing an intercollegiate athletic experience for its female students that is equivalent to that provided to its males students." Remedial Order at 7 (footnote omitted). "An institution does not provide equal opportunity if it caps its men's teams after they are well-stocked with high-caliber recruits while requiring women's teams to boost numbers by accepting walk-ons." Remedial Order at 8. The Court further rejected Brown's proposal to include "junior varsity" teams in the count as not constituting intercollegiate teams. "Counting new women's junior varsity positions as equivalent to men's full varsity positions flagrantly violates the spirit and letter of Title IX; in no sense is an institution providing equal opportunity if it affords varsity positions to men but junior varsity positions to women." Remedial Order at 6 (footnote omitted). The Court did not give Brown another opportunity to submit a new plan, instead ordering Brown to elevate women's gymnastics, water polo, skiing and fencing to university-funded status, but staying the order pending appeal. Order at 12.[4]

On appeal, the First Circuit reaffirmed its earlier decision in *Cohen II* as "law of the case" and rejected Brown's constitutional challenges. The Court "agree[d] with the district court that Brown's proposed plan fell short of a good faith effort to meet the requirements of Title IX," *Cohen IV*, 101 F.3d at 187, but reversed the Remedial Order, instead remanding to afford Brown another opportunity to propose a remedial plan. *Id.* at 188. Brown's petition for *certiorari* was denied. 520 U.S. 1186 (1997).

---

[4]    Brown had previously restored women's volleyball to full varsity status.

The matter returned to this Court for determination of relief. By the time it was to be heard on remedy, the case was reassigned to District Judge Torres.

On the eve of hearing on remedy, the parties resolved the issue of compliance with a "Joint Agreement" subject to approval of the Court after notice to the class and hearing on fairness of the settlement. After hearing, the Joint Agreement was approved by Judge Torres and incorporated as the Judgment of the Court on October 15, 1998.

### B.   The Joint Agreement.

The Joint Agreement is designed to address Brown's decision to achieve and maintain compliance under Prong One of the Three Part Test[5] by setting forth how participants are counted and by specifying the permissible differential between women undergraduates and women athletes at Brown. (A copy of the Joint Agreement is attached to the accompanying Motion to Enforce as Exhibit A.) It identifies the teams that were then part of Brown's varsity program. It specifies that Brown's variance between undergraduate enrollment and athletic participation rates for women can be as high as 3.5%—which represents over 30 individuals in a program of 890,[6]—but that the permitted variance will drop to 2.25% if Brown alters the current lineup of varsity teams in a way adverse to women, e.g., by reducing the status of or eliminating a women's team or creating or elevating the status of a men's team.

While several provisions guaranteed financial support for donor-funded teams and were limited in duration, the Joint Agreement specifies that it "is indefinite in duration as to those

---

[5]      In contrast, the Court's remedial Order of August 17, 1995, envisioned compliance under Prong Three, by fully and effectively accommodating the interests and abilities of the underrepresented gender, which would have left Brown free to have a corresponding men's program without reference to the size or proportionality of either program. Remedial Order at 11.

[6]      Brown's total program of men and women typically equals or exceeds 890 athletes each year.

provisions concerning measurement of participation rates by applicable percentages (proportionality)." The Joint Agreement specifies that any party who seeks relief from the terms of the Joint Agreement must seek Court approval and cannot unilaterally ignore the obligations imposed by it. The Joint Agreement, at page 17, expressly states that the "terms of this Agreement shall be subject to the full enforcement powers of the Court by appropriate order. *The Court shall retain jurisdiction concerning interpretation, enforcement and compliance with this Agreement.*" (Emphasis added.)

The Joint Agreement further provides that participation ratios are determined retrospectively, by counting the individuals actually participating on varsity teams whose name appears on the roster for that sport on the first and last day of competition and taking the average of those two numbers. Each team is counted separately, except for indoor and outdoor track, which are counted as a single sport. Joint Agreement at 10-11.

### C. History of Enforcement.

The Joint Agreement has been in operation since 1998. Every August, Brown has provided class counsel with reports of its program and participants for the academic year just concluded. Over the past 20 years, Brown has failed to achieve compliance at the 3.5% level in 2000-2001 (3.7%), 2001-2202 (4.8%), 2004-2005 (4.4%) and 2009-2010 (5.6%). In those years, Brown notified class counsel of the noncompliance and took action to address and correct the issues leading to noncompliance. On each occasion, Brown rectified the noncompliance without any need for judicial intervention.

