UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AMY COHEN, et. al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 92-0197-T |
| | ) | |
| BROWN UNIVERSITY, | ) | |
| VARTAN GREGORIAN and | ) | |
| DAVID ROACH, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT AGREEMENT

This Agreement is made between Plaintiffs and Defendants, Brown University, and

E. Gordon Gee (successor to defendant Vartan Gregorian) and David Roach, each in their

official capacity (collectively referred to as "Brown").

WHEREAS this matter is currently before the Court subject to the Court of Appeals

for the First Circuit's Order reversing the District Court judgment in part and remanding to

this Court for the purpose of Brown submitting its plan for compliance; and

WHEREAS Brown submitted a Proposed Compliance Plan to which Plaintiffs

objected; and

WHEREAS Brown has developed an Amended Proposed Compliance Plan, a copy

of which is attached hereto as Exhibit A, which sets forth the criteria and methodology

utilized by Brown in formulating its plan to achieve compliance and the specific steps

Brown currently intends to implement to achieve compliance; and

1

**Exhibit A**

WHEREAS plaintiffs have not agreed to or endorsed the criteria, methodology, or steps set forth in the Amended Proposed Compliance Plan attached hereto, but do not object to Brown's implementation of that Plan to the extent that it is consistent with the terms of this Agreement; and

WHEREAS the parties recognize that having the Court consider Brown's Amended Proposed Compliance Plan may result in uncertainty with respect to the outcome of such consideration; and

WHEREAS the parties have reached this Agreement, which will, if approved by the Court, eliminate the uncertainty inherent in further formal proceedings; and

WHEREAS, in light of the fact that this matter has been certified as a class action, the parties believe it is appropriate and necessary that the Court approve of any agreement between the parties and provide notice to the class of such proposal;

NOW THEREFORE, in consideration of the mutual premises and covenants contained herein, it is agreed as follows:

I.    GENERAL PROVISIONS

    A.    This Agreement shall be binding on the parties hereto as well as their successors, as the case may be, only if approved by the Court as set forth herein, provided, however, that Brown shall implement the terms set forth herein during the pendency of the Court's consideration of the Joint Motion to Approve this Agreement.

    B.    This Agreement shall be without prejudice to either party's position with respect to attorney's fees and costs in connection with this litigation.

2

**Exhibit A**

C.   The parties shall jointly move to have the Court approve this Agreement and enter an appropriate Order.

D.   This Agreement resolves all issues remaining in this suit except for attorneys' fees and costs.

E.   This Agreement, if approved by the Court, is indefinite in duration as to those provisions concerning measurement of participation rates by applicable percentages (proportionality) and is not subject to revision or modification except as follows:

1.   By agreement of the parties, approved by the Court in accordance with the provisions of Rule 23, Fed.R.Civ.P.;

2.   After June 30, 2002, in the event of a determination by the Court, upon application for review by defendants or plaintiffs, that the United States Supreme Court, the First Circuit Court of Appeals, Congress, or the controlling regulatory agency has changed or clarified the law such that compliance with Title IX is not measured with reference to a comparison of the proportion of athletes of one gender and the undergraduate proportion of that gender, or that the proportion necessary to establish compliance with Title IX is significantly different (greater or lesser) than the percentage variances permitted by this Agreement.

F.   Those provisions of this Agreement requiring Brown to take, or refrain from taking, specific actions within the period of 1998-99 through June 30, 2002,

**Exhibit A**

shall not be affected by a change in the law as set forth above.

G.    Nothing in this Agreement shall prevent members of the plaintiff class participating on university-funded teams from challenging the adequacy of Brown's treatment of women participants in its intercollegiate athletic program, even though on a program-wide basis, participation rates for men and women are within the applicable percentage of undergraduate enrollment of men and women for the subject academic year.  Commencing July 1, 2001 (July 1, 2002 as to participants on women's gymnastics), nothing in this Agreement shall prevent members of the plaintiff class participating on donor-funded teams from challenging the adequacy of Brown's treatment of women participants in its intercollegiate athletic program, even though on a program-wide basis, participation rates for men and women are within the applicable percentage of undergraduate enrollment of men and women for the subject academic year.

H.    Nothing in this Agreement shall be construed as requiring or permitting any Brown coach, administrator, staff member, or student athlete to violate any provision of NCAA legislation, Ivy League rules or other applicable rules or regulations.

II. BROWN'S INTERCOLLEGIATE ATHLETIC PROGRAM.

A.    Brown's intercollegiate athletic program, as that term is used in this Agreement consists of teams which are "donor-funded" and teams which are "university-funded." Within those two terms, Brown offers teams for women,

4

**Exhibit A**

men, and co-ed teams.  Except as specifically provided herein, nothing in this Agreement is intended, nor should it be construed, to alter or to require Brown to alter, the attributes of donor-funded and/or university-funded teams.

B.    <u>University-funded teams for women.</u>   For the academic years 1998-99, 1999-2000 and 2000-2001, Brown will continue to offer the following university-funded teams for women:

1.    basketball
2.    crew (novice and varsity)
3.    cross-country
4.    field hockey
5.    ice hockey
6.    lacrosse
7.    soccer
8.    softball
9.    squash
10.   swimming and diving
11.   tennis
12.   track, including winter (indoor) and spring (outdoor) seasons
13.   volleyball

C.    <u>University-funded teams for men.</u>  For the academic year 1998-99, Brown will continue to offer the following university-funded teams for men:

1.    basketball
2.    baseball
3.    crew (freshman and varsity)
4.    cross-country
5.    football
6.    ice hockey
7.    lacrosse
8.    soccer
9.    swimming and diving
10.   tennis
11.   track, including winter (indoor) and spring (outdoor) seasons

5

**Exhibit A**

12. wrestling

D. <u>Donor-funded teams for women.</u> During the academic years 1998-99, 1999-2000 and 2000-2001, Brown will offer the following donor-funded teams for women:

1. fencing
2. gymnastics
3. skiing
4. water polo

E. During the academic year 2001-2002, Brown's intercollegiate athletic program will continue to include donor-funded women's gymnastics.

