# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMY COHEN, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CHRISTINA PAXSON, *as successor to* VARTAN GREGORIAN, and JACK HAYES, *as successor to* DAVID ROACH,<br><br>*Defendants.* | Case No. 92-cv- 0197 |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXPEDITE

Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
David Shieh
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
dshieh@kaplanhecker.com

Robert C. Corrente
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
401.270.1333
rcorrente@whelancorrente.com

July 9, 2020

On June 29, 2020, Plaintiffs filed a Motion to Enforce Judgment, to Adjudge in Contempt, and for Emergency Relief (ECF 357, the "Emergency Motion"). This Court held a conference on July 2, 2020 and issued an order later that same day directing Defendants Brown University ("Brown" or the "University"), Brown President Christina Paxson, and Brown Athletics Director Jack Hayes to submit a proposed briefing schedule for the Emergency Motion (the "Order"). Consistent with that Order, Defendants propose a briefing schedule below and in the attached proposed order (Ex. A) that provides for the Emergency Motion to be fully briefed by the end of August 2020.

Defendants' proposed schedule, which itself is fairly expedited, ensures that the Court will receive thorough briefing, allows time for the limited document discovery discussed with the Court at the July 2 conference, affords the parties an opportunity to seek an alternative resolution, and makes certain that any relevant factual issues will be adequately developed for decision in a timely manner. To the extent that Plaintiffs would prefer an even more expedited process, one more similar to a TRO briefing schedule, that is unwarranted for two principal reasons: (1) there is no "emergency" here—Plaintiffs' Emergency Motion is wholly premature because the plain language of the Joint Agreement confirms that compliance for the 2020-21 academic year cannot be assessed until next summer at the earliest, *i.e.*, after the 2020-21 academic year has been completed; and (2) Defendants cannot possibly violate the Joint Agreement this year in any event because, in light of the ongoing COVID-19 pandemic, there will be no Ivy League varsity sports played this fall (or likely any kind of a regular season played this winter or spring), and only a fraction of Brown's undergraduate students will be on campus during each of the fall, spring, and summer terms. Both separately and together, these considerations dispel any suggestion that Plaintiffs' motion requires

near-instantaneous resolution. The more prudent course is to address Plaintiffs' filing in the normal course pursuant to the reasonable (but still expeditious) schedule proposed herein.

**I.     Plaintiffs' Emergency Motion Is Premature Under the Joint Agreement's Plain Text**

In their Emergency Motion, Plaintiffs allege that Brown has violated the Joint Agreement, which was entered as part of the Court's judgment more than two decades ago. *See* ECF 357 at ¶¶ 1, 9. Because Plaintiffs' position rests on a clear misapplication of the Joint Agreement's plain language, their request for a hurried disposition of the so-called Emergency Motion lacks merit.

The Joint Agreement calls for Brown to provide its students with opportunities to participate in intercollegiate varsity sports that are generally proportional to the gender ratios in Brown's undergraduate enrollment. ECF 357-2 § III.A.1.[1] Based on the plain language of the Joint Agreement, Brown's compliance with this proportionality requirement is necessarily assessed *retrospectively*, with an annual lookback to determine whether the University was in compliance during the prior academic year. This is confirmed by several provisions in the Joint Agreement, including the following:

> [V.A] Unless and until relieved of this obligation by the Court upon motion, no later than August 1 of each year, Brown shall prepare and serve upon Plaintiffs' counsel an annual report with regard to its compliance with this Agreement *for the academic year just being completed*. . . .
>
> [V.C] In the event that Brown fails to meet the applicable permitted variance in percentage ratios as set forth in this Agreement . . . Brown shall notify counsel for the Plaintiff class no later than August 1 *following the conclusion of the academic year of the failure.*

---

[1] Under the Agreement, Brown is required to maintain a maximum variance of 3.50% between the gender ratios of enrolled undergraduates and those participating in the University's intercollegiate athletic program. ECF 357-2 § III.C. If Brown removes a women's team from the varsity roster (which it has now done for women's equestrian, fencing, golf, skiing, and squash), the maximum permitted variance goes down to 2.25%. *Id.*

*Id.* §§ V.A & C (emphasis added); *see, e.g., Inmates of Suffolk Cty. Jail v. Kearney*, 928 F.2d 33, 35 (1st Cir. 1991) (holding that defendant's arguments about how to interpret a consent decree could not "overcome the plain language of the decree").

