# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMY COHEN, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 92 Civ. 0197 |
| BROWN UNIVERSITY, CHRISTINA PAXSON, *as successor to* VARTAN GREGORIAN, and JACK HAYES, *as successor to* DAVID ROACH, | |
| *Defendants.* | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE JUDGMENT, TO ADJUDGE IN CONTEMPT, AND FOR EMERGENCY RELIEF

Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
Matthew J. Craig
David Shieh
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com
dshieh@kaplanhecker.com

Robert C. Corrente
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
401.270.1333
rcorrente@whelancorrente.com

September 2, 2020

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 4

    A.   The Parties' 1998 Settlement Agreement .................................................... 4

    B.   Brown's Ongoing Efforts to Ensure Compliance .......................................... 8

    C.   Brown's 2020 Decision to Restructure Its Athletics Program...................... 10

    D.   Reinstatement of Track & Field and Cross Country.................................... 12

    E.   Current Proceedings................................................................................... 14

ARGUMENT ................................................................................................... 17

  I.   BROWN CANNOT HAVE PREEMPTIVELY VIOLATED THE GENDER
       PROPORTIONALITY REQUIREMENT FOR THE 2020-21 ACADEMIC YEAR...... 17

  II.  EVEN IF COMPLIANCE COULD BE ASSESSED NOW, PLAINTIFFS COME
       NOWHERE CLOSE TO DEMONSTRATING A GROSS VIOLATION FOR THE
       2020-21 ACADEMIC YEAR .................................................................. 22

    A.   Current Roster Data Shows that Brown Will Comply with Its 2020-21 Obligation .... 23

    B.   Brown Will Remain in Compliance Even if There Are Unexpected Changes to
       Enrollment or Varsity Participation ......................................................... 25

    C.   Plaintiffs Offer No Valid Reason to Discard the Current Roster Data ........................ 28

       1.  "Ignore All the Data"................................................................... 28

       2.  "Use Outdated Data".................................................................. 30

       3.  "Pretend Sailing Doesn't Exist"................................................... 36

       4.  "Don't Count the Women's Sailing Team" .................................... 40

  III.  PLAINTIFFS ARE NOT ENTITLED TO INTERIM RELIEF ...................................... 42

CONCLUSION.................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barbato v. Paul Revere Life Ins. Co.*,
794 A.2d 470 (R.I. 2002) ..................................................................... 21

*Cohen v. Brown Univ.*,
101 F.3d 155 (1st Cir. 1996) ............................................................ 3, 4

*Cohen v. Brown Univ.*,
879 F. Supp 185 (D.R.I. 1995) ...................................................... *passim*

*D'Oliveira v. Rare Hospitality Int'l, Inc.*,
No. P.C. 99-1835, 2003 WL 1223854 (R.I. Super. Ct. Feb. 13, 2003) ................... 21

*Favia v. Indiana University of Pennsylvania*,
812 F. Supp. 578 (W.D. Penn. 1993) .................................................. 39

*Griffin v. Zapata*,
570 A.2d 659 (R.I. 1990) ................................................................. 21

*Harvey v. Johanns*,
494 F.3d 237 (1st Cir. 2007) ............................................................ 42

*Hawkins v. Dep't of Health & Human Servs. for the State of N.H.*,
665 F.3d 25 (1st Cir. 2012) ............................................................. 22

*Inmates of Suffolk Cty. Jail v. Kearney*,
928 F.2d 33 (1st Cir. 1991) ............................................................. 18

*Lohnes v. Level 3 Commc'ns, Inc.*,
272 F.3d 49 (1st Cir. 2001) ............................................................. 41

*Mgmt. Capital, L.L.C. v. F.A.F., Inc.*,
209 A.3d 1162 (R.I. 2019) ...................................................... 19, 20, 22

*Nault v. United States*,
517 F.3d 2 (1st Cir. 2008) ......................................................... *passim*

*Olick v. John Hancock Mut. Life Ins. Co.*,
106 F. App'x 736 (1st Cir. 2004) ...................................................... 42

*Pascale Serv. Corp. v. Int'l Truck & Engine Corp.*,
No. 07 Civ. 247, 2007 WL 9789641 (D.R.I. Nov. 15, 2007) ....................... 21, 22

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  66 F. Supp. 2d 317 (D.R.I. 1999) ............................................................................... 18

*RPS Assocs., LLC v. McDonalds USA, LLC*,
  No. 16 Civ. 504, 2017 WL 2198954 (D.R.I. May 18, 2017)..................................... 21

*T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc.*,
  958 F. Supp. 2d 315 (D.R.I. 2013)............................................................................. 17

*United States v. Armour & Co.*,
  402 U.S. 673 (1971)..................................................................................................... 21

*United States v. Fairway Capital Corp.*,
  433 F. Supp. 2d 226 (D.R.I. 2006)............................................................................. 17

*United States v. ITT Cont'l Baking Co.*,
  420 U.S. 223 (1975)..................................................................................................... 17

**Statues and Regulations**

15 U.S.C. § 18a .................................................................................................................. 3

34 C.F.R. § 668.45(a)(4)(i) ............................................................................................. 23

34 C.F.R. § 668.47 ........................................................................................................ 6, 9

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................. 4

**Other Authorities**

23 Williston on Contracts § 63:28 (4th ed.)................................................................. 19

*Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test*, U.S. Dep't of
  Educ., Office of Civil Rights (Jan. 16, 1996) ........................................................... 9

*User's Guide for the Equity in Athletics Disclosure Act Web-Based Data Collection*, U.S. Dep't
  of Educ. (2019)............................................................................................................. 9

## INTRODUCTION

Founded in 1764, Brown is a leading university and an innovative educational institution where the curiosity, creativity, and intellectual joy of students drive excellence—in both its academic programs and its extracurricular activities. Even in this time of unprecedented challenge, Brown's number one priority is and will remain providing the best possible educational experience for its students. In keeping with that mission, Brown announced earlier this year that it was restructuring its athletics program to promote excellence, better align the size of Brown's program with available resources, and improve the competitive horizon for Brown's varsity teams. That decision was no different from decisions that Brown and other universities have made in the past, and no different from decisions that universities will continue to make in the future. In this particular instance, Brown transitioned certain varsity teams to club status, while elevating two club teams to varsity. Brown understood that, no matter what decision it made, some student athletes and alumni would be frustrated and disagree on the exact mix of teams that should be affected—indeed, Brown's decision was ultimately lauded by some and vilified by others. But at every step of the way, Brown was committed to improving the overall athletics experience for Brown's student athletes, while acting in accordance with the myriad rules and regulations that govern college sports.

More specifically, Brown was committed to complying with a decades-old Joint Agreement that the parties in this case entered into in 1998 to settle a prior Title IX dispute. That Agreement imposes a unique requirement on Brown that the athletics opportunities offered to women and men be within a fixed and narrow percentage of each gender's proportion of the undergraduate student body. Over the course of months, Brown looked at this gender proportionality requirement from every angle, and did not make a single decision about its varsity athletics offerings without first assuring itself that Brown would be able to continue to comply

1

with the Joint Agreement. Indeed, the detailed roster information that Brown gathered *before* it announced its final decision left no doubt about Brown's ability to do so.

But before they had availed themselves of the opportunity to review and discuss that data with Brown, Plaintiffs sued Defendants Brown University, President Christina H. Paxson, and Athletic Director Jack Hayes, claiming that Brown had "grossly violated" the Joint Agreement's gender proportionality requirement for the 2020-21 academic year. Their emergency filing demanded that Brown reinstate every single one of the women's teams that had been transitioned to club status.

The problem for Plaintiffs, however, is two-fold. The plain language of the Joint Agreement that Plaintiffs drafted and this Court so-ordered back in 1998 makes it absolutely clear that Brown's obligation turns on the number of varsity athletics participants on the "first day" and the "last day" of regular season competition, and thus it cannot possibly be the case that Brown has already violated the Agreement for the 2020-21 academic year. And even if it were appropriate to assess Brown's compliance prospectively before the competitive season even begins (or ends), the best roster information available leaves no doubt about Brown's ability to provide athletics opportunities within the required proportions—assuming, of course, that in light of the COVID-19 pandemic any athletic competition takes place at all in the upcoming year.

Perhaps because both the law and the facts weigh so strongly in Brown's favor, Plaintiffs have sought to transform this proceeding into something much bigger and different than it is (or can be). Their most recent filing falsely cries conspiracy against high-ranking Brown officials and inveighs against the process by which Brown decided to restructure its program in the first place. But this Court has already made clear the "path to compliance [Brown] elects to take" is left to Brown's discretion, *Cohen v. Brown Univ.*, 879 F. Supp 185, 214 (D.R.I. 1995) ("*Cohen III*"), and

Brown must be allowed "as much freedom as possible in conducting [its] operations consonant with" its legal obligations, *Cohen v. Brown Univ.*, 101 F.3d 155, 187 (1st Cir. 1996) ("*Cohen IV*"). As a result, this enforcement proceeding necessarily turns on a single numerical requirement in the parties' settlement agreement. Brown has complied with that requirement in the past, and it is committed to complying with it now and in the future.

It is true, of course, that the parties' settlement could have taken a different form in 1998. Plaintiffs, for example, could have demanded that gender proportionality be evaluated at the beginning of the year, in light of the rosters prepared before competition begins. Instead, Plaintiffs agreed, and the Joint Agreement reflects, that gender proportionality must be determined based on the average of the first- and last-day participation numbers, as reflected on squad lists assembled at the end of the academic year. Similarly, Plaintiffs could have insisted on a right to review any proposed changes to the mix of varsity and club teams, just like the federal government is entitled to premerger review under the Hart-Scott-Rodino Antitrust Act of 1976, 15 U.S.C. § 18a. Instead, Plaintiffs agreed to end all team-specific obligations with the 2001-02 academic year and leave it entirely to Brown's discretion to structure its varsity offerings and rosters in a way that best takes into account overall resources and competitiveness as long as Brown complies with the gender proportionality requirement of the Joint Agreement.