In 2000, Brown approached class counsel to propose the formal recognition of a women's golf team and a men's golf team within the co-ed golf program which would not alter the structure of the varsity program but would add post-season competitions for the women's program. Brown sought Plaintiffs' and the Court's agreement that the action would not trigger the "drop-down" in

permitted variance from 3.5% to 2.25%. Plaintiffs agreed, and the parties submitted, and the Court entered, an Order by Consent in July 2000.[7]

### D.   Brown's Unilateral Elimination of Women's Sports with No Advance Notice or Consultation.

On May 28, 2020, simultaneous with notice to the affected athletes, counsel for Brown telephoned class counsel, Labinger, to advise that Brown was, effective immediately, removing five women's and six men's teams from the varsity program, and creating two varsity sailing teams, called women's and co-ed sailing. Brown's counsel acknowledged that the actions would trigger the Joint Agreement's drop-down to 2.25% and represented that Brown's new program would meet that requirement. The teams were identified as men's and women's golf, fencing, and squash, women's skiing and equestrian, and men's cross-country, indoor/outdoor track and field.

In the official statement issued by the President of Brown that day, Brown represented that "[e]ffective immediately, Brown will cease training, competition and related operations at the varsity level for the following sports: men and women's fencing; men and women's golf; women's skiing; men and women's squash; women's equestrian; and men's track, field and cross country." Christina Paxson, *Excellence initiative to reshape athletics at Brown* (May 28, 2020) https://www.brown.edu/about/administration/president/statements/excellence-initiative-reshape-athletics-brown. The President noted that many of the sports might continue at the club level. *Id.*

The President further represented that Brown would remain in compliance with the Joint Agreement and that "the percentage of varsity athletic participation opportunities for women will

---

[7]    In 1999, due to recusal, no sitting judge in the District was available for assignment when matters relating to attorneys' fees and entry of the post-judgment consent order were heard by U.S. Magistrate Judge Martin and Chief Judge Paul Barbadoro of the District of New Hampshire between 1999 and 2003.

11

increase, and be even more closely aligned with the percentage of women in the undergraduate student body." *Id*.

In an accompanying post on Brown's "News from Brown,"[8] the University described its decision to cut the teams as part of a "bold plan to reshape its athletic program" that was the product of its "Excellence in Brown Athletics Initiative."  Brown said that "[t]he Initiative's launch follows a deliberative process that dates back to an external review of Brown Athletics conducted in the 2018-2019 academic year, which found that the high number of varsity sports at Brown was a barrier to competitiveness." Brown emphasized that "while some universities have reduced athletics programs in the wake of COVID-19, Brown's initiative *is not* a measure to reduce budget or an effort to contend with the financial impact of the pandemic." *Id.* (emphasis added) Rather, said Brown, "it's an opportunity to invest further in advancing excellence in Brown's full lineup of sports programs." *Id.* Brown further represented that "[g]ender equity was among the most essential criteria for decision-making for the revised lineup of teams," with specific reference to Brown's obligation to maintain compliance with the Joint Agreement.

Brown's decision to slash eleven men's and women's varsity teams was met with a groundswell of opposition from both within and outside the University. Brown initially refused to back down. On June 6, 2020, the President issued another public letter confirming the University's commitment to proceed with the elimination of all of the teams. *See* Christina Paxson, Addressing Brown varsity sports decisions (June 6, 2020), https://www.brown.edu/about/administration/president/statements/addressing-brown-varsity-sports-decisions.

---

[8]     *New initiative to reshape, improve competitiveness in Brown varsity and club athletics* (May 28, 2020) https://www.brown.edu/news/2020-05-28/athletics-excellence.

In that letter, Brown's President identified "Gender Equity" as one of the core concepts that drove the decision, including the number and selection of varsity teams to cut. The President stated:

> Under the 1998 legal settlement, which applies only to Brown and not to other universities, the fraction of athletics opportunities for women must remain within a tight band around the fraction of the undergraduate population that is women. As the fraction of women in the undergraduate student body has increased over time (currently at about 53%), it has become more challenging for Brown to meet its obligations under the settlement agreement and Title IX given the number of teams we have. In the past, the University has achieved the required gender balance by maintaining squad sizes of men's teams that, on average, are below Ivy League squad sizes.

*Id*. Brown's President further stated that,

> in [the Committee's] judgment, *the best way to restore competitiveness and meet the goal of reducing the number of teams overall was to eliminate a number of larger men's teams. This was an important factor in the decision to eliminate men's track, field and cross-country* which, together, provide the most varsity opportunities to men second only to football—the latter of which is a required sport for membership in the Ivy League.

*Id.* (emphasis added). She added that, "[s]ince the announcement of the athletics initiative, there have been requests to restore men's track, field and cross-country; however if these sports were restored at their current levels and no other changes were made, *Brown would not be in compliance with our legal obligations under the settlement agreement.* We continue to closely examine Brown's legal obligations." *Id.* (emphasis added).

On June 9, 2020, however, the University announced that it *was* restoring men's track, field, and cross-country.[9] *And no other changes were made.* Taking President Christine Paxson at

---

[9]      Letter from President Paxson: Track and field and cross country (June 10, 2020) https://www.brown.edu/news/2020-06-09/track. "The reinstatement is effective immediately and does not alter other decisions to reduce the number of varsity sports as part of the initiative."

her word, Brown is knowingly and intentionally violating the settlement agreement. Moreover, the participation numbers provided by Brown bear that out. As the tables in Plaintiffs' Motion, repeated below, show, Brown's decision to eliminate these three men's teams and five women's team will dramatically and unequivocally violate the Joint Agreement's requirement that the percentage of the underrepresented gender in the athletic population (which, at Brown, has always been women) must be within 2.25% of the percentage of that gender in the overall student body.[10]

### E. Plaintiffs Invoke Section V.E. of the Joint Agreement for Violation but Are Unable to Achieve Resolution Without Court Intervention.