F. <u>Donor-funded teams for men.</u> During the academic year 1998-99, Brown will continue to offer the following donor-funded teams for men:

1. fencing
2. squash
3. water polo

G. <u>Donor-funded co-ed teams.</u> During the academic years 1998-99, 1999-2000 and 2000-2001, Brown will continue to offer the following co-ed donor-funded teams (<u>provided</u>, however, that Brown may limit participation on these teams to women during the specified time if, in Brown's discretion, such limitation is advisable):

a. equestrian
b. golf

III. PERMITTED VARIANCE IN PARTICIPATION RATIOS (PROPORTIONALITY)

A. During the academic years 1998-1999, 1999-2000 and 2000-2001:

1. Brown shall provide participation opportunities in its intercollegiate

6

**Exhibit A**

program (university-funded and donor-funded) so that the percentage of each gender participating in the program is within 3.50% of each gender's percentage in the undergraduate enrollment for the same academic year.   In the event that Brown adds any men's intercollegiate athletic team, except as provided in subparagraphs 2 and 3 below, for that year and for each year thereafter, the percentage of each gender participating in Brown's intercollegiate athletic program shall be within 2.25% of each gender's percentage in the undergraduate enrollment for the same academic year.

2.     Brown will not add any men's team at the university-funded level or change the status of any men's team to the university-funded status unless the following conditions are met:

a.     If Brown adds a men's team, or changes the status of a men's team to university-funded, Brown will at the same time, add (or change the status of) one or more women's teams to the university-funded level so as to provide a number of actual women participants on the newly established women's university-funded team(s) so that the ratio of women participants to men participants at the university-funded level at the time of the change (based upon the previous year's participation) is not less than the ratio of women participants to men participants at the university-funded level before the

7

**Exhibit A**

changes. Satisfaction of this requirement may not be accomplished by increasing the number of women participating on university-funded teams for women existing before the addition/change.

    b.    If the classification of men's skiing, fencing or water polo is changed to university-funded status, the corresponding women's team will also be changed to university-funded status.

3.    Brown will not add men's teams at the donor-funded level, except that Brown may, in its sole discretion, add a donor-funded team for men's skiing.

B.    Through and including the end of academic year 2000-2001, Brown shall continue to recruit and otherwise use its best efforts to encourage participation of women on the women's and co-ed varsity teams provided for in this Agreement, and shall take no action intended to reduce the size of any women's team nor the number of women participating on any co-ed team identified above.

C.    Unless the permitted variance in participation ratios is already 2.25%, commencing July 1, 2001, Brown shall continue to provide participation opportunities in its intercollegiate program (university-funded and donor-funded) so that the percentage of each gender participating in the program is within 3.50% of each gender's percentage in the undergraduate

8

**Exhibit A**

enrollment for the same academic year. If, however, any of the events listed in subparagraph 1 through 4 below takes place, then for that year and for each year thereafter, the percentage of each gender participating in Brown's intercollegiate athletic program shall be within 2.25% of each gender's percentage in the undergraduate enrollment for the same academic year:

1.  The elimination of intercollegiate athletic teams for women or of co-ed teams or the change of status of intercollegiate athletic teams for women or co-ed teams from the university-funded to the donor-funded level.

2.  The replacement or substitution of existing intercollegiate athletic teams for women or co-ed teams at the university- or donor-funded level.

3.  The creation of intercollegiate athletic teams for men at the university- or donor-funded level.

4.  The change of intercollegiate athletic teams for men from the donor-funded to the university-funded level.

D.  Commencing July 1, 2001, the following circumstances shall not trigger the 2.25% variance (proportionality):

1.  The addition or creation of additional intercollegiate athletic varsity or junior varsity teams for women at the university- or donor-funded level.

2.  The reclassification of men's skiing, fencing or water polo to

**Exhibit A**

university-funded status, provided that the corresponding women's team will also be changed to university-funded status.

3.  The creation of a men's skiing team at the donor-funded level.

E.  In the event that, through no fault of Brown, intercollegiate competition is not available for any women's team whose continued existence is necessary to retain the 3.50% permitted percentage variance, then Brown may apply to the Court for leave to institute a new women's team in place of and at the same level as such team or to change the status of a women's team from donor-funded to university-funded status and, subject to the Court's determination, thereby seek to retain the permissible 3.50% variance.

F.  <u>Determination of participation ratios</u>.

1.  In determining the percentage of women and men participating in the overall intercollegiate athletic program, women and men student-athletes who participate on more than one intercollegiate athletic team will be counted separately for each team on which they participate, except that, for the purposes of counting under this Agreement ( it being understood that Indoor and Outdoor Track are two separate team for NCAA, Ivy League and other purposes, and Brown will continue to report them as such), Indoor and Outdoor Track shall be counted as a single sport.

2.  An individual shall be considered to be an intercollegiate varsity athletic participant if his or her name is included as an eligible athlete

10

**Exhibit A**

on the squad list on the first day of competition of the subject academic year.

3.    An individual shall be considered to be a intercollegiate varsity athletic participant if his or her name is included on the squad list as an active (or injured) participant on the last day of regular season competition of the subject academic year.

4.    The percentage of women and men participating in the overall intercollegiate athletic program shall be determined based upon the average number of men and women derived in accordance with the two preceding paragraphs, that is, if there were 420 women on all teams as of the first day of their respective competitions and 410 women on the last day of competition of the respective teams, then the number of female athletes for purposes of the determination of relative percentage of male and female student athletes would be 415.

G.    Nothing herein shall prevent or restrict Brown from adding or creating additional varsity or junior varsity teams for women at the university- or donor-funded level, or eliminating varsity or junior varsity teams for men or changing the status of varsity teams for men from the university-funded to the donor-funded level.

H.    Brown, in order to achieve compliance with the above, may, but is not required to, impose minimum numbers of participants for varsity teams. In

11

**Exhibit A**

addition, Brown retains the right to impose maximums on men's teams and/or eliminate any men's teams.