This retrospective structure in the Joint Agreement is no accident. It follows straight from the method for determining the gender proportionality ratios set forth in the Joint Agreement and agreed to by the parties. More specifically, as Plaintiffs themselves have acknowledged, "[t]he Joint Agreement . . . provides that participation ratios are determined *retrospectively*, by counting the individuals actually participating on varsity teams whose name appears on the roster for that sport on the first *and last day* of competition and taking the average of those two numbers." ECF 357-1 at 10 (emphasis added); *see also* ECF 357-2 §§ III.C & F.[2] As a matter of common sense, there is no way for Brown to determine the names and genders of the individuals participating on varsity teams on the "last day of competition" until the season is over. It would therefore be impossible to perform this calculation before the academic year is over, let alone—as here—when it has not even started. The Joint Agreement recognizes this in providing for a reporting structure keyed to notices by "no later than August 1 of each year" that assess "compliance with this Agreement for the academic year *just being completed.*" *Id.* § V.A (emphasis added); *see also id.* § V.C.[3]

---

[2] In this respect (among many others), the Joint Agreement differs materially from the applicable Title IX regulations, which assess athletic participation by applying the "general rule" that "all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants." Office of Civil Rights, U.S. Dep't of Ed., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html.

[3] If the University fails to meet the applicable permitted variance, it is required to notify Plaintiffs' counsel by August 1 *"following the conclusion of the academic year of the failure"* and "provide counsel . . . with its explanation, if any, for failure to achieve the applicable percentage," along with a "proposal . . . as to how and by what date Brown proposes to remedy this failure." *Id.* § V.C. (emphasis added). The parties are then to "confer and attempt to achieve agreement as to the appropriate remedy within 30 days thereafter," and "[i]f the parties are unable to agree, the matter shall be presented to the Court for determination of the manner in which Brown shall thereafter come into compliance with the then applicable percentage variance." *Id.* As Plaintiffs concede, Brown has followed this procedure in past years and each time, has resolved any issues with Plaintiffs. ECF 357-1 at 10.

3

Given these provisions, Plaintiffs do not—and cannot—dispute that the University was in compliance with the Joint Agreement for the 2019-20 academic year. ECF 357-1 at 20. That should be the end of the analysis under the Joint Agreement at this time, since the Joint Agreement does not provide any mechanism for Plaintiffs to assert a *prospective* violation for the 2020-21 academic year. As a result, Plaintiffs resort to a highly creative reading of Section V.E of the Joint Agreement, which states in full as follows: "Notwithstanding the foregoing, Plaintiffs may, in the case of an alleged gross violation of this Agreement, seek relief from the Court, provided that they have first notified Defendants of the alleged gross violation and spent a reasonable period of time meeting and conferring with Defendants in an attempt to resolve the issue." ECF 357-2 § V.E (emphasis in original).

Plaintiffs' reliance on this "gross violation" provision is entirely misplaced. The provision does nothing to alter the calculation or timing of the participation ratios, as discussed above. Rather, it simply provides for a more expedient process in the event that Plaintiffs' counsel can point to a "gross violation" of the Joint Agreement's proportionality requirements for the past academic year—presumably to prevent any such violation from continuing into September when school resumes. *Compare id.* § V.E *with id.* §§ V.A-D. Put another way, Section V.E does not magically transform the Joint Agreement's fundamentally retrospective framework into a prospective analysis whenever Plaintiffs speculate—based on conjecture and hypotheticals rather than actual, concrete data—that sufficiently "gross" violations might potentially occur at some point in the future.[4]

---

[4] Even if there were a "gross violation" exception to the retrospective analytical framework of the Joint Agreement, it would not apply here. Plaintiffs speculate that "the participation rates for men and women in Brown's 2020-21 intercollegiate athletic program will be 4.4% from their undergraduate enrollment rate for 2019-20." ECF 357 ¶ 17. But as Plaintiffs effectively concede, this is not a "gross" violation. Brown has had gender variances of 4.4% or more during the academic years 2001-02 (4.8%), 2004-05 (4.4%), and 2009-10 (5.6%), and in none of those years did Plaintiffs assert a "gross violation" or seek prospective relief. *See id.* ¶ 3. This reflects the parties' (previously) shared interpretation of the remedies contemplated by the Joint Agreement. Indeed, as Defendants

4

In sum, Plaintiffs' claims are premature. The Joint Agreement does not allow for hypothetical prospective violations and Plaintiffs cannot plausibly assert that Brown has committed a violation for the 2020-21 academic year before that year even has begun, before the first and last days of competition have occurred, ECF 357-2 §§ III.C & F, and before the data necessary to test compliance exists. *Cf. W.R. Grace & Co.–Conn. v. U.S. Envtl. Prot. Agency*, 959 F.2d 360, 366 (1st Cir. 1992) ("As we have stated, 'premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort.'").

## II. COVID-Related Issues and the Cancellation of Fall Varsity Sports Competition

Due to the precautions being taken to protect the health and safety of university communities like Brown in the midst of the pandemic, there is no way to have a fall—or perhaps even a winter or spring—varsity sports season this year. Indeed, the Ivy League has now officially cancelled the fall season. This is a second consideration that supports a more regular schedule here, as opposed to an "emergency" expedited schedule.