At the end of the day, this enforcement proceeding presents a single issue under the Joint Agreement since the parties and the Court must "remain[] confined to the language agreed to in the settlement." *Nault v. United States*, 517 F.3d 2, 7 (1st Cir. 2008). In their effort to undo Brown's discretionary athletics decisions, Plaintiffs cannot transform the Joint Agreement into something that it is not. As set forth below, based on the uncontested facts and the unambiguous language of the parties' 1998 agreement, Plaintiffs' motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties' 1998 Settlement Agreement

Between 1992 and 1998, the parties in this case were involved in a protracted and hotly contested class action litigation over whether Brown's athletics program complied with its obligations under Title IX of the Education Amendments of 1972. As Plaintiffs themselves recognize, the litigation raised novel issues under the Title IX statute, resulting in "the first appellate decision addressing the application of Title IX to athletics." ECF 357-1 at 6. Three years into the case, the Court (Pettine, J.) found Brown to have violated Title IX. *Cohen III*, 879 F. Supp. at 214. At that time, the proportion of female student athletes looked dramatically different than it does today—women made up only 38.13% of varsity athletics participants at Brown in the 1993-94 academic year, but 51.14% of Brown's undergraduate student body. *Id.* at 192.

On appeal, the United States Court of Appeals for the First Circuit affirmed this Court's decision on the merits, but vacated the Court's remedial order in 1996, finding that the Court had erred in rejecting Brown's proposal to "cut men's teams" as a "means of effectuating compliance with the statute." *Cohen IV*, 101 F.3d at 187.

Rather than continuing to litigate, the parties eventually decided to settle their dispute. The Joint Agreement that they negotiated and entered into two years later "resolve[d] all issues remaining in th[e] suit except for attorneys' fees and costs." ECF 357-2 ("Joint Agreement") § 1(D). Because the case had already been certified as a class action, the parties "believe[d] it [was] appropriate and necessary that the Court approve of any agreement between the parties and provide notice to the class of such proposal." *Id.* at 2; *see also* Fed. R. Civ. P. 23(e). The Court approved the parties' settlement agreement on October 9, 1998. ECF 281.

The whole purpose of the Joint Agreement was to "eliminate the uncertainty inherent in further formal proceedings." Joint Agreement at 2. It furthered that objective in three principal ways.

First, the Joint Agreement imposed a set of team-specific requirements that would last for one to four academic years after the settlement took effect. *See id.* § II(B)–(G). For example, the Joint Agreement identified 13 university-funded women's teams, three donor-funded women's teams, and two donor-funded coed teams that Brown had to keep in place through the end of the 2000-01 academic year. *Id.* § II(B), (D), (G). It also identified one donor-funded women's team that had to be kept in place through the end of the 2001-02 academic year. *Id.* § II(E). These provisions covered women's fencing, skiing, and squash, all of which Brown transitioned to club status earlier this year. *Id.* § II(B), (D). They also covered coed equestrian (which, as permitted by the Joint Agreement, later became women's only) and golf (which was later divided into separate men's and women's varsity teams); women's equestrian and both golf teams were transitioned to club status this summer. *Id.* § II(G); Ex. A (July 31, 2001 letter to Plaintiffs' counsel). These team-specific provisions no longer apply, and Brown no longer distinguishes between "donor" or "university" funded sports.

Second, the Joint Agreement required, and continues to require, that Brown provide varsity "participation opportunities" at a level such that "the percentage of each gender participating . . . is within [a fixed percentage] of each gender's percentage in the undergraduate enrollment for the same academic year." *Id.* § III(C). That percentage is 3.5%, unless Brown chooses to take certain actions, one of which is eliminating or replacing existing women's varsity teams, in which case the permitted variance drops to 2.25%. *Id.* § III(C). Because of Brown's decision to transition

certain women's teams to club status earlier this year, the parties agree that the 2.25% variance is what applies for the 2020-21 academic year.

In calculating the variance for a given academic year, the Joint Agreement requires the parties to take the average of the number of women and men, respectively, who are included as "eligible athlete[s] on the squad list on the first day of competition of the subject academic year" and the number of women and men, respectively, who are included "as active (or injured) participant[s] on the last day of regular season competition of the subject academic year." *Id.* § III(F)(2)–(3). The Joint Agreement also requires that "women and men student-athletes who participate on more than one intercollegiate athletic team will be counted separately for each team on which they participate." *Id.* § III(F)(1). The lone exception to this counting methodology relates to indoor and outdoor track, which must be treated as a single sport. *Id.* As further discussed below, the manner in which the Joint Agreement counts varsity athletics participants differs significantly from how other colleges and universities count athletics participation under the Equity in Athletics Disclosure Act ("EADA"). *See* 34 C.F.R. § 668.47.

Third, the Joint Agreement provides a procedural mechanism to facilitate the monitoring of Brown's compliance. By August 1 of each year, Brown must make a report to Plaintiffs' counsel that includes the information necessary to determine whether Brown has complied with the gender proportionality requirement, including "squad lists" reflecting student athletes on the first and last days of regular season competition, as well as the total number of female and male full-time undergraduate students, from the preceding academic year. Joint Agreement § V(B)(3), (6). The report must also identify "all intercollegiate athletic teams added or discontinued during the preceding academic year." *Id.* § V(B)(5).

6

In the event that the first- and last-day numbers put Brown out of compliance with the gender proportionality requirement, the Joint Agreement mandates a formal process by which the parties are to identify a remedy for Brown's violation "following the conclusion of the academic year of the failure." *Id.* § V(C). There is an exception to that formal process in cases where Plaintiffs allege a "gross violation" of the Joint Agreement, although the parties must still "spen[d] a reasonable period of time meeting and conferring" before raising a dispute with the Court. *Id.* § V(E). Because the only substantive requirement of the Joint Agreement that continues after 2002 is the gender proportionality requirement, any alleged "gross" violation of the Agreement must necessarily relate to this numerical requirement.

It is important to note given the context of this proceeding that the Joint Agreement contemplates that Brown can and will adjust both its varsity sports teams and its roster sizes. All the provisions requiring that specific sports retain their varsity status expired after one to four years, in 2002 at the latest, including those that governed the women's sports that were transitioned to club status earlier this year. *Id.* § II(B)–(G). Indeed, Brown's annual report to Plaintiffs' counsel specifically requires identification of "all intercollegiate athletic teams added or discontinued during the preceding academic year." *Id.* § V(B)(5). Other provisions in the Joint Agreement recognize that in order to achieve compliance, Brown may add teams, eliminate teams, and manage its team rosters, including by "impos[ing] maximums on men's teams." *Id.* § III(G)–(H).

Because the gender proportionality requirement is the only substantive requirement of the Joint Agreement that remains in effect today, *id.* § I(E), it is the only substantive requirement that the Court has authority to enforce at this time. And there, too, the Joint Agreement specifies the limits on any remedy the Court can order—*i.e.*, when Plaintiffs have proven a violation of the

gender proportionality requirement, the Court may order Brown to "come into compliance with the then applicable percentage variance." *Id.* § V(C)(6).

### B.    Brown's Ongoing Efforts to Ensure Compliance

For the past decade, and ever since President Paxson took over leadership of Brown in 2012, Brown has been in compliance with the Joint Agreement. *See* Ex. B ("Ashenfelter Rep.") at Table 3; Ex. C ("Paxson Dep.") at 12.[1] Although there were certain years before Christina H. Paxson's presidency when the variance exceeded the then-applicable 3.5% standard, Brown rectified the imbalance each time without any need for judicial intervention. ECF 357-1 at 10. At no point in the past have Plaintiffs claimed that Brown grossly violated the Joint Agreement. *See id.*

Brown's record of compliance with the Joint Agreement is no accident. Instead, it reflects many years of continuous and conscientious attention to its roster sizes and the gender make-up of its athletics program. Each summer, for example, Brown's Athletics Department examines the expected rosters for each sport and "manage[s] from there," including by reducing men's rosters if necessary. Ex. D ("Hayes Dep.") at 18–19. As part of this process, Brown relies on formal Roster Declaration Forms, *id.* at 96, which, once signed or certified by each team's coach, "serve as the initial roster reported at the beginning of each academic year." *E.g.*, Ex. E (Roster Declaration Form for women's water polo). And because compliance with the Joint Agreement depends on the number of participants on both the first and last days of regular season competition, Joint Agreement § III(F)(2)–(3), Brown must undertake "careful roster management" throughout the entire year to ensure that Brown remains in compliance even if the number of female athletes goes down mid-season. Paxson Dep. at 28; *see also id.* at 124 ("Jack [Hayes] is athletics director. His

---

[1] All deposition citations will be to transcript pages, rather than the pages of the exhibits themselves.

job has been roster management for years."); Hayes Dep. at 146–47 ("[W]e use the roster declaration forms to identify what the variance is at the beginning of the year and then manage that accordingly.").

In this sense, the Joint Agreement imposes a set of obligations on Brown that are materially different from those generally imposed on any other college or university receiving federal funds. The EADA, for instance, requires institutions to report athletics participation "as of the day of a varsity team's first scheduled contest." 34 C.F.R. § 668.47(c)(2)(i).[2] At Brown, however, if a high number of female athletes leave a Brown team over the course of a season, the Joint Agreement may require Brown to adjust the men's rosters so that the applicable gender proportionality variance is satisfied when the last-day-of-competition numbers are accounted for. As a result, the Joint Agreement requires a degree of near-constant supervision of rosters (or "roster management") that no other school has to face. In addition, the EADA requires all universities receiving federal funds to submit an annual report each October, while the Joint Agreement requires Brown to make an additional annual report to Plaintiffs' counsel each August. 34 C.F.R. § 668.47(c); Joint Agreement § V(A); *see also User's Guide for the Equity in Athletics Disclosure Act Web-Based Data Collection* at 1, U.S. Dep't of Educ. (2019). Given these separate reporting requirements and the distinct counting methodologies that underlie them, the burden on Brown in overseeing and managing two different sets of data for each and every sport is not immaterial. *See* Joint Agreement § III(F)(1).[3]

---

[2] Similarly, although one of the ways in which an institution may demonstrate Title IX compliance is to provide athletics participation opportunities "in numbers substantially proportionate to [women's and men's] respective enrollments," the statute does not impose a rigid numerical standard like the Joint Agreement does. *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test*, U.S. Dep't of Educ. at 4, Office of Civil Rights (Jan. 16, 1996).