On June 10, 2020, Plaintiffs' counsel notified Brown, through its counsel, that Brown's decision to cut five viable women's teams from the varsity program constitutes a "gross violation" of the Joint Agreement within the meaning of Section V.E, for which Plaintiffs are authorized to seek direct court intervention after notice and a reasonable period of time to meet and confer in an attempt to resolve the issue.

In an effort to resolve the issue amicably and better understand the bases for Brown's decision, class counsel sought a variety of data from Brown, including the analyses, modeling, and recommendations on which Brown, and its committees, had based its *initial* decision to cut all six men's sports teams, including men's track, field and cross-country, and its *subsequent* decision to *not* eliminate men's track, field and cross-country. Brown has refused to provide this information.[11]

---

[10]    Throughout the last 22 years of operation of the Joint Agreement, not once have women athletes at Brown ever reached their proportion within the undergraduate enrollment and at all times have remained the "underrepresented" gender.

[11]    On June 10 and 11, Plaintiffs requested production of reports, resolutions, and analyses of the decision-making leading up to the determination to cut the five women's teams and that only by cutting men's track, field and cross-country would Brown comply with the Settlement Agreement. In its public postings, Brown had described a long and considered deliberative process, comprised of proceedings and deliberations of consultants, a Presidential Committee on

Plaintiffs also asked Brown to explain why, in its view, its new version of the cuts would achieve compliance at the 2.25% level mandated by the Joint Agreement, and to provide any analysis Brown had conducted to reach its decision. Brown initially represented that it did not yet have that information. On June 16, 2020, Brown told Plaintiffs that its new plan would comply with the Joint Agreement because, among other things, it proposed to add 25 participation opportunities for women athletes on a woman's sailing team and 25 participation opportunities for women on a coed sailing team. But the names provided to class counsel for these two teams are *the same 25 women.*

Brown also provided class counsel with projected participation numbers for teams for the 2020-21 year on which it based its claim that it would be in compliance. Brown did not provide any projection of the undergraduate enrollment of women at Brown for 2020-21, contending such numbers are unavailable.[12]

---

Excellence in Athletics, internal review within Athletics, and the Office of the President, culminating in review and approval by the Board of Trustees. A copy of the request is appended as Exhibit G. Brown declined to provide any of the requested materials.

On June 18, 2020, class counsel asked Defendants to provide them with all data, reports, analyses, and other information leading up to and forming the basis for the decision to reinstate the men's track, field, and cross country teams and make no other changes. Defendants have refused to provide all such information. Plaintiffs also requested Brown's June or preseason team rosters for the last three academic years and any written plans that exist for the creation of the coed and/or women's varsity sailing program. Brown has not provided this information. Plaintiffs also asked Brown when, if at all, it would make the sailing coach and the administrative person(s) who knows the most about the proposed varsity sailing program available for interviews. Brown has not responded to those requests.

[12]     In making its projections, Brown used estimated team sizes based on its projections for 2020-21, but used the 2019-20 rate of 52.3% women undergraduates, claiming it had no additional information. The Joint Agreement, however, requires women's athletic participation rate for 2020-21 to be within 2.25% of women's undergraduate enrollment rate "for the same academic year." Moreover, President Paxson, in her letter of June 6, 2020, stated that undergraduate enrollment for women is "currently at about 53%."

After reviewing Brown's information, class counsel concluded that there is substantial reason to doubt Brown's projections and to reject Brown's reliance upon them. Plaintiffs invited Brown to confer to attempt a resolution of the dispute. Brown declined, taking the position that its revised plan complies with the Joint Agreement.

In light of that decision, Plaintiffs have no choice but to seek judicial intervention.

## ARGUMENT

I.   **THIS COURT SHOULD ENJOIN BROWN FROM IMPLEMENTING ITS PLAN TO CUT FIVE EXISTING, VIABLE WOMEN'S INTERCOLLEGIATE ATHLETIC VARITY TEAMS BECAUSE THAT PLAN VIOLATES THE JOINT AGREEMENT.**

A.   **Brown's Announced Elimination of Women's Teams Disproportionately Harms Women Athletes at Brown, in Violation of the Joint Agreement.**

Plaintiffs are seeking enforcement of the Judgment of the Court, which incorporated the Joint Agreement, and which expressly provides for continued enforcement by the Court in the event of a violation or effort to obtain modification or termination.