IV.   FUNDING AND TREATMENT OF CERTAIN DONOR-FUNDED TEAMS

    A.   For the academic years 1998-99, 1999-2000 and 2000-2001 (and 2001-2002 for women's gymnastics) the following donor-funded teams shall have not less than the following budget allocations, with funding assurances as indicated in paragraph B below:

        1.   fencing (administered jointly for men and women): $25,000

        2.   women's gymnastics: $64,400

        3.   women's skiing: $23,079 (provided that this budget allocation shall not be utilized to relieve the budget obligations of men's club ski team presently provided for compensation of a coach jointly assigned to men's and women's skiing)

        4.   women's water polo: $25,000

    B.   Funding shall be assured by Brown for the teams and years specified above, up to and including any deficit which remains at the end of the year for each such team (but in no event beyond the budgeted amount), through any source Brown chooses, including donations solicited through or made through the Brown University Sports Foundation, according to the following schedule:

      •   100% during the year 1998-99;

**Exhibit A**

- 95% during the year 1999-2000; and

- 90% during the year 2000-2001.

- 90% during the year 2001-2002 as to women's gymnastics only

C.     Notwithstanding the levels of funding assurance set forth herein, in the event that all other donor-funded teams receive a higher percentage of their budget for the applicable year than as stated above, each of the said teams shall also receive that higher percentage in that year.

D.     Nothing contained herein shall be construed as relieving any student or employee of any obligation or responsibility under Brown's policies or procedure.   Women's teams will cooperate in good faith in efforts for fundraising, but lack of success will not be the basis for elimination or reclassification of such team, nor shall the same relieve Brown of its financial obligations under this Agreement during the years specified in paragraph A above.

E.     All women's donor-funded teams shall be subject to the same responsibilities and obligations and accorded the same benefits and treatment as other donor-funded teams, except that during the years 1998-1999, 1999-2000 and 2000-2001 and 2001-2002, women's gymnastics will receive the same benefits and treatment (other than financial provisions otherwise provided herein) as the team received in 1997-1998.

V.     REPORTING AND ENFORCEMENT

A.     Annual Report.  Unless and until relieved of this obligation by the Court upon

13

motion, no later than August 1 of each year , Brown shall prepare and serve upon Plaintiffs' counsel an annual report with regard to its compliance with this Agreement for the academic year just being completed. The report need not be filed with the Court in the absence of a dispute. If Plaintiffs' counsel has any comment, objection or request for consideration with regard to the report, Plaintiffs' counsel shall provide Defendants' counsel with a written statement specifically setting forth such comment, objection or request for consideration within 30 days. Within 20 days thereafter, Defendants' counsel shall respond to Plaintiffs' counsel's comment, objection or request for consideration. If any differences are not resolved or settled within 15 days of Plaintiffs' receipt of Defendants' response, either party may seek review by or relief from the Court, provided, however that neither party may seek such review or relief without the parties first having met and conferred in an effort to resolve their differences. Thereafter, either party may request expedited hearings.

B.   The report shall provide the following:

1.   For the years 1998-99, 1999-2000, and 2000-2001, year-end budget and expenditure reports (university and all gift accounts, if any) showing total amounts budgeted and expended by line item for the women's skiing, women's water polo, women's fencing and women's gymnastics teams.

2.   For the year 2001-2002, year-end budget and expenditure reports

14

**Exhibit A**

(university and all gift accounts, if any) showing total amounts budgeted and expended by line item for the women's gymnastics team.

3. Copies of official Brown team rosters (squad lists) used to determine varsity eligibility under Brown, NCAA, Ivy and/or other intercollegiate conference eligibility requirements, which copies identify with specificity the individuals included as participants on the team as of the first competition and as of the last competition of the regular competitive schedule, as well as the dates of the first competition and last competition.

4. The last available NCAA sports sponsorship form completed by Brown.

5. A list identifying all intercollegiate athletic teams added or discontinued during the preceding academic year and identifying all intercollegiate athletic teams whose status has been changed from donor-funded to university-funded or from university-funded to donor-funded, and any teams which Brown plans to change in status for the following year.

6. The number of male and female full-time undergraduate students enrolled at Brown in the preceding year.

C. In the event that Brown fails to meet the applicable permitted variance in percentage ratios as set forth in this Agreement:

15

**Exhibit A**

1. Brown shall notify counsel for the Plaintiff class no later than August 1 following the conclusion of the academic year of the failure.

2. Brown shall provide counsel for the Plaintiff class with its explanation, if any, for the failure to achieve the applicable percentage.

3. Brown shall provide counsel for the Plaintiff class with its proposal, including details concerning any mechanism for enforcement of requirements, as to how and by what date Brown proposes to remedy this failure.

4. The parties shall confer and attempt to achieve agreement as to the appropriate remedy within 30 days thereafter.

5. If the parties are able to agree, the terms of their agreement shall be reduced to writing and implemented, but their agreement need not be filed with the Court.

6. If the parties are unable to agree, the matter shall be presented to the Court for determination of the manner in which Brown shall thereafter come into compliance with the then applicable percentage variance.

D. Additional information. Brown will provide additional information reasonably requested by Plaintiffs' counsel regarding compliance with this Agreement.

E. Notwithstanding the foregoing, Plaintiffs may, in the case of an alleged gross violation of this Agreement, seek relief from the Court, provided that they have first notified Defendants of the alleged gross violation and spent a reasonable period of time meeting and conferring with Defendants in an

16

**Exhibit A**

attempt to resolve the issue.

VI.  Enforcement.  This terms of this Agreement shall be subject to the full enforcement powers of the Court by appropriate order.  The Court shall retain jurisdiction concerning interpretation, enforcement and compliance with this Agreement.

VII.  Retaliation Prohibited.  Brown agrees that there shall be no retaliation against any person for lawfully opposing practices believed to violate Title IX, for lawfully providing information, assistance or encouragement to plaintiffs or their counsel in connection with this lawsuit, or hereafter in lawfully assisting in efforts to enforce, determine or ensure compliance with the terms of this Agreement.