Specifically, earlier this week, on July 7, Brown announced its "Plan for a Healthy and Safe 2020-21" (Ex. B), pursuant to which (among other things):

- Brown is instituting "a three-term academic year calendar [for 2020-21], rather than Brown's typical two-semester approach" that will "result[] in far fewer students, and less density, on campus during each term." Ex. B at 2.

- Each class year (first-years, sophomores, etc.) will be on-campus for only two of the three terms, resulting in approximately only two-thirds of undergraduate students being on the Brown campus in the fall term and possibly the spring term, and potentially fewer than half of undergraduates being on campus during the summer term. *Id.*

---

will detail in their response to the Emergency Motion, Plaintiffs will not be able to show *any* violation of the Joint Agreement—let alone a "gross violation"—under the "clear and convincing evidence" standard applicable here. *See, e.g., Hawkins v. Dep't of Health & Hum. Servs. for N.H., Comm'r*, 665 F.3d 25, 31 (1st Cir. 2012).

5

- "The start of classes each term will be preceded by a 'quiet period,' during which students will be expected mostly to self-quarantine within their residences." *Id.* at 3.

- "[A]t least for the fall term, in-person events will be limited and small," "travel to and from the campus will not be possible," and "[n]on-essential visitors will be discouraged from coming to campus." *Id.* at 10.

In light of these restrictions and others announced by universities across the country, yesterday's announcement by the Ivy League—that the fall varsity sports season has been canceled and that the remaining winter and spring sports competition calendar remains uncertain—comes as no surprise. *See Ivy League Outlines Intercollegiate Athletics Plans; No Competition in Fall Semester* (July 8, 2020) (Ex. C); *see also, e.g.*, *Ivy League Places All Sports on Hold Until January*, N.Y. TIMES, July 8, 2020 (Ex. D). As the Ivy League Council of Presidents offered in its joint statement:

> *With the information available to us today regarding the continued spread of the virus, we simply do not believe we can create and maintain an environment for intercollegiate athletic competition that meets our requirements for safety and acceptable levels of risk, consistent with the policies that each of our schools is adopting as part of its reopening plans this fall.*

Ex. C at 2. The press release also stated that "it will not be possible for Ivy League teams to participate in intercollegiate athletics competition prior to the end of the fall semester." *Id.* at 1-2. As for beyond the fall, the Princeton football coach is reported as saying that "a vaccine, better therapies and people following health guidelines would be necessary if there were any chance of playing in the spring, but there is also the fear of a second wave of the virus this winter." Ex. D at 1.

Against this backdrop, it makes little sense to attempt to apply the Joint Agreement to the 2020-21 academic year, since the data points that the Joint Agreement presumes and the metrics it imposes do not sensibly map onto the current extraordinary circumstances—in which the COVID-19 pandemic has curtailed the number of enrolled undergraduates who may be on campus at any

6

one time and has effectively put a halt to intercollegiate varsity athletic competition for at least the short-to-medium term. At the very least, these developments concerning the cancellation of the fall varsity sports season mean that Plaintiffs do not face any risk of immediate harm. *Cf. W.R. Grace & Co.*, 959 F.2d at 365 (noting that where "there exists the possibility that no[] [dispute] will ever arise . . ., the prudential concerns underlying the ripeness doctrine counsel us to refrain from decision"). An irregular, hyper-accelerated briefing schedule is therefore unnecessary.

### III.   Proposed Schedule

Because there is no "emergency" or need to rush ahead—and because the Court has already directed the parties to engage in limited document discovery—we respectfully submit that permitting time to allow the parties to fully brief the issues with the benefit of a more complete factual record will aid the Court in its decision-making process. This approach will also allow the parties an opportunity to assimilate each other's presentations and potentially negotiate an alternative resolution, as the Court sensibly urged.

To that end, Defendants respectfully propose the following schedule:

| | |
|---|---|
| July 31: | Defendants complete the expedited document discovery contemplated by the July 2 Order; |
| August 7: | Defendants respond to Plaintiffs' Emergency Motion; |
| August 28: | Plaintiffs file their reply brief in support of their Emergency Motion; |
| September 1-11: | Parties meet and confer in good faith, or with the assistance of a mediator, to seek a negotiated resolution; and |
| September 14: | Parties provide a status update to the Court. |

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt the briefing schedule set forth above and in the attached proposed order.

Dated: July 9, 2020                     Respectfully submitted,

/s/ *Roberta A. Kaplan*
Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
David Shieh
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
dshieh@kaplanhecker.com

/s/ *Robert C. Corrente*
Robert C. Corrente, No. 2632
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
401.270.1333
rcorrente@whelancorrente.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of July 2020, I filed and served the within document electronically via the Court's CM/ECF system on all counsel of record. The document electronically filed and served is available for viewing and/or downloading from the Court's CM/ECF System.

/s/ *Robert C. Corrente*
Robert C. Corrente

9