[3] For example, Audrey Anderson, former general counsel for Vanderbilt University, was recently quoted as saying that "the requirement Brown agreed to as part of the settlement to the lawsuit is a 'really tight fit' compared to other institutions. Under Title IX, colleges have multiple ways of proving their athletic opportunities are compliant, one of which is to show athletic programming for women and men is 'substantially proportionate to their overall enrollment'

C.      **Brown's 2020 Decision to Restructure Its Athletics Program**

As with any athletics program, where winning and losing obviously matter, the pursuit of "competitive excellence" is an important goal for Brown. Ex. F at 1 (Committee on Excellence in Athletics charge). Certain of Brown's teams have achieved notable success. Women's soccer, women's crew, men's lacrosse, and men's wrestling, for example, have had 10 champion or runner-up finishes among them over the past five years. Ex. G (excerpt from "Baseline Numbers and Statistics" presentation). But other programs have not been able to achieve similar results— and thus have not always been able to offer Brown's student athletes a quality competitive experience. In fact, from 2009 to 2018, Brown won just 2.8% of the Ivy League championships overall—the lowest success rate in the Ivy League. Ex. F at 1.

The competitiveness of Brown athletics has been hampered, in part, by its size and sprawl. As of March 2020, Brown offered "38 varsity sports and 33 club sports," making it the "third largest [athletics program] in the country after Stanford University and Harvard University." *Id*. at 1. Yet Harvard, with 42 varsity sports, has an athletics budget that exceeds Brown's by $28 million. Ex. H ("Mundt Dep.") at 44. Brown is therefore unable to adequately support such a large number of varsity teams while simultaneously living up to its obligation, expressed in the Ivy League's Statement of Principles, to contribute to "a reasonable competitive balance among [Ivy League] institutions over time over all sports." Ex. F at 1.

Accordingly, during the 2019-20 academic year, President Paxson decided to establish a "Committee on Excellence in Athletics" (the "Committee") to "determine whether Brown should re-focus its efforts on perhaps a smaller and different menu of varsity teams so as to increase the

---

with no specific number to hit . . . . The agreement may have looked like a good idea at the time, but it has now become 'operationally inconvenient for Brown,' she said." https://www.insidehighered.com/news/2020/09/01/brown-emails-show-frustration-title-ix-agreement.

competitive balance within the Ivy League and to pursue a standard of excellence at Brown." *Id.* at 2. That Committee was charged with advising President Paxson on "the numbers and identities of varsity and highly competitive club sports" that should be offered at Brown, keeping the following goals in mind: "enhanc[ing] the quality of the student experience in athletics, provid[ing] for gender equity, ensuring diversity and inclusion, sustaining reasonable support for the pursuit of excellence, increasing competitiveness in varsity athletics, and building a stronger university community with a focus on collegiate loyalty." *Id.*

From its inception, the Committee understood that any change that Brown considered would have to ensure that Brown would remain in compliance with both Title IX and the Joint Agreement. The Committee's formal charge instructed the Committee to ensure "substantial [gender] proportionality with the undergraduate population." *Id.* And at its very first meeting in March 2020, the Committee was briefed on the legal requirements of both Title IX and the Joint Agreement. Ex. I (Office of General Counsel presentation). As the Committee was asked to consider various "scenarios" for a restructured athletics program, compliance with the Joint Agreement remained at the forefront. Indeed, much of the Committee's second meeting, in April 2020, was dedicated to analyzing compliance with the gender proportionality requirement. Ex. J (Committee on Excellence in Athletics powerpoint).

At its third meeting, in May 2020, the Committee offered its views to President Paxson, who then presented a proposal on restructuring to the Brown Corporation's Committee on Campus Life (the committee of Brown's governing body that oversees athletics). Paxson Dep. at 55. A week later, the full Corporation considered and approved the changes to Brown's athletics program that President Paxson had recommended. *Id.*; Ex. K (Corporation resolution). And, on May 28, Brown publicly announced its decision to transition 11 varsity teams to club status (men and

women's fencing; men and women's golf; women's skiing; men and women's squash; women's equestrian; and men's track & field and cross country), and to elevate two club teams to varsity status (women's sailing and coed sailing). Christina H. Paxson, *Excellence Initiative to Reshape Athletics at Brown*, Brown Univ. (May 28, 2020).[4]

### D.      Reinstatement of Track & Field and Cross Country

Unsurprisingly, Brown's May 28 announcement prompted a broad spectrum of reactions, ranging from excitement over potentially improved competitiveness to "deep disappointment, coupled with sadness and frustration" relating to the programs that would no longer compete as varsity sports. Christina H. Paxson, *Addressing Brown Varsity Sports Decisions*, Brown Univ. (June 6, 2020) ("Paxson June 6 Letter").[5] But perhaps the most common response to the May 28 announcement concerned the impact that the changes would have on diversity in Brown athletics. Like gender equity, "ensuring diversity and inclusion" was among the chief goals of the Committee, Ex. F at 2, and the Committee carefully considered the impact of its decision on the representation of historically underrepresented groups ("HUGs"), Paxson June 6 Letter; Mundt Dep. at 61. The restructured athletics program was expected to "maintain HUG varsity representation" and "representation of students with high financial need" at "similar levels across all varsity sports, even if Brown changed nothing about its recruiting." Paxson June 6 Letter. Brown further "envisioned an increase in diversity-enhanced recruiting over time." *Id.*

At the same time, men's track & field—one of Brown's most diverse teams—was slated for transition to club status. Many current athletes and alumni expressed concern that the decision to transition men's track & field would disproportionately impact opportunities for black male student athletes. *Id*. Furthermore, members of the women's track & field and cross country teams

---

[4] https://www.brown.edu/about/administration/president/statements/excellence-initiative-reshape-athletics-brown.
[5] https://www.brown.edu/about/administration/president/statements/addressing-brown-varsity-sports-decisions.

forcefully communicated their own concerns that eliminating the men's program would negatively impact the women's program, both for staffing reasons and through the loss of community and camaraderie among athletes across genders. Christina H. Paxson, *Decision on track and field and cross country*, Brown Univ. (June 10, 2020) ("Paxson June 9 Letter").[6]

In light of these concerns, Brown began considering whether it might be possible to reinstate men's track & field and cross country as varsity sports. But Brown's evaluation of whether it was feasible to do so turned on whether Brown could reinstate those teams while ensuring compliance with the Joint Agreement. Athletic Director Hayes immediately began to "review[] where [Brown's] numbers were and then began to ask the coaches exactly" what their "roster[s were] going to be in the fall," including the specific names of the student athletes on each team. Hayes Dep. at 117. As Hayes testified, he knew "that in order to make the decision about whether track could be reinstated, the main concern was could [Brown] meet the requirements of proportionality, so [he] needed to know what the rosters were going to be for every sport." *Id.* at 97. Based on the detailed information he gathered, Hayes confirmed that with appropriate roster management (*i.e.*, capping the size of men's teams where necessary to ensure compliance), Brown could reinstate men's track & field and cross country and still be in compliance with the Joint Agreement at the end of the academic year. *Id.* at 17, 97, 116–17; Paxson Dep. at 107.

That determination was critical to the reinstatement decision. There is no dispute that certain Brown officials expressed frustration that the Joint Agreement imposes certain inflexible numerical requirements that no other peer institution faces. *See* ECF 378 at 16–19. But Brown's leadership understood Brown's legal obligations and testified in no uncertain terms that they intended to comply with them. *See* Paxson Dep. at 31 ("I think how I feel about the consent decree

---

[6] https://www.brown.edu/news/2020-06-09/track.

is completely irrelevant. We comply with it . . . and we will continue to comply with it as long as it exists."); Hayes Dep. at 97 ("[I]n order to make the decision about whether track could be reinstated, the main concern was could we meet the requirements of proportionality . . . ."); Mundt Dep. at 69 ("[W]e were focused on whether or not we could put back in men's track and field and was there a way to nip and tuck all the other rosters to stay within Title IX compliance and the consent decree."). Not one witness ever expressed a desire or scheme to *intentionally violate* the Joint Agreement, with which they had taken such pains to comply, in order to somehow prompt its ultimate demise, as Plaintiffs now suggest. *See* ECF 378 at 4.

On June 9, 2020, President Paxson publicly announced the decision to reinstate men's track & field and cross country. *See* Paxson June 9 Letter. After that announcement, Athletic Director Hayes continued to closely monitor 2020-21 roster sizes to ensure compliance, "solidif[ying]" the coaches' June 2020 roster information with formal Roster Declaration Forms later that month. Hayes Dep. at 94–96. Each year, these Roster Declaration Forms are used to "see where the numbers are" at the beginning of the academic year and to decide whether "men's rosters may have to be managed." *Id.* at 124. The Forms reflect the specific student athletes each coach "anticipate[s] their roster to [contain] on the first date of competition"; they are "not an estimate," but rather are the best available indicator of the identities and number of participants expected on each team. *Id.* at 126. And the 2020-21 Roster Declaration Forms confirmed what Athletic Director Hayes had already determined: Brown will remain in compliance with the Joint Agreement for the 2020-21 academic year. *See* Ashenfelter Rep. at 3.

### E.   Current Proceedings

On June 29, 2020, Plaintiffs filed their Motion to Enforce Judgment, to Adjudge in Contempt, and for Emergency Relief ("Emergency Motion"), alleging that Brown had grossly violated the gender proportionality requirement for the 2020-21 academic year. ECF 357. Shortly

thereafter, the Court set a schedule that called for expedited discovery, supplemental briefing from Plaintiffs, and an opportunity for Defendants to oppose the Emergency Motion. ECF 367.

Discovery commenced on July 2, and by the end of that month—despite logistical challenges stemming from the necessity of remote work during the pandemic—Brown completed production of a large set of documents concerning Brown's athletics decisions and continued compliance with the Joint Agreement. ECF 370. These included the rosters that Athletic Director Hayes had collected and provided to Plaintiffs' in June 2020 that supported Brown's expectation of compliance before deciding to reinstate men's track & field and cross country. ECF 370-2 at 1. They also included the Roster Declaration Forms that were completed in July and constitute the most current set of rosters available for the 2020-21 academic year. ECF 370 at 3–4.