As explained in further detail below, Brown's decision to eliminate three men's and five women's intercollegiate athletic teams violates the 2.25% participation requirement set forth in the Joint Agreement. Brown is proposing to eliminate (depending on which year's figures are used) *twice as many* women's participation opportunities as men's. This will place Brown far outside the maximum 2.25% participation rate difference required—indeed, it will prevent Brown from satisfying even the maximum 3.5% participation rate difference that applied when Brown had *not* eliminated any women's teams.

Brown's arguments to the contrary are based on expectations and projections where the Joint Agreement mandates reliance on actual data. Among other things, Brown's claim of compliance depends upon achieving participation rates that its actual experience does not support and the addition of women participating in a varsity program that does not yet exist. Brown's plan

also double counts the female athletes that Brown contends will participate in *both* the women's and co-ed sailing programs in the 2020-2021 season.  Because Brown's plan will place it in clear violation of the Joint Agreement, Plaintiffs are asking this Court to enjoin Brown from implementing its current proposal.

To be clear, Plaintiffs do *not* take the position that Brown lacks authority to eliminate any intercollegiate athletics teams. But Brown has a duty, under both Title IX and the Joint Agreement, to not discriminate on the basis of gender when deciding to eliminate athletic participation opportunities. Brown's initial plan to eliminate six men's teams and five women's teams, although entirely regrettable, appeared to be designed to achieve the 2.25% permitted variance.

But Brown's decision to reinstate men's track, field and cross-country teams—while pressing forward with the elimination of five women's teams—*will* violate the Joint Agreement, That's all Plaintiffs are asking for here: that they be treated fairly and equitably as required by Title IX *and* by the Joint Agreement that Brown itself agreed to abide by in 1998, and which remains in effect to this day.

### 1.  This Court Has the Authority to Enforce the Joint Agreement.

As a threshold matter, this Court plainly has the authority to enjoin Brown from implementing its unlawful plan. The Court has inherent authority to enforce its judgments. *See generally Burgos-Yantin v. Municipality of Juana Diaz*, 909 F.3d 1, 3 (1st Cir. 2018) (collecting cases). *See also* 28 U.S.C. §2202. While an order of enforcement and a finding of contempt often go hand-in-hand, they are two separate analyses. *See, e.g., Paiva v. Rhode Island Dep't of Corr.*, 2020 WL 430062 (D.R.I. 2020) (issuing an order of compliance but denying a finding of contempt). *See also Ollier v. Sweetwater Union High School District*, 2014 WL 1028431 (S.D. Cal. 2014) (granting a motion to enforce the judgment and issuing a show cause order in a Title IX case). As the Supreme Court has explained, "courts have inherent power to enforce compliance

with their lawful orders through civil contempt. When a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (internal quotation marks and citations omitted). "The Court may impose civil contempt 'to compel compliance with a court order or to compensate a party harmed by non-compliance.'" *Paiva,* 2020 WL 430062, at *6 (quoting *United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005)).

The Joint Agreement explicitly recognizes this authority. "This [*sic*] terms of this Agreement shall be subject to the full enforcement powers of the Court by appropriate order. The Court shall retain jurisdiction concerning interpretation, enforcement and compliance with this Agreement." Joint Agreement at VI [V.C.], at 17.

## 2.  Brown's Proposal Would Violate the Joint Agreement.

There is also no doubt that Brown's plan would violate the maximum 2.25% participation difference requirement in the Joint Agreement. This conclusion comes directly from Brown's own data provided to Plaintiffs during the course of the parties' effort to resolve this situation without judicial intervention.

Defendants have provided class counsel with intercollegiate athletic participation numbers for 2019–20 and 2018–19 that show why President Paxson made her June 6 announcement. Based on the numbers Brown provided, if the five women's teams were eliminated along with the six men's teams originally included (including track, field, and cross country), then women's opportunities would be (depending on the year) 42.15% or 42.72% of the total eliminated—bringing women *closer* to equality in Brown's program. But with men's track, field, and cross country reinstated and no other changes made, women's opportunities will be (depending on the year) 66.83% or 69.35% of the total eliminated—bringing women *farther* from equality in Brown's program.

18

| Teams Eliminated | | Number of participants 2019-20 | Number of participants 2018-19 |
|---|---|---:|---:|
| **Women's** | | | |
| | Equestrian | 23.5 | 21.5 |
| | Fencing | 12 | 13.5 |
| | Golf | 9 | 11 |
| | Skiing | 10 | 9 |
| | Squash | 14 | 14 |
| | | | |
| **Total** | | **68.5** | **69** |
| | | | |
| **Men's** | | | |
| | Fencing | 11 | 8.5 |
| | Golf | 8 | 8.5 |
| | Squash | 15 | 13.5 |
| (Reinstated) | | | |
| | Cross Country | 15 | 17 |
| | Track and Field | 45 | 45 |
| | | | |
| **Total Eliminated Originally** | | **94** | **92.5** |
| **Total Eliminated Now** | | **34** | **30.5** |
| | | | |
| **Total Women's % Originally** | | **42.15%** | **42.72%** |
| **Total Women's % Now** | | **66.83%** | **69.35%** |