VIII.  Class Notice.  In accordance with Federal Rule of Civil Procedure 23(e), the parties will jointly move the Court to enter an order: (a) tentatively approving this Agreement and (b) providing for individual and publication notice to the class, the filing of objections, if any, to the Agreement, and the scheduling of a hearing to consider final approval of the Agreement.  The parties will cooperate in identifying the members of the class and drafting the language of the class notice.  Defendants will provide the notice to the class members in a form agreeable to Plaintiffs' counsel.


Lynette Labinger
RONEY & LABINGER
344 Wickenden Street
Providence, RI 02903
Telephone:  (401) 421-9794
Telecopier: (401) 421-0132

Beverly E. Ledbetter, Esq.
Brown University
103 University Hall
Providence, RI  02912
Telephone:  (401) 863-3122

17

**Exhibit A**

Arthur H. Bryant, Esq.
Executive Director
Trial Lawyers for Public Justice
1717 Massachusetts Ave., N.W., #800
Washington, D.C.  20036
Telephone:  (202) 797-8600
Telecopier: (202) 232-7203

Julius C. Michaelson
Jeffrey S. Michaelson
Michaelson,  Michaelson & Zurier
321 South Main Street
Providence, RI  02903
Telephone:  (401) 277-9300
Attorneys for Defendants

ATTORNEYS FOR DEFENDANTS

Amato A. DeLuca
DeLuca & Weizenbaum
36 Exchange Terrace
Providence, RI 02903
Telephone:  (401) 456-1500

ATTORNEYS FOR PLAINTIFFS


Approved:

_____                    Date:_____
Ernest Torres, U.S.D.J.

18

**Exhibit A**

Ex. A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

*JUN 24 1998*
*RECEIVED*

| | |
|---|---|
| AMY COHEN, et. al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BROWN UNIVERSITY, | ) |
| VARTAN GREGORIAN and | ) |
| DAVID ROACH, | ) |
| | ) |
| Defendants. | ) |

C.A. No.  92-0197-T

## BROWN UNIVERSITY'S AMENDED PROPOSED COMPLIANCE PLAN[1]

## I. INTRODUCTION

This Compliance Plan is submitted by Brown University in accordance with the Mandate of the Court of Appeals for the First Circuit and the Order of the District Court entered February 24, 1997.

## BROWN'S CRITERIA

The Compliance Plan is fashioned with consideration for the longstanding guiding principles which Brown has incorporated in its athletics programs, and these principles represent Brown's institutional preferences and priorities, which include the following:

- Since Brown's current lineup of intercollegiate teams is principally the result of historical development of teams based upon student interest and ability, and reflects investment of University resources, development of donor support and fosters strong alumni loyalty and support, it is Brown's desire to avoid eliminating any existing teams which continue to meet the minimum requirements for operation within the University's priorities.

---

1  This Amended Proposed Compliance Plan is submitted only in conjunction with, and subject to approval of, the Joint Agreement which is filed simultaneously with this document.  This Amended Proposed Compliance Plan addresses major concerns of the Plaintiffs regarding viability of Donor-funded teams and a major concern of the Defendants regarding proportionality.

**Exhibit A**

- Offer the maximum number of opportunities to participate in intercollegiate competition within the practical limits of facilities and budgets and with regard to the availability of competition within the Ivy League and within practical geographic limits.

- Add no additional sports which would further distress already overtaxed facilities, taking into consideration the intramural, physical education and recreational needs of the entire University Community.

- Attempt to maintain matched sports in the same funding category if possible.

- In light of the number of intercollegiate teams currently offered, which are approximately double the national average, comply with Court requirements through Prong One or Prong Two[2] to the extent possible.

- Offer new intercollegiate competition only to those teams which demonstrate increasing interest, sustained and sustainable ability to attract suitable numbers of athletes, demonstrated fundraising abilities, and appropriate competitive opportunities.

- Given the expense of maintaining University-funded status, those teams which repeatedly fail to achieve minimum team sizes will be reclassified to Donor-funded status until such time as they reestablish stability at a level justifying University-funded status. Donor-funded teams which are unable to achieve participation within minimums or fundraising ability will be subject to reclassification as Club teams.

---

[2] As both the District Court and the Court of Appeals have noted, Brown's program was marked by explosive growth in women's sports in the 1970's, which made the Court's interpretation of Prong Two as requiring continuous, slow growth impractical for Brown and inconsistent with Brown's commitment to women's sports.

Nevertheless, the number of women participating in Brown's intercollegiate athletics has continued to grow as existing women's teams attract greater numbers of athletes. This growth is a positive reflection on Brown's commitment to women's athletics as it affects Brown's ability to attract, through recruited and non-recruited athletes, greater numbers of participants on existing teams.

Ironically, Brown's commitment to women, in such programs as the WISE (Women In Science And Engineering) program, which specifically seeks to increase women's participation in those studies, as well as the attractiveness of the entire Brown experience to women, have combined to increase the undergraduate percentage of women, with the result that Brown is now forced to mirror that growth in its intercollegiate athletics program.

2

**Exhibit A**

Brown is desirous of submitting a plan of its own devise which is both satisfactory to the Court and consistent with Brown's academic freedom, within its economic limitations and consistent with its own priorities, academic and athletic.[3]

### THE COURT'S CRITERIA

This Compliance Plan seeks to achieve compliance with the District Court's March 29, 1995 decision, reported at 879 F.Supp. 185(D.R.I. 1995), within the guidelines set forth in the District Court's August 17, 1995. The District Court's findings include:

- "Brown may achieve compliance ... [by] demot[ing] or eliminat[ing] the requisite number of men's positions...." March 29, 1995 Opinion, p. 67.

- Title IX compliance can be achieved by a program where "intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." (Quoting Prong One).

- Under the District Court's Prong One analysis, the ratio of male and female student-athletes must "mirror[] the student enrollment as closely as possible." March 29, 1995 Opinion, at 37.