On July 27, 2020, Plaintiffs served thirteen additional requests for documents and demands for five depositions. ECF 370. Given that Brown had already produced all the relevant roster data and significant materials from the Committee on Excellence in Athletics, Brown contended, among other things, that Plaintiffs' new requests exceeded the bounds of permissible discovery under the Federal Rules of Civil Procedure. ECF 370. After the Court denied Brown's motion for a protective order, Brown immediately and expeditiously collected, reviewed, and produced tens of thousands of pages of documents in roughly a week. ECF 375.[7]

Plaintiffs then took the depositions of President Paxson; Athletic Director Hayes; John Mollicone, the sailing coach; and expert Jeff Orleans, whose expert report considers athletics department best practices, the reliability of current rosters, and the status of women's and coed sailing as varsity sports. *See* Ex. L ("Orleans Rep."). Plaintiffs declined to take the deposition of

---

[7] During the course of producing those documents, Brown asserted narrowly tailored confidentiality interests in certain documents in order to protect the integrity of its confidential admissions strategy, budgets, and proprietary information, as well as the privacy of its donors and employees. ECF 375; *see also* ECF Text Order dated Aug. 20, 2020 (denying motion for protective order, but directing that such information be redacted from public filings).

expert Dr. Orley Ashenfelter, whose report and supplemental report, among other things, assess Brown's compliance with the Joint Agreement's gender proportionality requirement based on currently available data and evaluate the reliability of that data based on historical trends. *See* Ashenfelter Rep.; Ex. M ("Ashenfelter Supp. Rep."). Brown, in turn, took the deposition of Plaintiffs' expert, Dr. Donna Lopiano, whose report largely focuses on the general requirements of Title IX, rather than Brown's compliance with the Joint Agreement.[8] Plaintiffs have elected not to submit Dr. Lopiano's report as part of their briefing.

On August 26, 2020, with this extensive, expedited discovery process complete, Plaintiffs filed their supplemental brief in support of their Emergency Motion. ECF 378. The majority of Plaintiffs' supplemental brief is dedicated to describing the emails and other communications Brown produced in discovery, focusing particular attention on certain officials' expressions of frustration regarding the Joint Agreement, along with the diversity concerns raised by the initial decision to transition track & field to club status. *Id.* at 16–19. Plaintiffs make almost no effort to tie those communications to the one and only relevant issue in this enforcement proceeding: whether Brown has committed a gross violation of the gender proportionality requirement of the Joint Agreement for the 2020-21 academic year.

---

[8] At her deposition, Dr. Lopiano admitted that her report contained several errors and her analysis suffered from certain methodological flaws. *See, e.g.*, Ex. N ("Lopiano Dep.") at 79 (admitting that she did not "know whether the roster declaration forms are a poor or a good indicator of actual participation for that academic year" because she "did not do a comparison"); *id.* at 98–99 (admitting that the numbers in her report that "are supposed to be based on the July 17th rosters that were produced by plaintiffs" were "identical" to the June 2020 numbers, and conceding that she "obviously didn't pick . . . up" on the differences between the two sets of numbers); *id.* at 100–01 (admitting that the numbers in "table number 4, in column B for men's water polo" are "not accurate"); *id.* at 105 (admitting that she did not "do any calculation of standard deviation" and it is "correct" that "there's no way of knowing from [her] chart whether these fluctuations between the rosters and the mean and the median fall within a normal expected fluctuation" because she "only indicated those . . . that exceeded the previous median or mean").

**ARGUMENT**

## I.     BROWN CANNOT HAVE PREEMPTIVELY VIOLATED THE GENDER PROPORTIONALITY REQUIREMENT FOR THE 2020-21 ACADEMIC YEAR

The only question in this enforcement proceeding is whether Brown has violated the Joint Agreement's gender proportionality requirement. But compliance with that requirement turns on the number of men and women on Brown's athletics rosters on the first and last date of regular season competition—neither of which has happened yet for the 2020-21 academic year. It is simply too soon to determine whether Brown has complied with the Joint Agreement for the current academic year, much less whether there was a "gross violation." On that basis alone, Plaintiffs' Emergency Motion should be denied.

Compliance with the Joint Agreement, of course, is a question of contract law. "Settlement agreements are treated as contracts and enforced under the rules governing contracts generally." *T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 321 (D.R.I. 2013) (quoting *United States v. Fairway Capital Corp.,* 433 F. Supp. 2d 226, 244 (D.R.I. 2006)). This principle applies equally where a party seeks to enforce "a settlement subsequently adopted by a court." *Nault*, 517 F.3d at 4; *see also United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract[.]").

The analysis here, therefore, must begin with the plain text of the Joint Agreement itself. The gender proportionality requirement of the Joint Agreement is straightforward. In addition to full-time undergraduate enrollment, it looks at the "percentage of women and men participating in the overall intercollegiate athletic program . . . based upon the average number of men and women" participating "on the first day of competition of the subject academic year" and "on the last day of regular season competition of the subject academic year." Joint Agreement § III(F)(2)–(4). As a

result, calculating gender participation ratios in the manner that the Joint Agreement requires cannot be done until *after* the final day of regular season competition—which even Plaintiffs admit. *See* 357-1 at 10 (conceding that participation ratios are "determined retrospectively" by counting the individuals "whose name[s] appear[] on the roster for that sport on the first and last day of competition and taking the average of those two numbers").

It thus follows that—because there has not been a first day of competition, let alone a last day—Plaintiffs' theory that Brown has already committed a gross violation of its 2020-21 obligation is foreclosed by the "plain, ordinary, and natural meaning" of the Joint Agreement. *Nault*, 517 F.3d at 4. Where, as here, the "terms of the contract are clear and unambiguous, the task of judicial construction is over." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 325 (D.R.I. 1999), *aff'd*, 217 F.3d 8 (1st Cir. 2000) (internal quotation marks omitted); *see also Inmates of Suffolk Cty. Jail v. Kearney*, 928 F.2d 33, 35 (1st Cir. 1991) (holding that defendant's arguments about how to interpret a consent decree could not "overcome the plain language of the decree").

This conclusion is buttressed by other provisions in the Joint Agreement. For example, section V(A) requires a report about "compliance with [the] Agreement for the academic year *just being completed*" (emphasis added), and section V(C)(1) requires that Brown provide notice of noncompliance "*following the conclusion* of the academic year of the failure" (emphasis added). Both provisions confirm that Brown's compliance with the gender proportionality requirements turns on what happens over the course of the full academic year. Similarly, section V(B)(5) requires annual reporting about "all intercollegiate athletic teams added or discontinued *during the preceding academic year*" (emphasis added), envisioning an assessment of compliance after a

18

restructured set of varsity teams have completed their competitive seasons, not before the teams' seasons have even begun.

The idea that Brown cannot be preemptively deemed in breach is also confirmed by black-letter principles of contract law. *See* 23 Williston on Contracts § 63:28 (4th ed.) ("One who contracts to do a certain thing on a certain contingency or at a certain time cannot break that promise unless the contingency happens or the time arrives."). Indeed, only where a party "unequivocally disavows any intention" to perform under a contract will that party be deprived of an opportunity to do so. *Mgmt. Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1175 (R.I. 2019).

This rings especially true in a year like this one, where COVID-19 has caused the cancellation of fall sports and has put in doubt the academic year's remaining seasons as well. ECF 366-3; ECF 366-4. In fact, Brown students will be on campus for only part of the year, if they return to campus at all. ECF 366-2 at 2. In other words, not only are Plaintiffs asking the Court to find a violation before the key dates for compliance have passed, but they are also asking the Court to find a violation while ignoring a once-in-a-lifetime pandemic that has altered every single aspect of university life, including varsity sports.[9]

Although Plaintiffs offer two arguments in opposition to Brown's straightforward interpretation of the plain language of the Joint Agreement, both lack merit.

---

[9] Some Division I institutions have been forced to "permanently eliminat[e] dozens of sports programs" as a result of the pandemic. *See, e.g., E.g.*, Meredith Cash, *Cincinnati, Stanford, and 17 other Division I Schools Are Permanently Eliminating Dozens of Sports Programs in an Unexpected Loss from the Pandemic*, Insider (July 8, 2020), https://www.insider.com/college-sports-programs-cut-due-to-coronavirus-pandemic-2020-7. Other schools and many athletic conferences have cancelled or rescheduled competitive seasons. *See, e.g., The Coronavirus and College Sports: NCAA Reopening Plans, Latest News, Program Cuts, More*, ESPN (Sept. 1, 2020), https://www.espn.com/college-football/story/_/id/29036650/the-coronavirus-college-sports-ncaa-reopening-plans-latest-news-program-cuts-more; Christina Maxouris, *Coronavirus Has Pushed These Schools to Cancel Their Athletic Programs in the Fall*, CNN.com (July 9, 2020), https://www.cnn.com/2020/07/09/us/schools-sports-programs-canceled-coronavirus/index.html.

First, Plaintiffs argue that Brown wrongly "rel[ies] on the *reporting* requirements found in the Joint Agreement and treat[s] these reporting requirements as specifying the only time to determine when or whether the violation occurs." ECF No. 368 at 3 (emphasis in original). But that is not Brown's argument. The Joint Agreement requires Brown to provide an annual report about "compliance with [the] Agreement for the academic year just being completed." Joint Agreement § V(A). When compliance can be determined only after the final day of regular season competition, it makes sense that a report about compliance will follow that date. But the annual report's August 1 deadline is not the "only time to determine when or whether the violation occurs." ECF No. 368 at 3. The only time to do so is after "the last day of regular season competition of the subject academic year." Joint Agreement § III(F)(3). Until that day has passed, all the information needed to determine compliance simply does not exist.