As a result, based upon the participations numbers Brown has provided for 2019–2020, if the five women's teams were eliminated along with the six men's teams originally included (including track, field, and cross country), the participation rates for men and women in Brown's 2020–21 intercollegiate athletic program would likely have been within 2.25% of their undergraduate enrollment rate for 2019–20. (We do not yet know the undergraduate enrollment rates for 2020-21.) But, with the men's track, field, and cross-country teams reinstated, the participation rates for men and women rates in Brown's 2020–21 intercollegiate athletic program will be 4.4% from their undergraduate enrollment rate for 2019–20:

| 2019-2020 Total Undergraduates | |
|---|---:|
| Men | 3249 |
| Women | 3561 |
| Percentage of Women | 52.29% |
| | |
| **Total Number of Athletes with All 11 Teams Eliminated** | |
| Men | 354 |
| Women | 380.5 |
| Percentage of Women | 51.80% |
| | |
| **Total Number of Athletes after 3 Men's Teams Reinstated** | |
| Men | 414 |
| Women | 380.5 |
| Percentage of Women | 47.89% |
| | |
| **Difference from Undergraduate Percentage Rates** | |
| With All 11 Teams Eliminated | 0.49% |
| After 3 Men's Teams Reinstated | 4.40% |

Thus, Brown has announced that it will eliminate participation opportunities for twice as many women as for men.

For 2019-20, Brown reported that women represented 52.29% of the undergraduate enrollment and 50.06% of the women varsity athletes, producing a differential of 2.23%. However, of the total women participating (449), 68.5 were on the teams designated for elimination. Of the total men participating (448), 34 were on the teams designated for elimination. Without those participants, the athletic program provided for women would be 4.40% less than their representation in the undergraduate enrollment for 2019-20.

For 2018-19, Brown reported that women represented 53.72% of the undergraduate enrollment and 51.04% of the women varsity athletes, producing a differential of 2.68%. However, of the total women participating (466.5), 69 were on the teams designated for elimination. Of the total men participating (447.5), 30.5 were on the teams designated for elimination. Without those

participants, the athletic program provided for women would be 4.91% less than their representation in the undergraduate enrollment for 2019-20.

Based on these numbers, Brown would not merely fail to comply with the drop-down 2.25%; it would not be in compliance with the more lenient 3.5% variance which it has lost by eliminating women's sports.

### 3. Brown's Contention that Its Plan Would Not Violate the Joint Agreement is Based on Imaginary and Unrealistic Numbers.

Brown has offered Plaintiffs no serious reason to doubt this conclusion. When Brown announced its original decision to cut six men's teams and five women's teams, it said this balance of teams was necessary to maintain compliance with the Joint Agreement. When Brown revised that plan and decided to reinstate men's track, field, and cross country, it offered no explanation as to why its plans would not violate the Joint Agreement. That's no surprise, because, now, Brown's plans *do* violate the Agreement.

Brown's claim that it will achieve compliance at the 2.25% in 2020-21 is not based on current facts but rather hopeful projections about larger team sizes for remaining women's teams and the creation of a new varsity program in sailing that counts the projected 25 new women participants not once but twice and restricts the number of men (who apparently sail the co-ed boats in equal numbers with women) to 10, or less than half of the number of women Brown is counting on to participate. Brown's proposal is inadequate on its face, because neither of these teams yet exists and, according to Brown, each will *have the same women on them*. So Brown is not only double-counting athletic participation opportunities, but it is doing so for a varsity program that does not yet exist.

This is manifestly improper. First, Brown's reliance on the composition and size of a varsity team that *does not yet exist* to demonstrate proportionality or compliance with the Joint

Agreement is grossly misplaced. As one court has explained, "[y]ou can't replace programs with promises." *See Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 585 (W.D. Pa.), *aff'd,* 7 F.3d 332 (3d Cir. 1993). But that's exactly what Brown is doing here: promising that the violation of Title IX embodied in its proposal to cut five existing teams will be counterbalanced by a varsity program that does not yet exist. Brown cannot sidestep the requirements of either Title IX or the Joint Agreement by providing estimated numbers to replace actual participants.[13]

The fact that a coed sailing program has operated at Brown for many years at the club level does not alter this analysis. It is well established—and the law of *this* case—that a club sport is *not* a varsity sport, either under the Joint Agreement or under controlling law. *See Cohen III*, 879 F. Supp. at 200 (*quoted supra*). The rules, requirements, and members of a *varsity* sailing program have not been established, and its members cannot be counted, under the Joint Agreement or the law, prospectively. *See* 34 C.F.R. § 668.47 (requiring institutions to count participation using "[t]he total number of participants as of the day of its first scheduled contest of the reporting year").

And any such measure would be a mere prediction that could ultimately prove no more than wishful thinking. Not all athletes at the club level may wish to subject themselves to the varsity-level requirements. Moreover, individual expressions of intent to participate before the first date of competition are not the measurement of participation under the Joint Agreement.  *See* Joint Agreement Section III.F.2-4. Indeed, expressions of intent or interest, as opposed to actual participation, were championed by Brown as a more accurate way to measure "participation opportunities" *and rejected by the Court* in *Cohen III. See* 879 F. Supp. at 203-04.