## II.  OVERVIEW OF COMPLIANCE PLAN

Through a combination of significant and substantial increases in the intercollegiate participation of women at Brown, as noted in Brown's evidence and Post-Hearing Memorandum, and experience in imposing maximum squad sizes on men's teams, Brown has determined that, under the conditions stated in this Plan, and within the requirements imposed by the Court, Prong One compliance remains possible without having to entirely eliminate men's teams or having to create additional University-funded varsity teams.

The Compliance Plan achieves compliance with Prong One by:

---

[3] Brown has consistently expressed, and continues to express that limitations on facilities and funds make it impractical and inconsistent with Brown's overall priorities to create new varsity teams as the University-funded level.

3

**Exhibit A**

- eliminating men's positions without eliminating any men's teams.

- enforcing team minimums and maximums to stabilize relative proportions of men and women.

- creating additional women's intercollegiate opportunities consistent with both the District Court's analysis and Brown's physical and budgetary limitations. This Compliance Plan offers Brown's students, athletes and non-athletes, the broadest possible educational/athletic offering and retains continuity in Brown's sports program and its tradition of offering the broadest possible range of sports within the limits of facility and budgetary constraints.[4]

The Compliance Plan results in intercollegiate participation on University-Funded and Donor-Funded teams which result in each gender's percentage participation in varsity athletics being within a specified percentage, as discussed _infra_, of that gender's percentage within the undergraduate student population as a whole.

## COMPLIANCE PLAN METHODOLOGY

The Compliance Plan uses the following methodology:[5]

Step 1:  Count the number of women who participated in a given academic year on Varsity teams, using the following methodology:[6]

1.      In determining the percentage of women and men participating in the overall intercollegiate athletic program, women and men student-athletes who participate on more than one intercollegiate athletic team will be counted separately for each team on which they participate, except that, for the purposes of counting under this Plan

---

[4] In this respect, Brown has maintained, and continues to maintain, that its facilities, while clearly outstanding, are severely strained given the demands of recreational, physical education, intramural, club and varsity programs. Under these circumstances, Brown has virtually nowhere left to grow, with the exception of specialized, exclusive use facilities, such as the Marston Boathouse, which are not subject to competing demands.

[5] The chosen methodology lends itself to annual recalculation, and Brown anticipates that it will be employed annually in order to maintain compliance with the District Court's analysis of Prong One so long as Brown remains bound by that analysis.

[6] Brown will continue to promulgate and enforce rules which will ensure that Women's teams attract and support athletes. These minimum requirements are consistent with proven past capacity of women's teams, barring circumstances justifying such increased minimums.

4

**Exhibit A**

( it being understood that Indoor and Outdoor Track are two separate team for NCAA, Ivy League and other purposes, and Brown will continue to report them as such), Indoor and Outdoor Track shall be counted as a single sport.

2.  An individual shall be considered to be an intercollegiate varsity athletic participant if his or her name is included as an eligible athlete on the squad list on the first day of competition of the subject academic year.

3.  An individual shall be considered to be a intercollegiate varsity athletic participant if his or her name is included on the squad list as an active (or injured) participant on the last day of regular season competition of the subject academic year.

4.  The percentage of women and men participating in the overall intercollegiate athletic program shall be determined based upon the average number of men and women derived in accordance with the two preceding paragraphs, that is, if there were 420 women on all teams as of the first day of their respective competitions and 410 women on the last day of competition of the respective teams, then the number of female athletes for purposes of the determination of relative percentage of male and female student athletes would be 415.

<u>Step 2</u>: Ascertain whether there is any reasonable basis to conclude that those participation numbers will differ significantly in the next academic year, and, if so, adjust the number derived in Step One;

<u>Step 3</u>: Calculate ratio of men to women in current academic year's undergraduate student body;

<u>Step 4</u>: Determine number of athletes of each gender which will result in gender ratio of student-athletes being exactly proportionate to undergraduate student body ratio, according to the following formula:

$$\frac{\text{\# of female athletes}}{\text{\# of male athletes}} = \frac{\text{\% of female undergraduates}}{\text{\% of male undergraduates}}$$

In applying the formula, where one gender has, under this Plan, been subject to maximum roster sizes, all values except the number of athletes of that gender are known, and the formula is solved to render the number of athletes of that gender which would achieve exact proportionality; and

<u>Step 5</u>: The number of athletes permitted of any gender subject to maximum roster sizes in the preceding year is allocated among those teams which Brown determines it will field in the following academic year, giving consideration to the needs of each team, as they may be

5

**Exhibit A**

determined to exist by Brown, as well as reasonable expectations concerning the number of athletes of that gender expected to seek to participate on such teams such that the relative participation ratios for men and women may reasonably be expected to be within the percentage variance set forth in the Plan. The maximums derived under the Plan, if any, shall reflect, to the extent feasible in Brown's judgment, the selection of existing sports, the interest historically shown in those sports and the desire to offer athletic opportunity to student-athletes to the maximum extent possible within the limits set by the Court. The maximum derived herein shall be enforced as of the first day of competition. In the event that participation as of the first day of competition is or is reasonably expected to be substantially different than expected for either gender under this Plan, adjustments to maximums may be made for the purpose of either permitting increased participation for either gender or decreasing participation for either gender so as to maintain gender proportions within the limits set forth in this Plan.