Second, Plaintiffs suggest that assessing compliance after regular season competition has ended would effectively render the Joint Agreement toothless and "could not have been the parties' intent." ECF 368 at 3. In Plaintiffs' view, "Defendants urge this Court to construe the Joint Agreement in a manner that would permit Brown to announce it will knowingly and intentionally be out of compliance with Title IX and the Agreement and violate both for at least a full year." *Id.*

The problem with this argument is that there is a doctrine of black-letter contract law that exists to address Plaintiffs' concern—namely, anticipatory breach. Anticipatory breach "occurs when the promisor unequivocally disavows any intention to perform when the time for performance comes." *Mgmt. Capital, L.L.C.*, 209 A.3d at 1175 (internal quotation marks omitted). Because the law gives parties to an agreement a full opportunity to perform under the agreement, there is a "high burden on a litigant who wants to establish an anticipatory breach," requiring proof that "'the defendant intended to repudiate its contractual obligation unqualifiedly, unconditionally

and unequivocally.'" *Pascale Serv. Corp. v. Int'l Truck & Engine Corp.*, No. 07 Civ. 247, 2007 WL 9789641, at *3 (D.R.I. Nov. 15, 2007) (quoting *D'Oliveira v. Rare Hospitality Int'l, Inc.*, No. P.C. 99-1835, 2003 WL 1223854, at *2 (R.I. Super. Ct. Feb. 13, 2003)); *see also RPS Assocs., LLC v. McDonalds USA, LLC*, No. 16 Civ. 504, 2017 WL 2198954, at *3 (D.R.I. May 18, 2017) ("[I]n order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional." (internal quotation marks omitted)).

Plaintiffs do not—and, as discussed below, cannot—show that Brown has clearly and unequivocally demonstrated its intention not to perform under the Joint Agreement. Indeed, not only does the data show that Brown will be in compliance, but Brown has repeatedly stated its intention to do so. *See, e.g.*, Paxson Dep. at 31 ("We comply with [the Joint Agreement] . . . and we will continue to comply with it as long as it exists."); Hayes Dep. at 97 (testifying that in considering the possible reinstatement of track & field and cross country, "the main concern was could [Brown] meet the requirements of proportionality"); *see also infra* at 32–33. In these circumstances, a claim for anticipatory breach is invalid. *Cf. Barbato v. Paul Revere Life Ins. Co.*, 794 A.2d 470, 472 (R.I. 2002) (party committed anticipatory breach "by announcing that it would not pay" any future payments that were due); *Griffin v. Zapata*, 570 A.2d 659, 662 (R.I. 1990) (party committed anticipatory breach where he communicated to the buyer that he would not attend the closing for property sale and expressed no willingness to close at a later date).

At bottom, the scope of the Joint Agreement "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). And within those four corners is the single requirement relevant here: that, accounting for the first- and last-day participation numbers, gender proportionality must fall within the applicable variance. Under the plain and unambiguous terms

of the Joint Agreement, Plaintiffs' claim that Brown has already committed a gross violation of this provision necessarily fails.

## II.   EVEN IF COMPLIANCE COULD BE ASSESSED NOW, PLAINTIFFS COME NOWHERE CLOSE TO DEMONSTRATING A GROSS VIOLATION FOR THE 2020-21 ACADEMIC YEAR

Even if it were appropriate to consider at this time whether Brown will be in compliance with the Joint Agreement's gender proportionality requirement for the 2020-21 academic year, Plaintiffs provide no evidentiary basis for finding any violation, much less a gross violation.

As noted above, the doctrine of anticipatory breach imposes a "high burden" on a party seeking to prove a violation without giving the other party an opportunity to comply, *Pascale Serv. Corp.*, 2007 WL 9789641, at *3, and requires proof that the defendant "unequivocally disavows any intention to perform when the time for performance comes." *Mgmt. Capital, L.L.C.*, 209 A.3d at 1175 (internal quotation marks omitted); *see also Hawkins v. Dep't of Health & Human Servs. for the State of N.H.*, 665 F.3d 25, 31 (1st Cir. 2012) (motion for contempt requires "clear and convincing evidence" that the alleged contemnor "violated the order" in question). If anything, Plaintiffs' burden is even higher here than in a typical case: they have to show not only that Defendants unequivocally intend to violate the Joint Agreement, but that Defendants unequivocally intend to commit a *gross* violation of the Agreement.

The best available data on 2020-21 varsity athletics confirms that Brown intends no such thing. Brown will be in compliance with the 2.25% variance at the end of this academic year—assuming athletic competition even happens at all in light of COVID-19. In fact, Brown is so comfortably within the applicable variance that it will remain in compliance even if there are unexpected changes either to its enrollment or varsity participation numbers. And, as explained

below, Plaintiffs' various arguments for disregarding the best available relevant data, in either whole or part, all fall short.

### A.    Current Roster Data Shows that Brown Will Comply with Its 2020-21 Obligation

The Joint Agreement currently requires that the percentage of each gender participating in varsity sports be within 2.25% of "each gender's percentage in the undergraduate enrollment for the same academic year." Joint Agreement § III(C). The formula for calculating compliance with this proportionality requirement therefore has two variables: (1) the proportion of women to men in Brown's undergraduate student body; and (2) the gender participation ratio across all sports. *Id.* The gender participation ratio, as noted above, is determined based on the average number of women and men who are included on the squad lists "on the first day of competition" and "on the last day of regular season competition" of the academic year. *Id.* § III(F)(2)–(4).

With respect to the first variable (undergraduate enrollment proportions), both sides have relied on Brown's 2019-20 data as the best available data, and that data reflects a full-time undergraduate student body that was 52.29% female and 47.71% male. *See* Ashenfelter Rep. at Table 2; ECF 357-1 at 20. The expected gender proportions for the incoming first-year class are essentially the same as the overall 2019-20 gender proportions. *See* Ex. O (Brown University Class of 2024 Profile).[10]

With respect to the second variable (gender participation ratios in varsity athletics), the relevant numbers from the first and last days of regular season competition do not yet exist, but the most current and best information available is contained in the 2020-21 Roster Declaration Forms. As discussed above, these forms are completed and verified each year by each team's coach

---

[10] Although the actual 2020-21 undergraduate gender proportions will not be confirmed until October 15, 2020, the official gender proportions in 2020-21 are expected to be substantially the same as in 2019-20. *See* 34 C.F.R. § 668.45(a)(4)(i).

in the ordinary course of business and identify the specific students, by name and class year, expected to participate on each of Brown's varsity teams. Hayes Dep. at 125–26.[11] An analysis of prior years' Roster Declaration Forms against the actual first- and last-day participation numbers for that academic year demonstrates that Roster Declaration Forms are a reliable predictor of future compliance. Ashenfelter Supp. Rep. at Figures 4 & 5.

Based on the certified Roster Declaration Forms for 2020-21, Brown has calculated the varsity athletics participants for 2020-21 as follows:

| Men's Teams | | | Women's Teams | |
|---|---|---|---|---|
| Baseball | 27 | | Basketball | 15 |
| Basketball | 18 | | Crew | 53 |
| Crew | 46 | | Cross Country | 27 |
| Cross Country | 12 | | Field Hockey | 25 |
| Football | 99 | | Gymnastics | 22 |
| Ice Hockey | 30 | | Ice Hockey | 23 |
| Lacrosse | 51 | | Lacrosse | 36 |
| Sailing (Coed) | 10 | | Rugby | 33 |
| Soccer | 30 | | Sailing (Coed) | 24 |
| Swimming & Diving | 29 | | Sailing (Women's) | 24 |
| Tennis | 10 | | Soccer | 32 |
| Track & Field | 41.5 | | Softball | 23 |
| Water Polo | 19 | | Swimming & Diving | 37 |
| Wrestling | 28 | | Tennis | 12 |
| | | | Track & Field | 58 |
| | | | Volleyball | 21 |
| | | | Water Polo | 23 |
| **Men's Subtotal** | 450.5 | | **Women's Subtotal** | 488 |
| | | | | |
| **Grand Total (Men's and Women's): 938.5** | | | | |

*See* Ashenfelter Supp. Rep. at Table 1.

Based on the above data, Brown is able to calculate its expected gender participation ratios for 2020-21 as follows: the men's participation ratio (450.5/938.5) is 48%, and the women's

---

[11] An example of one of these Roster Declaration Forms is attached hereto as Exhibit E.

participation ratio (488/938.5) is 52%. And with these participation ratios, the calculations that must be performed under the Joint Agreement are as follows:

|  | Undergraduate enrollment proportion | Gender participation ratio | Variance |
|---|---|---|---|
| Women | 52.29% | 52% (488/938.5) | .29% |
| Men | 47.71% | 48% (450.5/938.5) | -.29% |

*See* Ashenfelter Rep. at 12–13 & Table 2.

In other words, the female percentage of full-time undergraduate enrollment (52.29%) minus the female 2020-21 participation ratio (52%) yields a variance of 0.29%—well within the permissible 2.25% range under the Joint Agreement. In fact, the expected variance is roughly *seven times less* than the variance permitted under the Joint Agreement for the 2020-21 academic year.

### B. Brown Will Remain in Compliance Even if There Are Unexpected Changes to Enrollment or Varsity Participation

The 0.29% variance leaves plenty of room to account for any unexpected changes in either Brown's enrollment proportions or gender participation ratios.

Starting with the first variable (enrollment) and holding varsity athletic participation ratios constant, even if the female enrollment proportion were to increase to as high as 54.25% of the full-time undergraduate population or drop to as low as 49.75%, Brown would still be in compliance. Ashenfelter Rep. at Table 2. In other words, assuming no change in the varsity athletics participation ratio, Brown would be in compliance even if the number of full-time undergraduate women increased by 133 (from 3,561) and the number of men decreased by an identical amount (from 3,249), or if the number of full-time undergraduate women decreased by 173 female students and the number of men increased by an identical amount. *Id.*



*Id.* at Figure 3.

Likewise, there is plenty of room for the second variable (the varsity athletic participation ratio) to vary in either direction as well, holding the enrollment proportions constant. Thus, even if Brown's female varsity athletic participation ratio were to decrease to 50.04% (the equivalent of eliminating 18 female varsity participation opportunities and adding 18 male opportunities) or increase to 54.54% (the equivalent of eliminating 24 male opportunities and adding 24 female opportunities), Brown would *still* be in compliance with the 2.25% proportionality requirement.



*Id.* at Figure 4.

Brown would also remain comfortably in compliance even if women's and coed sailing were treated as a single participation opportunity. In that case, the total number of female varsity participation opportunities would fall by 24, yielding a subtotal of 464 female opportunities, and a grand total of 914.5 opportunities. *Id.* at Table C2. The expected gender participation ratios for 2020-21 would thus be calculated as follows: the men's participation ratio (450.5/914.5) would be 49.26%, and the women's participation ratio (464/914.5) would be 50.74%. *Id.* These ratios yield a variance of 1.55%, still well within the permissible 2.25% range. *Id.* at Table C2.