---

[13]     While the district court in *Favia* was analyzing a promise to promote a club sport to a varsity sport in regards to the university's ability to show compliance with Prong Two, it is axiomatic that if a university cannot rely on an as-yet non-existent team to demonstrate compliance with Prong Two, then they cannot use "numbers" from a non-existent team to meet the requirements of Prong One.

Additionally, Brown has acknowledged that the coed sailing will not be eligible to compete in a conference championship because there are not enough teams in the Ivy League to qualify for a championship. *See* Emails from Brown's Counsel, Exhibit C. This raises further questions as to the propriety of Brown's reliance upon double-counting women as participants on two sailing teams as it is unclear if they will receive an equivalent participation opportunity to the teams that were eliminated or even the women's sailing program. *See* Letter from Stephanie Monroe, Assistant Secretary for Civil Rights of the Department of Education (Sept. 17, 2008) ("2008 OCR Letter") (listing ability for post-season championship among its factors for counting a sport as a genuine athletic opportunity); *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 104 (2d Cir. 2012) (discussing the same).

Whether or not a sailing program can be established at Brown and successfully compete at the varsity level in the future does not change the fact that Brown's claim that it will meet the maximum variance of 2.25% is based on *projections* of athletes who have not yet had a single season at the varsity level.

Brown's proposal is fatally flawed for another reason: it is based on the dubious legal proposition that the same women who may hereafter compete at the varsity level for sailing should be counted *twice* because their program permits them to sail in competition on a women's boat or a co-ed boat with men. If the history of this case tells us anything, it is that Brown and the Plaintiff class rarely agreed on how to measure or count genuine participation opportunities—which is why every detail for the *existing* program was spelled out in the Joint Agreement or by later consent order. The Joint Agreement included contingencies for certain teams that might be elevated to university-funded varsity status, but there is no provision for a varsity sailing team that dictates

23

how the new program, once it is established, should be counted or measured, and Brown has deliberately excluded Plaintiffs from the discussion.

But, even if double-counting female athletes who participate on both women's sailing and co-ed sailing could be justified, Brown's proposal must be rejected because it proposes to count future varsity opportunities while eliminating current, actual ones. As we now explain, Plaintiffs cannot afford to wait to see if Brown's projections are accurate enough without risking devastating consequences to real individuals who are being denied their chance to compete.

### B.  Interim Relief is Required to Preserve the Status Quo Ante and Avoid Irreparable Harm.

Plaintiffs seek an order requiring the preservation of each of the five varsity women's teams eliminated from Brown's varsity program until the Court can determine whether Brown is in compliance with the Joint Agreement. Only preservation of the status quo immediately before Brown announced the team eliminations will avoid irreparable harm from Brown's gross violation of the Joint Agreement.

Brown's claim that it *will* achieve 2.25% compliance is based on a projection of conditions that do not and may never exist. If Plaintiffs are required to wait until the Fall to see if Brown's plan complies with the Joint Agreement, it will be too late to provide effective relief for the class members who have lost their competitive opportunities.

This is true for at least two reasons. First, a later opportunity to compete cannot and does not replace the ones that are lost, particularly for athletes who have a finite number of seasons or years to compete. Second, a team cut from varsity status loses its ability to retain its coaches, its schedule, and its caliber of athletes, such that a later order to restore it to varsity status typically means either that there is no team to restore or that it needs to be completely rebuilt. In the meantime, competitive opportunities disappear.

The prior litigation in this case confirms that interim relief is necessary to protect the athletes by preserving the status quo. In 1992, in *Cohen I,* the Court concluded that the Plaintiffs and class members would suffer irreparable harm if Brown's action to remove them from the varsity program were to stand while the Court determined whether Brown had violated Title IX. The Court found "a strong likelihood of irreparable harm in three major areas": recruitment, diminution of competitive level and access to varsity competition, and loss of coaching staff. *Cohen I*, 809 F. Supp. at 997-998. The Court found that the reduction in status from funded to unfunded "varsity" signaled the demise of the teams since each of the women's teams was "struggling not only to remain active in varsity-level competition at Brown, but also to survive as a team at all." *Id.* at 992. Here, the harm is even more complete, since Brown is eliminating *any* chance at varsity status and, "[e]ffective immediately, [terminating] training, competition and related operations at the varsity level." Paxson, *Excellence initiative to reshape athletics at Brown.*