## III.   APPLICATION OF COMPLIANCE PLAN

Step One: Following are 1997-1998 actual female participation figures as calculated from Squad Lists on the first day of competition and 1997-1998 minimums:

6

**Exhibit A**

| WOMEN'S 1997-1998 PARTICIPATION | | WOMEN'S 1997-1998 MINIMUMS | |
|---|---|---|---|
| University-funded | | University-funded | |
| Basketball: | 14 | Basketball: | 16 |
| Crew: | 57 | Crew: | 55 |
| Cross-Country: | 26 | Cross-Country: | 25 |
| Field Hockey: | 32 | Field Hockey: | 36 |
| Gymnastics: | 18 | Gymnastics: | 16 |
| Ice Hockey: | 19 | Ice Hockey: | 22 |
| Lacrosse: | 29 | Lacrosse: | 32 |
| Soccer: | 27 | Soccer: | 26 |
| Softball: | 17 | Softball: | 20 |
| Squash: | 17 | Squash: | 17 |
| Swimming: | 28 | Swimming: | 28 |
| Tennis: | 11 | Tennis: | 11 |
| Track: | 53 | Track: | 50 |
| Volleyball: | 26 | Volleyball: | 18 |
| | | | |
| Donor-funded | | Donor-funded | |
| Equestrian: | 27 | Equestrian: | 26 |
| Fencing: | 15 | Fencing: | 15 |
| Skiing: | 15 | Skiing: | 15 |
| Golf: | 8 | Golf: | 5 |
| | | | |
| **Total women varsity:** | **439** | | |

Step Two:  The anticipated participation for women in the 1998-1999 academic year is expected to differ from the 1997-1998 participation in the following respects:

- Women's Lightweight Crew was added as a Varsity division to the Women's Crew Team. This is an emerging sport which offers the opportunity for new athletes to compete at the varsity level in regular season competition. Based upon the needs of a team, the experience Brown has in recruiting women's Crew teams, the experience Brown has had in recruiting for a Lightweight Division during the 1997-1998 year, the experience of other institutions which have sponsored Women's Lightweight Crew teams, expected participation in this division for 1998-1999 is 15 women;

- Women's Water Polo will be changed to a Donor-Funded Varsity team. Participation is expected to be at least 16 women;

7

**Exhibit A**

■    Given the stringent requirement that participation numbers be within the
     variance set forth in this Plan, minimum and maximum participation numbers
     will be strictly enforced during the entire season.   Based upon previous
     experience, it is clear that many coaches are able to exceed their minimums.
     However, certain coaches have failed to meet their minimums for reasons
     beyond the control of the University.  Therefore, minimum roster sizes will be
     adjusted/imposed (subject to modification at Brown's discretion if
     circumstances warrant) and enforced as follows:

## 1998-1999 MINIMUM ROSTER SIZES FOR WOMEN'S TEAMS

### University-funded

| | |
|---|---|
| Basketball: | 16 |
| Crew (incl. L/W): | 60 |
| Cross-Country: | 25 |
| Field Hockey: | 36 |
| Ice Hockey: | 22 |
| Lacrosse: | 32 |
| Soccer: | 26 |
| Softball: | 20 |
| Squash: | 17 |
| Swimming: | 28 |
| Tennis: | 11 |
| Track: | 50 |
| Volleyball: | 18 |

### Donor-funded

| | |
|---|---|
| Equestrian: | 26 |
| Fencing: | 15 |
| Gymnastics: | 16 |
| Skiing: | 15 |
| Water Polo: | 16 |
| Golf: | 5 |

---

**Minimum women
varsity:**          **454**

8

**Exhibit A**

- Experience during 1997-1998 reveals that minimums for women may not be met in every case, but that, overall, female participation will meet the total of the minimums. In 1997-1998, the total of women's minimums was 438 (which did not include Women's Water Polo), and the participation on those teams was 439.

- Given the strict limits under this Plan, minimums will be strictly enforced under this Compliance Plan during the entire season.

- Anticipated participation for any gender in a given year will consider the experience of the previous year as well as reasonably anticipated factors which may affect such anticipated participation. For purposes of this Compliance Plan, Brown assumes that the number of women athletes participating in excess of the minimums will be the same (although not necessarily on the same teams) as the number of actual participants in the previous year unless circumstances exist which make such expectation unreasonable.

Step Three: According to figures obtained from the Registrar, the undergraduate student body gender ratio for the 1997-1998 academic year was 46.70% male and 53.30% female.

Step Four: Apply formula:

$$\frac{\text{\# of female athletes}}{\text{\# of male athletes}} = \frac{\text{\% of female undergraduates}}{\text{\% of male undergraduates}}$$

which is calculated as follows:

$$\frac{455}{\text{\# of male athletes}} = \frac{53.30}{46.70}$$

and renders the following: # of male athletes = 399, which is the number of male athletes which would result in exact proportionality.

Step Five: Brown imposes the following maximum and minimum roster sizes on men's teams:[7]

---

[7] Because the Women's and Men's Track teams share coaching, and because the Coach would, permit essentially unlimited membership, the maximum number of men will be increased by one man for each two women by which the Women's Track team exceeds its minimum. This would apply to

(continued...)

9

**Exhibit A**

| MEN'S MAXIMUMS | | MEN'S MINIMUMS | |
|---|---|---|---|
| **University-Funded** | | **University-Funded** | |
| Baseball: | 26 | Baseball: | 20 |
| Basketball: | 16 | Basketball: | 14 |
| Crew: | 46 | Crew: | 45 |
| Cross-Country: | 20 | Cross-Country: | 18 |
| Football: | 99 | Football: | 85 |
| Ice Hockey: | 33 | Ice Hockey: | 25 |
| Lacrosse: | 39 | Lacrosse: | 32 |
| Soccer: | 26 | Soccer: | 24 |
| Swimming: | 22 | Swimming: | 16 |
| Tennis: | 10 | Tennis: | 9 |
| Track: | 50 | Track: | 40 |
| Wrestling: | 30 | Wrestling: | 20 |
| **Donor-funded** | | **Donor-funded** | |
| Equestrian | 2 | Equestrian | 0 |
| Fencing: | 15 | Fencing: | 10 |
| Golf: | 10 | Golf: | 5 |
| Squash: | 10 | Squash: | 8 |
| Water Polo: | 16 | Water Polo: | 14 |
| **Maximum men varsity:** | **470** | **Minimum men varsity:** | **385** |

■   Experience during the 1996-1997 and 1997-1998 academic year with the application of team maximums reveals that, program-wide, it can be anticipated that the total number of participants will be less than the total maximum number of athletes permitted, but it cannot be anticipated on which specific teams those shortfalls will occur. For example, in 1996-1997, while the maximum number of Men's University-Funded Athletes was 417,[8] the actual participation number on those teams was 384, which renders an expected participation rate of not more than 92.1% of total

---

(...continued)
both Cross-country and Indoor/Outdoor Track. A similar rule would apply to Men's Fencing and Swimming, which also share coaching with the matched Women's teams.