A 1.55% variance would leave Brown with plenty of breathing room to account for unexpected fluctuations in full-time undergraduate enrollment or varsity athletics participation. For example, if the female proportion of full-time undergraduate enrollment increases by 0.7% to 52.99%, Brown would still be in compliance if it treated women's and coed sailing as a single participation opportunity (assuming the varsity athletic participation ratios are held constant). Similarly, if female varsity athletic participation were to decrease by 0.7%, Brown would still be in compliance with the Joint Agreement (assuming the varsity athletic participation ratios are held constant). *Id.* at Table C2.



*Id.* at Figures C3 & C4.

27

And all of the above analyses—calculating the variance, calculating the buffer, calculating the variance and buffer without treating women's and coed sailing as distinct opportunities—continue to reflect Brown's compliance even if repeated using the June roster numbers that Brown gathered before Brown reinstated track & field and cross country and that Brown provided to Plaintiffs before they filed the Emergency Motion. *Id.* at Tables 1 & C1. In other words, the available roster information substantiated Brown's expectation of compliance then, just as the current roster information continues to substantiate Brown's expectation of compliance now.

And, of course, none of the projected numbers account for the fact that Brown is always free to take other steps to address unexpected changes and ensure continued compliance throughout the year—as Brown does every year—including managing the sizes of its male rosters, as expressly permitted by the Joint Agreement. *See* Joint Agreement § III(H); Lopiano Dep. at 69 ("Caps are always appropriate.").

### C.     Plaintiffs Offer No Valid Reason to Discard the Current Roster Data

Plaintiffs have not questioned any of the above analyses and, in fact, declined to take the deposition of Dr. Ashenfelter, despite having every opportunity to do so. Nor did Plaintiffs retain an expert who had any expertise in statistics, economics, or mathematics. The expert they did retain primarily offered her opinion on Title IX regulations and caselaw, and Plaintiffs have not made her report part of this proceeding.

Perhaps recognizing that accounting for the best data available does not support their position, Plaintiffs advance a series of arguments in the hope of eliminating the relevant data, or at least some of it, from the equation. But none of those arguments works.

### 1.     "Ignore All the Data"

Plaintiffs' opening pitch is that the Court should effectively ignore the data in its entirety.

28

In making this argument, Plaintiffs repeatedly reference President Paxson's June 6 statement that "[s]ince the announcement of the athletics initiative, there have been requests to restore men's track & field and cross country; however if these sports were restored at their current levels and no other changes were made, Brown would not be in compliance with our legal obligations under the settlement agreement. We continue to closely examine Brown's legal obligations." *See* ECF 357-1 at 13; ECF 378 at 6, 18. In Plaintiffs' telling, following that statement, "the University announced that it *was* restoring men's track, field and cross-country. *And no other changes were made.*" ECF 357-1 at 13 (emphasis in original). In other words, according to Plaintiffs, President Paxson's public statement essentially amounted to an admission of liability. *See* ECF 378 at 6–7.

But this narrative misrepresents what actually occurred *before* Brown announced it was reinstating men's track & field and cross country. As discussed above, Brown obtained and reviewed the most up-to-date roster information available at that time, requesting that coaches provide 2020-21 roster projections based on "the names of those returning and the incoming students . . . to see [if there was] a way that [Brown] could remain within the variance if [it] brought track back." Hayes Dep. at 117. Based on these projected roster sizes, Brown ensured that it could reinstate men's track & field and cross country with proper "roster management"—*i.e.*, "looking at the men's rosters and capping them," if necessary. *Id.* at 117–24; *see also* Paxson Dep. at 107, 109.

In other words, before reinstating men's track & field and cross country, Brown *did* make "other changes" and confirmed that it "could be [in compliance] with some modifications to men's rosters." Paxson Dep. at 108–09; *see also* Hayes Dep. at 116. Plaintiffs might have preferred that Brown ensure compliance by restoring one or more women's teams, but that is not what the Joint

Agreement requires or allows Plaintiffs to demand, especially since Brown retains "discretion to decide how it will balance its program to provide equal opportunities for its men and women athletes." *Cohen III*, 879 F. Supp. at 214 (explaining Brown "may eliminate its athletic program altogether, it may elevate or create the requisite number of women's positions, it may demote or eliminate the requisite number of men's positions, or it may implement a combination of these remedies"); *see also* Joint Agreement § III(G)–(H); Lopiano Dep. 69, 108.

## 2.    "Use Outdated Data"

Plaintiffs' next argument is that the Court should simply ignore the current rosters in assessing compliance for the 2020-21 year, insisting instead that the "most accurate numbers the Court can use to determine compliance" for 2020-21 "are the rosters from the 2019-20 season." ECF 378 at 29. But that approach makes little sense. Plaintiffs allege that Brown will be out of compliance with the 2.25% proportionality requirement at the end of the 2020-21 academic year. Why, then, would the Court disregard the best evidence and most up-to-date data on the 2020-21 rosters? Plaintiffs appear to offer three rationales to justify this counterintuitive position.

First, Plaintiffs argue that the 2019-20 rosters are the best proxy for the 2020-21 academic year because those "numbers represent actual women who competed in all (or at least some) of a season." ECF 378 at 29. But last year's rosters obviously also include "student athletes who graduated, and/or who were on a prior year's roster but who are not expected to be enrolled and/or on a roster" this year, while, by definition, excluding incoming first-year student athletes as well as any walk-ons, transfers, or other new additions to the team. Orleans Rep. at 8.

That holds especially true at Brown, where team sizes regularly change from year to year. *See* Ashenfelter Supp. Rep. at Figures 2A–J. In fact, year-to-year fluctuations may be significant. For example, the number of participants increased by 17.5 athletes in women's track & field from

2009-10 to 2010-11; decreased by 23.5 athletes in men's football from 2017-18 to 2018-19; and decreased by five athletes (or 20.83%) in women's cross country from 2018-19 to 2019-20. *Id*. at Table 2B. Because of annual fluctuations in roster sizes, using last year's rosters to predict future participations ratios is statistically unreliable. *See* Orleans Rep. at 8; Lopiano Dep. at 104 (agreeing that roster numbers may "fluctuate quite widely" from year to year).

The current Roster Declaration Forms, by contrast, are in fact an accurate predictor of gender participation ratios for the current year. Ashenfelter Supp. Rep. at 20. To determine the predictive accuracy of the Roster Declaration Forms, Brown's expert conducted a regression analysis of the 2018 and 2019 Roster Declaration Forms against the actual participation numbers for the 2018-2019 and 2019-20 academic years. That regression analysis yielded a value called "R-squared," which reflects how much of the variance in the average number of varsity athletic opportunities is explained by the number of varsity athletic opportunities in the Roster Declaration Forms. *Id.* at 15 n.17. An R-squared value of "1" would mean that the Roster Declaration Forms completely explain the actual participation rates for that year. *Id*. Each set of numbers confirms that the Roster Declaration Forms were extremely reliable predictors of male and female varsity athletics participation in 2018-19 and 2019-20, with R-squared values ranging from 0.95 to 0.99, as depicted graphically below:







*Id.* at Figures 4I, 4L, 5I, 5L.

Second, Plaintiffs seem to argue that the Roster Declaration Forms cannot be trusted this year because, amidst the backlash from its decision to cut men's track & field and cross country, Brown somehow "conspired" to do away with the Joint Agreement. It is true that in the days following the May 28 announcement, various officials at Brown expressed frustration with the Joint Agreement and the distinct obligations it imposes on Brown, as compared to all other colleges and universities. *See* ECF 378 at 14–19. But Plaintiffs' narrative falls apart when they suggest that, as a result of those frustrations, Brown concocted a plan to "knowingly violate[]" the Joint Agreement as a means to get out from under it. *Id.* at 4. One reason why this theory makes no sense is how would it even work? The Joint Agreement itself identifies the circumstances in which the Joint Agreement can be modified, and an intentional violation by Brown is certainly not one of them. *See* Joint Agreement § I(E). And if Brown truly thought that violating the Joint Agreement were somehow a way to end it, why would Brown have consistently maintained—before the public, Plaintiffs, and the Court—that Brown has every intention to comply?

Plaintiffs' alleged conspiracy not only lacks a logical basis; it also lacks factual support. The record is clear that prior to reinstating track & field and cross country, Brown undertook a substantial effort to gather information about the 2020-21 rosters. Athletic Director Hayes gathered

current roster information from every coach before the reinstatement decision was made, understanding that compliance with the Joint Agreement was "the main concern" bearing on whether reinstatement was even possible. Hayes Dep. at 97; *see also id.* at 116–17. And President Paxson's position could not have been clearer: "We comply with [the Joint Agreement] . . . and we will continue to comply with it as long as it exists." Paxson Dep. at 31.

Third, Plaintiffs argue, without a shred of evidentiary support, that the 2020-21 Roster Declaration Forms somehow contain "inflated numbers of women." ECF 378 at 25. But Plaintiffs have not come forward with anything other than pure speculation to justify this theory.

As an initial matter, the roster sizes reflected in the 2020-21 Roster Declaration Forms do not reflect "participation opportunities" in the abstract; rather, each roster spot is associated with the name of a specific student athlete. Hayes Dep. at 96–97. And on top of that, each roster is signed or certified by the relevant coach confirming that it is accurate. *See, e.g.*, Ex. E (Roster Declaration Form for women's water polo). Plaintiffs' legal theory for ignoring the Roster Declaration Forms is thus misguided, *see* ECF 378 at 32, since the Court in *Cohen III* (Pettine, J.) rejected the argument that "participation opportunities offered at Brown should be measured by counting each team's filled *and unfilled* athletic slots." 879 F. Supp. at 203 (emphasis in original). Here, by contrast, Brown is not relying on "theoretical opportunities" that may go unfilled, *id.*; it has provided a list, certified by each team's coach, naming each and every student athlete on each team's current roster.