Where sports have been eliminated, or threatened with elimination, courts finding a likelihood that Title IX has been violated have, by weight of authority, recognized that the cancellation of varsity sports at the college level represents irreparable harm for the athletes denied the opportunity to compete and have granted preliminary injunctive relief preventing the elimination while the case is pending. *See, e.g., Mayerova v. Eastern Michigan University*, 346 F. Supp. 3d 983 (E.D. Mich. 2018) ("In general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim." *Id.* at 997 (citations omitted)); *see also Portz v. St. Cloud State University,* 196 F. Supp. 3d 963, 972–73 (D. Minn. 2016); *Biediger v. Quinnipiac Univ*., 616 F. Supp. 2d 277, 291–93 (D. Conn. 2009); *Choike v. Slippery Rock Univ.*, No. 06-622, 2006, WL 2060576 at *9 (W.D. Pa. 2006); *Barrett v. West Chester Univ. of Penn.*, No. 03-cv-4978, 2003

WL 22803477 at *13–14 (E.D. Pa. 2003); *Favia*, 812 F. Supp. at 583. Of course, this Court already

made that finding of fact in earlier proceedings in this matter, and the same holds true today:

> Plaintiffs face two irreparable harms. 'given the fleeting nature of college athletics,' a plaintiff suffers an irreparable harm if he or she los[es] the opportunity to participate in their sport of choice on a continuous and uninterrupted basis." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (granting a preliminary injunction prohibiting the elimination of certain women's teams); *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012) (affirming the district court's findings of fact and conclusions of law following a bench trial in the same case); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n. 25 (2d Cir. 2004) (collecting cases and finding that the deprivation of the opportunity to play a sport constitutes an irreparable harm). Here, the harm Plaintiffs will suffer is on all fours with the harm at issue in *Biediger*: if SCSU eliminates the women's tennis team right away, and this case is not resolved in time for Plaintiffs to adequately prepare for and participate in the 2016-17 season—a very real possibility given the pace of modern day litigation—Plaintiffs would likely lose the opportunity to play at least one season of tennis at SCSU even if they later prevail in this case. And even if Plaintiffs' do later win, the temporary elimination of the women's tennis program would harm recruiting efforts for future tennis seasons and could make it difficult for SCSU to retain or hire coaches in the near term. Since Plaintiffs cannot wait for the long term—their time in college is limited—those effects would cost them dearly. The threat to Plaintiffs' participation in SCSU's women's tennis team is not a harm that can be repaired later with money; it would be irreparable.

*Portz*, 196 F.Supp.3d at 972.

At this writing, Brown has not announced its plans for the resumption of fall classes, nor

has the Ivy League announced its plans for the resumption of fall sports. Neither of these

uncertainties diminishes the ongoing and irreparable harm to the women athletes and the continued

viability of their teams. Coaches work year-round and assessment and recruiting of new team

members is ongoing even when classes are not in session or proceeding remotely. The eliminated

teams, without coaches, recruiting or admissions preferences, lose their ability to survive, as this

Court has already found.

### C. The Five Women's Teams and Their Members Slated for Elimination are Highly Accomplished and Will be Irreparably Harmed without Interim Relief.

Defendants should be prohibited from eliminating any of the women's teams unless and until they prove that their elimination will not violate the Joint Agreement and this Court's Decree. The teams and their members are highly accomplished and will be irreparably injured without such interim relief.

#### 1. Equestrian.

The Women's Equestrian team at Brown is extremely successful. It won the Regional Championship in 2017-18, in which twelve collegiate teams competed. The team finished as the top team in its region (of 12 schools) in 11 out of the past 20 seasons and has finished in the top five nationally five times. Brown's Equestrian team has made more appearances at the nationals than all of the other Ivy League teams combined. Hannah Woolley, a member of the team and of the Brown class of 2021, placed second in two events at the 2018 Ivy Championships and qualified for post-season competition in 2019. Maya Taylor, a member of the team and of the Brown class of 2022, was recognized as the Academic All-Ivy recipient for 2018-19 and 2019-20 and was slated to be co-captain of the team for the next two years.

The team was standing in second place in the region when the 2019-20 season was terminated. There is no established club team for equestrian at Brown, and it is expected that the student "fees" or "dues" associated with a club equestrian team (there are none for a varsity) would pose a significant financial barrier for many to continue to participate even if offered.

#### 2. Fencing.

Women's Fencing at Brown had a team member who captured third place at the NCAA Northeast Regional in 2020 and qualified for the 2020 NCAA Championships, which were not

held. The team has had four NCAA All-Americans since 2000. Casey Chan, a member of the team and of the Brown class of 2023, is a nationally ranked fencer, who qualified for the COVID-cancelled post-season competition but will never have a chance to compete at that level if she stays at Brown. Anna Susini, a member of the team and of the Brown class of 2022, was slated to be captain of the team in 2020-21. In applying for colleges, she limited her selection only to those offering varsity-level fencing. In 2020, Susini collected "First Team Foil honors" at the Northeast Fencing Conference.