8  Men's Cross-country' 1996-1997 maximum was increased to 22 based upon increased women's participation.

**Exhibit A**

permitted maximums.  In 1997-98, the total maximum permitted was 468, and actual participation was 419, or 89.5% of total permitted maximums.

- ■   Based upon this experience, Brown assumes that the percentage of men participating in 1998-1999 will be 92.5% of 470, or 435.

**Assuming a program which has 435 male participants and 455 women, the relative percentages of men and women would be 48.9% male and 51.1% female.  The 1997-1998 undergraduate population, as noted above, was 46.2% male to 53.8% female ratio of the undergraduate student body.**

## IV.  BROWN'S INTERCOLLEGIATE ATHLETIC PROGRAM.

A.   Brown's intercollegiate athletic program consists of teams which are "donor-funded" and teams which are "university-funded."  Within those two terms, Brown offers teams for women, men, and co-ed teams.

B.   University-funded teams for women.   For the academic years 1998-99, 1999-2000 and 2000-2001, Brown will continue to offer the following university-funded teams for women:

1.   basketball
2.   crew (novice and varsity)
3.   cross-country
4.   field hockey
5.   ice hockey
6.   lacrosse
7.   soccer
8.   softball
9.   squash
10.   swimming and diving
11.   tennis
12.   track, including winter (indoor) and spring (outdoor) seasons
13.   volleyball

C.   University-funded teams for men.   For the academic year 1998-99, Brown will continue to offer the following university-funded teams for men:

1.   basketball
2.   baseball
3.   crew (freshman and varsity)
4.   cross-country
5.   football

11

**Exhibit A**

6. ice hockey
7. lacrosse
8. soccer
9. swimming and diving
10. tennis
11. track, including winter (indoor) and spring (outdoor) seasons
12. wrestling

D. <u>Donor-funded teams for women.</u> During the academic years 1998-99, 1999-2000 and 2000-2001, Brown will offer the following donor-funded teams for women:

1. fencing
2. gymnastics
3. skiing
4. water polo

E. During the academic year 2001-2002, Brown's intercollegiate athletic program will continue to include donor-funded women's gymnastics.

F. <u>Donor-funded teams for men.</u> During the academic year 1998-99, Brown will continue to offer the following donor-funded teams for men:

1. fencing
2. squash
3. water polo

G. <u>Donor-funded co-ed teams.</u> During the academic years 1998-99, 1999-2000 and 2000-2001, Brown will continue to offer the following co-ed donor-funded teams (<u>provided,</u> however, that Brown may limit participation on these teams to women during the specified time if, in Brown's discretion, such limitation is advisable):

1. equestrian
2. golf

## V. PERMITTED VARIANCE IN PARTICIPATION RATIOS (PROPORTIONALITY)

A. During the academic years 1998-1999, 1999-2000 and 2000-2001:

1. Brown shall provide participation opportunities in its intercollegiate program (university-funded and donor-funded) so that the percentage of each gender participating in the program is within 3.50% of each gender's percentage in the undergraduate enrollment for the same academic year. In the event that Brown adds any men's intercollegiate athletic team, except as provided in

12

**Exhibit A**

subparagraphs 2 and 3 below, for that year and for each year thereafter, the percentage of each gender participating in Brown's intercollegiate athletic program shall be within 2.25% of each gender's percentage in the undergraduate enrollment for the same academic year.

2. Brown will not add any men's team at the university-funded level or change the status of any men's team to the university-funded status unless the following conditions are met:

   a. If Brown adds a men's team, or changes the status of a men's team to university-funded, Brown will at the same time, add (or change the status of) one or more women's teams to the university-funded level so as to provide a number of actual women participants on the newly established women's university-funded team(s) so that the ratio of women participants to men participants at the university-funded level at the time of the change (based upon the previous year's participation) is not less than the ratio of women participants to men participants at the university-funded level before the changes. Satisfaction of this requirement may not be accomplished by increasing the number of women participating on university-funded teams for women existing before the addition/change.

   b. If the classification of men's skiing, fencing or water polo is changed to university-funded status, the corresponding women's team will also be changed to university-funded status.

3. Brown will not add men's teams at the donor-funded level, except that Brown may, in its sole discretion, add a donor-funded team for men's skiing.

B. Through and including the end of academic year 2000-2001, Brown shall continue to recruit and otherwise use its best efforts to encourage participation of women on the women's and co-ed varsity teams provided for in this Plan, and shall take no action intended to reduce the size of any women's team nor the number of women participating on any co-ed team identified above.

C. Unless the permitted variance in participation ratios is already 2.25%, commencing July 1, 2001, Brown shall continue to provide participation opportunities in its intercollegiate program (university-funded and donor-funded) so that the percentage of each gender participating in the program is within 3.50% of each gender's percentage in the undergraduate enrollment for the same academic year. If, however, any of the events listed in subparagraph 1 through 4 below takes place, then for that year and for each year thereafter, the percentage of each gender participating in

**Exhibit A**

Brown's intercollegiate athletic program shall be within 2.25% of each gender's percentage in the undergraduate enrollment for the same academic year:

1.  The elimination of intercollegiate athletic teams for women or of co-ed teams or the change of status of intercollegiate athletic teams for women or co-ed teams from the university-funded to the donor-funded level.

2.  The replacement or substitution of existing intercollegiate athletic teams for women or co-ed teams at the university- or donor-funded level.

3.  The creation of intercollegiate athletic teams for men at the university- or donor-funded level.

4.  The change of intercollegiate athletic teams for men from the donor-funded to the university-funded level.

D.  Commencing July 1, 2001, the following circumstances shall not trigger the 2.25% variance (proportionality):

1.  The addition or creation of additional intercollegiate athletic varsity or junior varsity teams for women at the university- or donor-funded level.

2.  The reclassification of men's skiing, fencing or water polo to university-funded status, provided that the corresponding women's team will also be changed to university-funded status.