Nor does a comparison of this year's rosters to last year's rosters demonstrate that the current rosters are impermissibly inflated. *See* ECF 378 at 27. Once again, Plaintiffs ignore the fact that, given graduations, recruitment, transfers, and injuries, roster sizes are not constant from year to year. Orleans Rep. at 8; Ashenfelter Supp. Rep. at Figures 2A–J; Lopiano Dep. at 104. And

the two decades' worth of data that Brown has provided to Plaintiffs illustrate that this year's rosters are hardly remarkable. In fact, the 2020-21 women's rosters are *lower* than their maximum size for all teams except gymnastics, lacrosse, and softball (which only exceed their maximums by 4, 2, and 3 athletes, respectively) since 1998 when the Joint Agreement took effect.

| Women's Teams | 2020-21 Roster Declaration Forms | 20-Year Maximum | Difference Between 2020-21 Rosters and 20-Year Maximum |
|---|---|---|---|
| Basketball | 15 | 18 (2011-12) | 3 fewer women |
| Crew | 53 | 71.5 (1998-99) | 18.5 fewer women |
| Cross Country | 27 | 39.5 (2012-13) | 12.5 fewer women |
| Field Hockey | 25 | 32 (1999-2000) | 7 fewer women |
| Gymnastics | 22 | 18 (*e.g.*, 2015-16) | 4 more women |
| Ice Hockey | 23 | 26.5 (2002-03) | 3.5 fewer women |
| Lacrosse | 36 | 34 (2017-18) | 2 more women |
| Rugby | 33 | 36 (2015-16) | 3 fewer women |
| Sailing (coed) | 24 | n/a | n/a |
| Sailing (women's) | 24 | n/a | n/a |
| Soccer | 32 | 49 (1999-00) | 17 fewer women |
| Softball | 23 | 20 (*e.g.*, 2018-19) | 3 more women |
| Swimming & Diving | 37 | 38 (2019-20) | 1 fewer woman |
| Tennis | 12 | 15.5 (2008-09) | 3.5 fewer women |
| Track & Field | 58 | 67.5 (2013-14) | 9.5 fewer women |
| Volleyball | 21 | 23 (*e.g.*, 2011-12) | 2 fewer women |
| Water Polo | 23 | 27 (2016-17) | 4 fewer women |

*See* Ashenfelter Supp. Rep. at Tables 1, 2.

Plaintiffs next argue that the women's track & field roster is a "case study" of purported improprieties and that that roster has grown "with seemingly little regard to whether these women could have a meaningful participation opportunity." ECF 378 at 29–30. But there is nothing nefarious, much less unlawful, about investing resources so that a team may continue to grow. The emails exchanged between Athletic Director Hayes, Deputy Athletic Director Colin Sullivan, and the women's track & field coach, Tim Springfield, discuss strategies to grow the women's track & field roster over time. As Coach Springfield explained, the women's track & field roster could

34

grow for 2020-21 if certain "[k]ey steps" were implemented, including "[a]ctively recruit[ing] current Brown students who ran cross country / track in high school," broadening "recruiting efforts for walk-ons," providing "*adequate training equipment* for *all* team members," and ensuring "*full competitive* opportunities for expanded roster at local/regional meets." ECF 378-3, Ex. 17 at 3 (emphasis added). And Springfield and Sullivan reaffirmed the importance of providing meaningful resources and competitive opportunities, discussing whether they could use admission slots or walk-ons to grow the team, but *only if* student athletes receive "the right level of equipment/opportunity." *Id.* at 2. In other words, Plaintiffs' own evidence confirms that Brown was only adding women to its team if those student athletes would receive authentic varsity-level competitive opportunities and resources, which was the point of President Paxson's Excellence in Athletics initiative in the first place. *Id.* at 1.

But even more simply, Plaintiffs actually have the current women's track & field roster and have not identified a single participant listed who will not have a "real" varsity track & field experience. That shortcoming is hardly a surprise. The 2020-21 roster is verifiably *not* inflated when placed in historical context, as it contains 9.5 fewer women than its historic peak in 2013-14. Ashenfelter Supp. Rep. at Table 2. Far from inflating its women's track & field numbers, Brown is reinvesting and rebuilding the team to a level consistent with its past size.

Plaintiffs' other purported examples of impermissible inflation involving Brown's water polo and sailing teams fare no better. *See* ECF 378 at 32–33. With respect to water polo, the coach represented to Athletic Director Hayes that his ideal roster size would be 18 for men and 20 for women, despite already carrying rosters greater than those numbers for both genders. ECF 378-3, Ex. 24. While Plaintiffs seize on the coach's comment that he "always anticipate[s] carrying more women to help with Title 9 numbers," *id.*, allowing for a greater number of women than men is

explicitly permitted under the Joint Agreement, *see* Joint Agreement § III(H). And Plaintiffs do not identify any of the 23 female water polo athletes for the upcoming year who they believe will not have a genuine varsity-level experience—just as they did not claim that any of the 23 female water polo athletes on last year's roster failed to have a genuine varsity-level experience.

Plaintiffs similarly point to the fact that the number of women participating on the women's and coed sailing teams is larger than the ideal roster numbers that Coach Mollicone reported back in May 2020. ECF 378 at 32. But, again, Plaintiffs omit important context. Coach Mollicone testified that he expressed his so-called "ideal" numbers "fairly quickly," before sailing had been elevated to varsity status, and even at the time, he had more than 18 female sailors. Ex. P ("Mollicone Dep.") at 93–94. With respect to the 2020-21 rosters themselves, Coach Mollicone testified that he has "a very large freshman class coming in this year, . . . with a lot of females," and that he will be able to "continu[e] to add . . . a lot more females" in light of sailing's new varsity status. *Id.* at 93. He confirmed that "[e]very female" sailor on the Roster Declaration Form is "fully qualified to be a varsity athlete." *Id.* Given the historical success of Brown sailing—and the women's recent national championship—it is no surprise more and more Brown students want to join the now-varsity sailing teams. It is also unsurprising that Plaintiffs are once again unable to identify a single sailor listed by name on the 2020-21 Roster Declaration Forms who, in their estimation, should not count.

### 3.    "Pretend Sailing Doesn't Exist"

Plaintiffs next argue that the Court should ignore sailing altogether in assessing whether Brown will be in compliance for the 2020-21 academic year. According to Plaintiffs, a "club sport is *not* a varsity sport," ECF 357-1 at 22 (emphasis in original), and thus "sailing cannot be counted as a varsity sport until the team has had its first competitive season," ECF 378 at 33.

But that argument is completely inconsistent with the language and structure of the Joint Agreement. It is beyond dispute that at the end of the 2020-21 academic year, Brown would be required under the Joint Agreement to report the number of student athletes who participated on its sailing teams, and that those participants would be part of the gender proportionality calculation. Joint Agreement §§ III(F), V(B)(3). There is no reason why the Court, in assessing the likelihood of compliance at the end of the year, would ignore a whole set of numbers that would necessarily be part of that end-of-the-year assessment.

Indeed, that is precisely what occurred between 2014 and 2015, when Brown elevated women's rugby from club to varsity status. On July 31, 2014, when Brown provided its 2013-14 Annual Report, it notified Plaintiffs that it planned to "elevate its women's rugby team from club level to full varsity status beginning in the 2014-15 academic year." Ex. Q. On July 28, 2015, when Brown provided its next annual report, it included the participation numbers from the newly elevated women's rugby team and used those numbers to demonstrate that it had "met the permitted variance." Ex. R. Plaintiffs did not object. This is exactly what Brown plans to do when it makes its report to Plaintiffs' counsel on or before August 1, 2021.

There is nothing about sailing at Brown that would put in doubt its viability as a "real" varsity sport. *See* Orleans Rep. at 9–13; Lopiano Dep. at 108 (acknowledging that adding women's varsity opportunities is a "permissible way to meet proportionality requirements" under the Joint Agreement and stating that "adding sailing would be great"). To the contrary, the Brown sailing program is already one of the school's premiere athletics programs. The women's sailing team won the women's national championship in 2019, after second- and third-place finishes in 2016 and 2015, respectively. Mollicone Dep. at 19–20. It ended the 2019-20 academic year ranked first in the country. *Id.* at 20. The coed team took fifth place at the coed national championship in 2019

and ended last season ranked sixth in the country. *Id.* The women's national sailor of the year for 2019-20 was from Brown, and she was among the eight all-American sailors from Brown that year. *Id.* The success of Brown sailing is a product of the intense commitment that Brown's sailors make and decades of leadership from Coach Mollicone, himself one of the top sailors in the United States and last year's college coach of the year. *Id.* at 13, 18–20, 65. As Coach Mollicone stated, the club program "has operated like a varsity team" for years. *Id.* at 81.

Plaintiffs' claim that Athletic Director Hayes and Coach Mollicone "testified that key aspects of what is needed to confirm a varsity sport [are] not in place for sailing at this time" rests on blatant mischaracterizations of the record. ECF 378 at 33. With respect to Athletic Director Hayes, Plaintiffs say that he "testified that, although he believes the sailing team is already a varsity team, there are many aspects of being a varsity team that do not yet exist." *Id.* Yet the transcript pages that Plaintiffs cite show no such thing. Athletic Director Hayes testified that "[t]here is a varsity sailing team because all operations going forward are under NCAA compliance," and that the "admissions and financial aid process" is the same as other varsity sports. Hayes Dep. at 154. In fact, as of July 1, 2020, the compliance process that governs all varsity sports, including sailing, has been underway. *Id.* at 155. It is true that the 2020-21 competitive sailing season has not yet begun and sailing uniforms have not yet been ordered. *See* ECF 378 at 33–34. But, as Athletic Director Hayes explained, the competitive seasons for *no* sports have started, and although the process for ordering sailing uniforms has begun, the uniforms for *no* sports have been ordered due to COVID-related holds. Hayes Dep. at 156 ("We have gone through the exact same ordering uniform process for sailing as we have for every other varsity program, which is a different process than sailing had in years past."). In other words, the "key aspects" Plaintiffs say are not in place for sailing are not in place for any other varsity sport either.

38

With respect to Coach Mollicone, Plaintiffs argue that he testified that the "roster is not finalized and will not be until after the team holds tryouts"; that the "schedule is not finalized" for spring competition; and that the sailors do not have "varsity uniforms, access to the varsity trainers, or the academic services available to all varsity athletes." ECF 378 at 33–34. But the fact that the spring competition schedule is not finalized has nothing to do with Brown: as Coach Mollicone explained, the spring schedule for all sailing programs is set every year in December, based on a team's performance in the fall. Mollicone Dep. at 53. And Plaintiffs' remaining points, once again, apply to all varsity programs at Brown. Because there are no students currently on campus, *no* varsity team can hold tryouts, *no* varsity team can use varsity trainers, and *no* varsity team can use academic services. Once the sailing teams "officially start being able to do team-related activity, . . . they'll have access to all [the] things" to which varsity teams get access. *Id.* at 71.