### 3. Golf

Women's Golf at Brown had just installed a new coach in 2019-20 and announced three new recruited freshman on April 30, 2020. In the past eight years, the team has produced three Academic-All Ivy recipients, First and Second Team All-Ivy players, and won the Ivy League Championship in 2015. Winnie McCabe, a member of the team and of the Brown class of 2021, was twice recognized as an All-American by the Women's Golf Coaches Association. As a senior finishing her college career, this is her last opportunity to participate in her chosen varsity sport. Pinya Pipatjarasgit, a member of the team and of the Brown class of 2022, finished in fourth place at the Brown Bear Invitation in 2018. Outside of Brown, she qualified for the US Golf Association's 2019 U.S. Girls' Junior Championship in 2019. After learning of the elimination of her team, Pipatjarasgit investigated the possibility of a transfer, only to find that it was too late in the year to transfer to a comparable institution for the following year.

### 4. Skiing.

Women's Skiing finished third in the United States in slalom at the 2020 USCSA National Championships and fourth at the USCSA Eastern Regionals. Women's Skiing consistently

qualified for post-season competition, reporting in 2017 that it was their thirteen year in a row of qualifying. That year Brown finished in third place overall.

    **5. Squash.**

    Women's Squash competed at the CSA National Championship Kurtz Cup in February 2020, and is ranked twelfth in national standings (50 total teams). At the Championship, the Brown team was awarded the sportsmanship award, which is voted on by all of college squash. Alexa Jacobs (who plays the number one position), a member of the team and of the Brown class of 2021, was slated to be co-captain of next year's team—her last opportunity to compete at the collegiate level. In May 2020, just days before the team was cut, women's squash honored Jacobs for the best record at the Howe Cup Team Nationals, as well as a CSA Scholar-Athlete, and announced two recruited athletes to the incoming freshman class.

**Conclusion**

    Plaintiffs have shown that Defendants' decision to eliminate five women's varsity sports has caused Defendants to be in gross violation of the Joint Agreement. Defendants announced their intention to eliminate five women's sports and at no point before announcing the elimination to the public did Brown reach out to Plaintiffs' class counsel to discuss the ramifications of this decision or try come to an agreement. Plaintiffs ask the Court to enforce the Joint Agreement and prevent Defendants from depriving the women at Brown of the rights they have under the Joint Agreement and Title IX.

    Defendants knew that these eliminations would trigger the need to be within 2.25% participation gap under the Joint Agreement, as evidenced by notice to class counsel and President Paxson's statements that the school needed to ensure it remained in compliance. President Paxson went on to further acknowledge that reinstating the men's track, field, and cross county teams

29

would mean the university was not in compliance with the Joint Agreement. However, despite acknowledging these facts, Defendants moved forward with their decision to eliminate five women's teams and reinstate these men's teams.

Defendants are out of compliance with the Joint Agreement and offer nothing more than prospective promises of a varsity sailing program to try and argue that they are in compliance. Promises cannot take the place of concrete women's athlete participation opportunities under either the Joint Agreement or the law. The varsity sailing program does not exist and therefore cannot be the basis for compliance. Moreover, Defendants cannot be permitted to rely on projections which it itself premised on counting the same 25 women twice, especially where Brown considers the men's component of the team fully stocked at 10. While Plaintiffs are always in favor of adding athletic opportunities for women at Brown—especially since women continue to be the underrepresented gender at Brown even with a judgment in place requiring specific compliance with Title IX—these new prospective opportunities cannot come at the expense of established teams with women with the interest and ability to compete at the college level.

Plaintiffs file this motion for immediate relief because Brown's decision to eliminate the five women's varsity teams threatens to harm the teams in ways the Court would not be able to rectify with a later order of restoration, should Brown's plans not come to fruition. These harms include, among other injuries, loss of coaching staff (who may obtain other employment), cessation of recruiting activities (to maintain viable team participants), and removal of these teams from intercollegiate conference and post-season schedules (which may not be remediable once the schedules have been announced). Plaintiffs therefore seek expedited consideration of this motion, including re-assignment to a judge sitting in the District of Rhode Island, issuance of an order

prohibiting implementation of the announced team eliminations, expedited discovery, and a prompt hearing on Plaintiffs' motion.

Respectfully Submitted,

 /s/ Lynette Labinger_____
Lynette Labinger #1645
128 Dorrance St., Box 710
(401) 465-9565
Providence, RI 02903
ll@labingerlaw.com

Cooperating counsel,
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF RHODE ISLAND and
PUBLIC JUSTICE

Arthur H. Bryant
Bailey & Glasser, LLP
1999 Harrison Street
Suite 660
Oakland, CA 94612
510-507-9972
abryant@baileyglasser.com

Leslie Brueckner
Public Justice, P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8205
lbrueckner@publicjustice.net

(To be admitted pro hac vice)
NEWKIRK ZWAGERMAN, P.L.C.
Jill Zwagerman, AT0000324
Lori Bullock AT0012240
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
Email: jzwagerman@newkirklaw.com
Email: lbullock@newkirklaw.com

CERTIFICATION

I hereby certify that on June 29, 2020, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record and was further sent by email to the following counsel for defendants:

Robert C. Corrente (RCorrente@whelancorrente.com)
Eileen Goldgeier (eileen_goldgeier@brown.edu)
James Green (JMGreen@brown.edu)

   /s/ Lynette Labinger
Lynette Labinger          #1645