3.  The creation of a men's skiing team at the donor-funded level.

## VI. FUNDING AND TREATMENT OF CERTAIN DONOR-FUNDED TEAMS

A.  For the academic years 1998-99, 1999-2000 and 2000-2001 (and 2001-2002 for women's gymnastics) the following donor-funded teams shall have not less than the following budget allocations, with funding assurances as indicated in paragraph B below:

1.  fencing (administered jointly for men and women): $25,000
2.  women's gymnastics: $64,400
3.  women's skiing: $23,079 (provided that this budget allocation shall not be utilized to relieve the budget obligations of men's club ski team presently provided for compensation of a coach jointly assigned to men's and women's skiing)
4.  women's water polo: $25,000

14

**Exhibit A**

B.    Funding shall be assured by Brown for the teams and years specified above, up to and including any deficit which remains at the end of the year for each such team (but in no event beyond the budgeted amount), through any source Brown chooses, including donations solicited through or made through the Brown University Sports Foundation, according to the following schedule:

- 100% during the year 1998-99;
- 95% during the year 1999-2000; and
- 90% during the year 2000-2001.
- 90% during the year 2001-2002 as to women's gymnastics only

C.    Notwithstanding the levels of funding assurance set forth herein, in the event that all other donor-funded teams receive a higher percentage of their budget for the applicable year than as stated above, each of the said teams shall also receive that higher percentage in that year.

D.    Nothing contained herein shall be construed as relieving any student or employee of any obligation or responsibility under Brown's policies or procedure. Women's teams will cooperate in good faith in efforts for fundraising, but lack of success will not be the basis for elimination or reclassification of such team, nor shall the same relieve Brown of its financial obligations under this Plan during the years specified in paragraph A above.

E.    All women's donor-funded teams shall be subject to the same responsibilities and obligations and accorded the same benefits and treatment as other donor-funded teams, except that during the years 1998-1999, 1999-2000 and 2000-2001 and 2001-2002, women's gymnastics will receive the same benefits and treatment (other than financial provisions otherwise provided herein) as the team received in 1997-1998.

## IV. CONCLUDING REMARKS

Brown has exerted its best good faith efforts to propose a Compliance Plan which comports with the District Court's analysis. It has never been Brown's desire to deny opportunities to any student-athlete with the ability and interest to compete intercollegiately. In fact, the genesis of this suit was Brown's decision, based upon budgetary constraints, to change the funding status of four teams, two men's and two women's, without eliminating the opportunity for Brown students to compete in the affected sports.

15

**Exhibit A**

The Compliance Plan is as consistent with that philosophy as Brown believes that the District Court's analysis permits. Brown takes no comfort in proposing this Compliance Plan, which denies participation to many interested and able student-athletes, but, as between the 'rock' of the District Court's analysis and the 'hard place' of the financial reality of running a University, Brown has proposed a plan which, among distasteful alternatives, is the least distasteful.

Respectfully submitted,
Brown University, by its attorneys,

Date: 6/23/98

Jeffrey S. Michaelson
MICHAELSON, MICHAELSON & ZURIER
321 South Main Street
Providence, R.I. 02903
(401)277-9300
(fax)331-2945

Beverly E. Ledbetter
General Counsel
103 University Hall
Brown University
Providence, R.I. 02912

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing document to be mailed, by first class mail, postage prepaid, to the following attorneys of record on the 23 day of June , 1998:

Lynette Labinger
Roney & Labinger
344 Wickenden Street
Providence, RI  02903

Amato A. DeLuca
DeLuca & Weizenbaum
36 Exchange Terrace
Providence, RI  02903

16

**Exhibit A**



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

OCT 17 1998
RECEIVED

RECEIVED

OCT 09 1998

CLERK
U.S. DISTRICT
DISTRICT OF R.I.

AMY COHEN, et al., each individually and on behalf
of all others similarly situated,
        **Plaintiffs**

    v.

BROWN UNIVERSITY, et al.,
        **Defendants**

:
:
:
:   C.A. No. 92-197-T
:
:
:

## JUDGMENT

This matter came on for hearing on October 8, 1998, before the Hon. Ernest

Torres, United States District Judge, on the joint motion of the parties' to give final

approval to the Joint Agreement of the parties preliminarily approved on June 23,

1998, and after having given notice to the plaintiff class and opportunity to submit

objections or otherwise be heard, it is hereby

### O R D E R E D:

1.    The Court approves the Joint Agreement of the parties of June 23, 1998 and

enters the same as the Order of the Court in accordance with the provisions set forth

therein.

2.    In accordance with Rule 54(d)(1) and (d)(2)(B), Fed.R.Civ.P., the Court extends

the time for filing of any further motion for the award of attorneys' fees or application

for costs by plaintiffs, and directs the following schedule to determine plaintiffs'

previously filed and outstanding requests for the award of attorneys' fees and costs:

if the parties are unable to resolve the issue by November 8, 1998, then plaintiffs shall

C:\WP51\DOCS\COHEN\DRI\JJMT-FEE.ORD

**Exhibit A**

have to and including December 8, 1998 within which to file a preliminary request for the award of attorneys' fees and costs, to include any further or supplemental motion, a statement of the amounts sought and a brief summary of the basis therefor; and plaintiffs shall have to and including January 11, 1999 within which to file affidavits, memorandum and other materials in support of plaintiffs' application for the award of attorneys' fees and costs.

ENTERED as the Order of the Court this __15th__ day of __October__, 1998.

By Order,

_____
Clerk

Enter: _____
U.S. District Judge

## CERTIFICATION

I hereby certify that I caused the within document to be served by telecopier upon Julius C. and Jeffrey Michaelson, Michaelson & Michaelson, 321 South Main Street, Providence, RI 02903; and Beverly E. Ledbetter, Brown University, 103 University Hall, Providence, RI 02912 on this the __8th__ day of October, 1998.

_____

C:\WP51\DOCS\COHEN\DRI\JJMT-FEE.ORD

**Exhibit A**