Finally, Plaintiffs' reliance on a solitary, out-of-context quote from a non-binding 1993 opinion does not advance their cause for similar reasons. *See* ECF 357-1 at 22; ECF 378 at 33–34. In *Favia v. Indiana University of Pennsylvania*, the court was not considering whether it should count a newly elevated varsity support under a settlement agreement or even under Title IX's distinct proportionality requirement. Instead, in evaluating whether the university could show a "continuing practice of program expansion," the court observed that "although it may at sometime in the future, [the university] has not elevated its popular women's club soccer to a varsity status. You can't replace programs with promises." 812 F. Supp. 578, 585 (W.D. Penn. 1993). The "promise" referenced was the possibility of elevating soccer at some indefinite point in the future. That is not what is happening here. Instead, Brown's women's and coed sailing—both nationally ranked, with a long history of success—have already been elevated. To borrow Plaintiffs' language, sailing is already a program, not a promise.

39

###### 4.   "Don't Count the Women's Sailing Team"

Finally, Plaintiffs argue that even if the Court includes sailing in its analysis, the opportunities for women to participate on both the women's and coed sailing teams should not be independently counted.

But the language of the Joint Agreement *requires* that "women and men student-athletes who participate on more than one intercollegiate athletic team . . . be counted separately for each team on which they participate." Joint Agreement § III(F)(1). The Joint Agreement is explicit that the parties must count "participation opportunities," not total number of athletes. *Id.* III(C). And this is a gender-neutral requirement. Imagine a world in which Brown offered only a coed sailing team, but later added a men's sailing team that gave men, but not the women on the coed team, access to a broad set of additional competitions. In those circumstances, Plaintiffs would almost certainly argue that the men have participation opportunities that the women do not, and Brown should be required to count those men's-only participation opportunities for purposes of the Joint Agreement.

It is thus unclear how Plaintiffs can urge the opposite position with respect to women's sailing, when women's sailing and coed sailing undoubtedly offer different opportunities. Each weekend of regular season sailing competition offers separate women's and coed events or "regattas," and a "regatta is either coed or it's women's. There's no men's." Mollicone Dep. at 47–48, 50. Thus, because women have the "the benefit of competing in the women's circuit and the coed circuit," there are "more opportunities" for women than men, and only women sailors get a chance to compete for an Ivy League championship. *Id.* at 74, 85. Many other schools with top sailing programs, including Yale, Stanford, and Tulane, have historically counted the women's and coed teams as providing separate opportunities. *Id.* at 86.

In response, Plaintiffs imply that Coach Mollicone testified that "the club varsity team was always considered to be *one* team." ECF 378 at 35 (emphasis in original). He said no such thing, testifying instead that the "women have always been on a women's team and a coed team," even if the club sailing program's website listed all Brown's sailors on a single webpage. Mollicone Dep. at 84. Plaintiffs next state that "a female student athlete can compete in either a coed race or women's race on any given day of a regatta, *but not both*." ECF 378 at 36 (emphasis in original). But there are multiple regattas every weekend, and a female sailor can compete in both a coed event and a women's event in a single weekend—an opportunity that male sailors do not have. *Id.* at 47–48, 57–58.

Finally, Plaintiffs point to a provision in the Joint Agreement that requires indoor and outdoor track to be counted as a single participation opportunity, and express their "belie[f]" that sailing is "akin to the indoor/outdoor track counting issue." ECF 378 at 34. But that argument only cuts against Plaintiffs and in Brown's favor. The only reason why indoor and outdoor track count as a single participation opportunity is because the Joint Agreement explicitly provides for a specific exception from the otherwise normal counting rules:

> [W]omen and men student-athletes who participate on more than one intercollegiate athletic team will be counted separately for each team on which they participate, *except that*, for the purposes of counting under this Agreement (it being understood that Indoor and Outdoor Track are two separate team[s] for NCAA, Ivy League and other purposes [*e.g.*, EADA], and Brown will continue to report them as such), Indoor and Outdoor Track shall be counted as a single sport.

Joint Agreement § III(F) (emphasis added). In effect, Plaintiffs are asking that the Court transform an *exception* to the normal counting rules into the normal counting rules themselves. That would turn the concept of an exception on its head. *See Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 61 (1st Cir. 2001) ("[T]he maxim expressio unius est exclusio alterius instructs that, when parties

list specific items in a document, any item not so listed is typically thought to be excluded."). Absent an express exception in the Joint Agreement, indoor and outdoor track would be counted as two opportunities, just as women's and coed sailing should be here.

Nonetheless, as explained above, it ultimately does not matter if women's sailing and coed sailing are treated as a single opportunity. Even if they are, Brown would be in compliance with the Joint Agreement for the 2020-21 academic year, with room to spare. *See supra* at 27–28.

## III.   PLAINTIFFS ARE NOT ENTITLED TO INTERIM RELIEF

In their supplemental brief, Plaintiffs reiterate their request for "interim" relief, declaring it "necessary to protect the athletes by preserving the status quo." ECF 378 at 37.

It is unclear in what sense Plaintiffs continue to seek "interim" relief. The Court will hold a hearing during the week of September 14, after which it will issue a final decision regarding Brown's compliance with the gender proportionality requirement for the 2020-21 academic year. That is the only issue that the Court needs to—and has the authority to—decide in these circumstances. Joint Agreement §§ V(C)(6), VI; *see also Harvey v. Johanns*, 494 F.3d 237, 244–45 (1st Cir. 2007) ("A court's power to enforce a judgment is confined to the four corners of the judgment itself. . . . Enforcement proceedings . . . cannot be used to take up matters beyond the contours of the judgment and thereby short-circuit the usual adjudicative processes.").

Regardless of the label that Plaintiffs put on their requested relief, they have not overcome their substantial burden to show that Brown unequivocally intends to commit a gross violation of the Joint Agreement. And contrary to Plaintiffs' suggestion, it is their burden to do so. *Compare* ECF 378 at 41 ("The Court should prohibit Brown from eliminating any of their teams—and order their reinstatement—unless and until *Brown can prove* that it is in compliance with the Joint Agreement and Title IX." (emphasis added)), *with Olick v. John Hancock Mut. Life Ins. Co.*, 106 F. App'x 736, 737 (1st Cir. 2004) ("While the district court's 1997 final judgment authorized

action[s] to enforce the terms of the Settlement Agreement, [the plaintiff class member] has failed to carry his burden of establishing any breach thereof." (internal quotation marks and citation omitted; first alteration in original)). Because Plaintiffs cannot succeed on the merits, their request for relief, interim or otherwise, must be denied.

In addition, the specific relief that Plaintiffs seek is problematic for two other independent reasons. First, the request for an order requiring Brown to restore *all* women's teams to varsity status, ECF 357-1 at 24, sweeps far more broadly than the violation that Plaintiffs allege. The Joint Agreement enables the Court's to determine the manner in which Brown comes "into compliance with the then applicable percentage variance." Joint Agreement § V(C)(6). The Agreement does not allow Plaintiffs or the Court to substitute their own judgment for that of Brown's leadership with respect to what combination of varsity and club teams Brown should offer. Having more cushion for Brown's compliance here would at most require the restoration of one women's team (*e.g.*, equestrian, which was one of two women's teams transitioned to club status with no men's counterpart). Given Dr. Ashenfelter's statistical analyses discussed above, relief that goes beyond a single team would not be necessary to bring Brown "into compliance," *id.*, and would effectively reinstate the team-specific protections for equestrian, fencing, golf, skiing, and squash that ceased to apply almost two decades ago, after the 2000-01 academic year, *id.* § II(B), (D), (G).

Second, Plaintiffs' request for relief is out of step with the reality of the world today given COVID-19 and the drastic effect that the pandemic is having on athletics and university life in general. The Ivy League has already cancelled fall sports, which has disproportionately affected male athletes due to the fact that football, by far the largest men's team, is played in the fall. And it is possible that no sports will be played at all in the 2020-21 academic year. In these unprecedented circumstances, it is not clear how the Court might fashion an order aimed at

43

bringing Brown "into compliance." Joint Agreement § V(C)(6). And the broad relief that Plaintiffs seek would unnecessarily bind Brown's hands at a time when the need for flexibility is at its zenith.

*      *      *

When they filed their Emergency Motion in June, Plaintiffs did not yet have access to the most recent Roster Declaration Forms which unequivocally show that Brown will once again be in compliance with the Joint Agreement in the 2020-21 academic year. *See* ECF 357-1 at 14. It is perhaps unsurprising that since Plaintiffs came into possession of that data, they have resorted to spurious conspiracy claims and focused their energies on the process that led to Brown's decision, rather than the hard data that makes Brown's compliance with the Joint Agreement all but a certainty.

This is not a proceeding about whether Brown would prefer to be governed only by Title IX, rather than navigate the dual and different requirements of Title IX and the Joint Agreement. Brown officials are entitled to their subjective views on the Joint Agreement even while they are committed to complying with it. Nor is this a proceeding about whether Brown followed Plaintiffs' preferred process in deciding to transition certain varsity sports to club status. Brown is permitted to eliminate varsity sports under the Joint Agreement, and Plaintiffs' counsel have no preordained consultation or veto rights in connection with Brown's decision to do so.

This is a proceeding about a single provision in the Joint Agreement—specifically, whether Brown unequivocally intends to commit a gross violation of the gender proportionality requirement for the 2020-21 academic year. Brown's witnesses all stated that Brown intends to abide by the Joint Agreement, and the best roster information available demonstrates that it will in fact do so.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Emergency Motion should be denied.

Dated: September 2, 2020                                    Respectfully submitted,

/s/ Roberta A. Kaplan
Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
Matthew J. Craig (*pro hac vice* pending)
David Shieh
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com
dshieh@kaplanhecker.com

/s/ Robert C. Corrente
Robert C. Corrente
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
401.270.1333
rcorrente@whelancorrente.com

*Attorneys for Defendants*