## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMY COHEN, et al., <br> PLAINTIFFS, <br><br>     v. <br><br> BROWN UNIVERSITY, CHRISTINA PAXSON, as successor to VARTAN GREGORIAN, and JACK HAYES, as successor to DAVID ROACH <br> DEFENDANTS | Case Number: 92-CV-0197-JJM-LDA |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO ENFORCE JUDGMENT, TO ADJUDGE IN CONTEMPT, AND FOR EMERGENCY RELIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... 2

**INTRODUCTION** .................................................................................................... 3

**I.**   **PLAINTIFFS' MOTION TO ENFORCE IS NOT PREMATURE.** ............................... 6

   A.   Brown is Already in Violation of the Joint Agreement. ..................................................... 6

   B.   Plaintiffs' Motion is Not Premature. ...................................................................... 7

**II.**   **THE 2020-21 PRESEASON ROSTERS DO NOT PROVE THAT BROWN IS IN COMPLIANCE WITH THE JOINT AGREEMENT.** ........................................................... 12

   A.   The Court Cannot Rely on Brown's 2020-21 Preseason's Rosters to Assess Compliance... ................................................................................................. 13

   B.   The Court Should Not Allow Brown to Double-Count Women Sailors. .......................... 17

**III.**   **THE COURT SHOULD PRESERVE THE STATUS QUO UNTIL BROWN HAS PROVED IT IS IN COMPLIANCE.** ........................................................................... 18

**CONCLUSION** ..................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Barrett v. West Chester Univ. of Penn.*, No. 03-cv-4978, 2003 WL 22803477 (E.D. Pa. 2003) . 22

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009)........................................... 22

*Choike v. Slippery Rock Univ.*, No. 06-622, 2006, WL 2060576 (W.D. Pa. 2006).................... 22

*Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992) .......................................................... 7, 18

*Cohen v. Brown Univ.*, 879 F. Supp. 185 (D.R.I. 1995)..................................................... 8, 14, 18

*Cohen v. Brown Univ.,* 991 F.2d 888 (1st Cir. 1993) ..................................................................... 8

*Cohen v. Brown University*, 101 F.3d 155 (1st Cir. 1996) ....................................................... 8, 20

*Mansourian v. Regents of Univ. of California*, 602 F.3d 957 (9th Cir. 2010)............................. 11

*Mayerova v. Eastern Michigan University*, 346 F. Supp. 3d 983 (E.D. Mich. 2018) ................. 22

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016).................................. 12, 22

*Rolland v. Patrick*, 946 F. Supp. 2d 226 (D. Mass. 2013) ............................................................ 8

*U.S. v. Com. of Mass.*, 890 F.2d 507 (1st Cir. 1989) ............................................................... 8, 11

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)...................................................................... 8

**INTRODUCTION**

Plaintiffs' Motion to Enforce Judgment and for Emergency Relief, Memorandum in Support, and Supplemental Brief showed that Brown University knew it would violate the Joint Agreement if it reinstated men's track, field, and cross country and no women's teams, but it decided to do so anyway—because, as Chancellor Samuel Mencoff put it in an email to President Christine Paxson at 8:50 pm on June 4, 2020, Brown wanted to "kill this pestilential thing." ECF 378 at 16-17. Just over an hour later, at 9:56 pm on June 4, 2020, Athletic Director Jack Hayes suggested to Chancellor Mencoff that Brown could "easily" comply with the Joint Agreement if it *also* reinstated the women's equestrian team. *Id.* at 17. But that is not what Brown decided to do.

The following day, June 5, 2020, at 12:06 pm, President Paxson responded to Mencoff's "kill the pestilential thing" email by writing, "I spoke with Jack [Hayes] about this. I think it's a good idea. He is talking with [General Counsel] Eileen [Goldgeier], and I will follow up." The next day, June 6, 2020, President Paxson announced in writing to the entire Brown Community that, if the men's track, field, and cross country "were restored at their current levels and no other changes were made, Brown would not be in compliance with our legal obligations under the settlement agreement."

On June 9, 2020, Paxson announced that Brown University was restoring men's track, field and cross country, and no other changes were made: "The reinstatement is effective immediately and does not alter other decisions to reduce the number of varsity sports as part of the initiative." In an email to Chancellor Mencoff and Excellence in Athletics Committee Chair Kevin Mundt, President Paxson wrote: "I expect both of you may have wanted us to be more explicit about our intention to fight the consent decree. Our concern is that this could rile up the Cohens of the world

and put us in a defensive posture. We need space to work out a rock-solid legal strategy and then go on the offensive."[1]

Plaintiffs filed their Motion to Enforce both because President Paxson *admitted* in advance that Brown would be in violation of the Joint Agreement if it took the actions it has taken and because the historical participation numbers at Brown *prove* that what President Paxson announced to the Brown community on June 6 was true: Brown *is* in violation of the Joint Agreement. But, because Plaintiffs acted so quickly, Brown did not have the chance to prepare the attack on the Joint Agreement it was planning and "then go on the offensive."

Defendants' Opposition says nothing about almost any of this. But it does "go on the offensive." Defendants' Opposition is based on a series of assertions that simply are not true. On the first two pages alone:

- The Opposition says, at 1, ECF 380 at 5, Brown "did not make a single decision about its varsity athletics offerings without first assuring itself that Brown would be able to continue to comply with the Joint Agreement." That is not so. The emails from Athletic Director Hayes to Chancellor Mencoff detailed in Plaintiffs' Supplemental Brief and mentioned above prove that. So does the deposition testimony of President Paxson and Excellence in Athletics Committee Chair Mundt that they decided Jack Hayes "could make it work" – without even asking him *how*. *See* Plaintiffs' Supplemental Brief, ECF 378 at 25.

- The Opposition says, at 2, ECF 380 at 6, that Plaintiffs sued Brown University for "gross violation" of the Joint Agreement "before they had availed themselves of the opportunity to review and discuss [the 2020-21 preseason roster] data with Brown." That is not so. Plaintiffs' Motion was filed *after* Plaintiffs reviewed that data. Plaintiffs' Memorandum in Support of their Motion discusses in detail, ECF 357-1 at 21-24, why these are "imaginary and unrealistic numbers."

- The Opposition says, at 2, "it cannot possibly be the case that Brown has already violated the Agreement for the 2020-21 academic year." This is incorrect in two respects. First, it suggests that Brown can only be in violation of the Joint Agreement for an entire academic

---

[1]     The President's own words—privately stating Brown's intention to fight the Joint Agreement rather than meet its requirements—belie Defendants' assertion, ECF 380 at 17, that at the time of these private discussions, Brown's decision to reinstate men's track, field and cross country was conditioned upon compliance with the Joint Agreement.

year, with the issue to be decided at the end of the year. The Joint Agreement does not say that. Brown can be in violation at any time. At this time, it is in gross violation. Second, Plaintiffs are not just alleging that Brown will be in violation of the Joint Agreement in the future. Brown will be in violation in the future if its actions are not changed, but it is also in violation now.

- The Opposition says, at 2, that Brown's 2020-21 preseason rosters are "the best roster information available" and they leave "no doubt about Brown's ability to provide athletics opportunities withing the required proportions." Both assertions are incorrect. As Plaintiffs' previous filings already demonstrate, the 2020-21 preseason rosters contain "imaginary and unrealistic numbers." Brown *knows* the numbers in them for the fall sports are not true. No fall sports are taking place this year at all. As Plaintiffs' previous filings show, the 2020-21 preseason rosters cannot and do not prove that Brown is or will be in compliance.

- The Opposition says, at 2, that Plaintiffs' Supplemental Brief "cries conspiracy against high-ranking Brown officials." This is inaccurate. Plaintiffs' filing does not even contain the words "conspiracy," "conspire," or "conspired." But the charge is repeated at 32, where the Opposition says Plaintiffs argued that "Brown somehow 'conspired' to do away with the Joint Agreement," putting the word "conspired" in quotes as if Plaintiffs said it. (They didn't.) It is repeated again, on 32, where the Opposition refers to "Plaintiffs' alleged conspiracy" when Plaintiffs never alleged any conspiracy. And, finally, on 44, the Opposition says Plaintiffs have "resorted to spurious conspiracy claims," when Plaintiffs made no conspiracy claims at all.[2]

- The Opposition says, at 2, that Plaintiffs' Supplemental Brief "inveighs against the process by which Brown decided to restructure its program in the first place." That is not so. Plaintiffs did not challenge the original Excellence in Athletics process at all. Remember, while the process resulted in a decision to eliminate 11 varsity teams at Brown – 6 men's and 5 women's, cutting far more participation opportunities for men than women – it would have significantly *increased* gender equity for women. Indeed, increasing gender equity was one of the central, original goals of the process. *See* Plaintiffs' Supplemental Brief at 10-13. Plaintiffs only challenged Brown's actions after that proposal was jettisoned, along with the goal of advancing gender equity; Brown reinstated three men's teams and no women's teams; and, as a result, Brown cut over twice as many opportunities for women as men.

The rest of Brown's Opposition proceeds with a similar disregard for the facts and the law.

It argues that Brown could not have "preemptively violated" the Joint Agreement when Plaintiffs

---

[2] Since Plaintiffs did not charge Brown's officials with a "conspiracy" to violate the Joint Agreement, Plaintiffs do not know why Defendants would repeatedly make the blatantly inaccurate charge that they did. But Plaintiffs have to wonder. Hamlet: "Madam, how like you this play?" Queen: "The lady doth protest too much, methinks." *Hamlet,* Act III, Scene II, 210-219.

contend and the evidence shows that Brown is in violation *now*. It maintains that the 2020-21 preseason roster numbers prove Brown will be in compliance for the upcoming academic year, when Plaintiffs have already demonstrated that those numbers prove nothing useful. And it contends that Plaintiffs are not entitled to interim relief without even addressing the declarations and other proof Plaintiffs have submitted, documenting the irreparable harm Brown's violation of the Joint Agreement is inflicting on them, their teams, and many others.

## I.   PLAINTIFFS' MOTION TO ENFORCE IS NOT PREMATURE.

Brown first argues that the Motion to Enforce must fail because "it is simply too soon" to determine whether Brown has violated the Joint Agreement for the current academic year, much less whether there was a "gross violation." ECF No. 380 at 17. According to Brown, the "plain text" of the Joint Agreement says that compliance must be based on "the average number of men and women" participating on the first and last days of competition "of the subject academic year." *Id*. at 17 (quoting Joint Agreement § III(F)(2)–(4)). Brown also contends because the season has not yet ended (or even begun), Plaintiffs' Motion to Enforce must fail. *Id*. at 17-22. Nor, Brown asserts, can Plaintiffs argue that Brown "be preemptively deemed in breach" because, under "black-letter principles of contract law," preemptive breach only occurs where a party has "unequivocally disavow[ed] any intention" to perform. *Id*. at 19 (quoting *Mgmt. Capital, L.L.C. v. F.A.F., Inc*., 209 A.3d 1162, 1175 (R.I. 2019)).[3]

Brown is wrong.

### A.   <u>Brown is Already in Violation of the Joint Agreement.</u>

First, to be clear, Plaintiffs are not arguing that Brown has "preemptively breached" the terms of the Joint Agreement. Plaintiffs are saying that Brown has *already* breached the

---

[3] The Joint Agreement is attached as Exhibit A to Plaintiffs' Motion to Enforce, ECF No. 357 (June 6, 2020).

Agreement—and it continues to do so with every day that passes. That breach occurred when Brown reinstated three of the men's teams without *also* adding back in sufficient women's teams to meet the Agreement's 2.25% permitted variance. Brown stated at the time that reinstating those three men's teams would violate the Agreement unless "additional changes" were made, (https://www.brown.edu/about/administration/president/statements/addressingbrown-varsity-sports-decisions, accessed 6/23/20), and discovery has only confirmed what Plaintiffs already showed to be true: *no* additional changes were made. President Paxson and Committee Chair Mundt testified that they decided solely to trust Athletic Director Jack Hayes to "make it work" through "roster management." They did not even ask him *how* he would "make it work." ECF 378 at 24-37. But, in addition to there being no plan, there was no change at all.

So Brown is currently in violation of the Joint Agreement. And, as Plaintiffs have already explained, this Court unquestionably has authority to enjoin Brown from violating the decree. See ECF 357-1 at 17-18 (collecting cases); *see also* ECF 357-2 at 145 (Joint Agreement at VI [V.C.]) ("This [sic] terms of this Agreement shall be subject to the full enforcement powers of the Court by appropriate order. The Court shall retain jurisdiction concerning interpretation, enforcement and compliance with this Agreement.").

### B.  <u>Plaintiffs' Motion is Not Premature.</u>

Brown is equally wrong in claiming that Plaintiffs must wait to challenge any violation of the Joint Agreement until the end of the competitive season. As explained below, that's not what the Joint Agreement actually says. And reading it in the manner Brown suggests would lead to an absurd result that no rational party could have intended: it would mean that Plaintiffs could not challenge Brown's decision to eliminate women's teams until the end of a competitive season, even if the University eliminated the *entire women's sports program* at the beginning of the season, leaving Brown's female athletes with *no* participation opportunities. That *can't* be the right result.

As a threshold matter, however, it is important to address Brown's erroneous contention that the Joint Agreement is no different than a garden-variety settlement agreement between private parties. What Brown ignores (or its trying to get this Court to forget) is that the Joint Agreement is a *consent decree* in a *federal civil rights action* where, after years of hotly contested litigation on behalf of a certified class going up to the First Circuit *twice* and then all the way up to the U.S. Supreme Court, Brown was found to have violated Title IX by eliminating viable women's teams when the bulk of its athletic resources were already being devoted to male athletes at Brown. *See Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992) (*Cohen I*); *Cohen v. Brown Univ.,* 991 F.2d 888 (1st Cir. 1993) (*Cohen II*); *Cohen v. Brown Univ*., 879 F. Supp. 185 (D.R.I. 1995) (*Cohen III*); *Cohen v. Brown University*, 101 F.3d 155 (1st Cir. 1996) (*Cohen IV*), *cert. denied,* 520 U.S. 1187 (1987). Unlike an ordinary settlement between private parties, where the parties mutually decide to reach a compromise in order to avoid a decision on the merits, the Joint Agreement is a *compliance plan* designed to ensure that Brown remains in compliance with the law *it was found to have violated*. And, as stated above, this Court has a continuing responsibility to enforce that plan. ECF 357-2 at 145.

As a result, Brown is incorrect when it argues that the Joint Agreement is just an ordinary contract that the Court must strictly construe and enforce as written, no matter how bizarre or counterintuitive the result. In reality, a consent decree in a case like this one, involving federally-mandated civil rights, is "more than just a voluntary agreement; it is also a final order that 'places the power and prestige of the court behind the compromise struck by the parties.'" *Rolland v. Patrick*, 946 F. Supp. 2d 226, 227 (D. Mass. 2013) (citing *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). And, in such cases, "district courts, which are responsible for overseeing the execution of consent decrees, *should have broad discretion in determining whether the objectives*

*of the decree have been substantially achieved.*" *U.S. v. Com. of Mass.*, 890 F.2d 507, 509–10 (1st Cir. 1989) (emphasis added; citations omitted). "[T]o satisfy [a] consent decree," moreover, the defendant "must not only submit an adequate plan, *it must implement it as well*." *Id.* at 510 (emphasis added).[4]

Here, construing the Joint Agreement in the manner suggested by Brown would ensure that "the objectives of the decree" are *gutted*, not "substantially achieved." *Id.* Brown's argument is that Plaintiffs must wait until the end of the season to challenge any violation, regardless of how deep the cuts and how severe the violation. If that were true, it would make it almost impossible for female athletes at Brown to avoid irreparable harm from the elimination of existing teams. If (as here), the cuts happen at or near the beginning of the competitive season, by the time the violation could be challenged in court, coaches would have left, students would have transferred or lost their opportunity to participate, and recruiting would have been decimated. And if, by the end of the season, sufficient interested athletes remained to mount a challenge, it would undoubtedly be too late to stop the bleeding; the teams would be ruined.

Brown nonetheless insists that the Joint Agreement requires that absurd result. But Section III(C) disproves that suggestion. It provides as follows:

> Unless the permitted variance in participation ratios is already 2.25%, commencing July 1, 2001, Brown *shall continue to provide*

---

[4] Notably, most of the cases cited by Brown involve settlement agreements between private parties to business disputes, not consent decrees in public law cases. *See* ECF No. 380 at 17-18 (citing, *inter alia*, *T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 321 (D.R.I. 2013); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 325 (D.R.I. 1999), aff'd, 217 F.3d 8 (1st Cir. 2000)). The only "public law" case cited by Brown is *Inmates of Suffolk Cty. Jail v. Kearney*, 928 F.2d 33, 35 (1st Cir. 1991), where the court refused to adopt the defendant's construction of a consent decree that would have undermined its letter and spirit. (The decree ordered a sheriff to construct a jail for male and female prisoners, but the sheriff's jail would have only housed men.) Here, in contrast, it is Brown's interpretation of the Joint Agreement that is inconsistent with its plain language and overriding purpose: to ensure that Brown does not discriminate against its female athletes.

> participation opportunities…so that the percentage of each gender participation in the program is within 3.50% of the enrollment for the same academic year. If, however, any of the events listed in subparagraph 1 through 4 below takes place, the percentage of each gender participating in Brown's intercollegiate athletic program shall be within 2.25% of each gender's percentage in the undergraduate enrollment *for the same academic year.*

ECF 357-2 at 136-37 (emphasis added). One of the "events listed in subparagraph 1 through 4" that triggers the 2.25% variance is "[t]he elimination of intercollegiate athletic teams for women…" *Id.* at 137 (Joint Agreement Section III(C)(1)).

Both of the phrases italicized above in Section III(C) contravene Brown's interpretation. *First*, by stating that Brown must "*continue to provide* participation opportunities" within the permitted variance, the Joint Agreement clearly contemplates that Brown must *always* be in compliance with the decree—in other words, it can't comply by eliminating a team at the beginning of the season and then suddenly reinstating it (or adding other participation opportunities, or cutting men's teams) at the end. *See* ECF 357-2 at 137.

*Second*, the provision stating that, in the event Brown eliminates a team, the percentage of each gender "shall be within 2.25% of each gender's percentage in the undergraduate enrollment *for the same academic year*" underscores that Brown must comply with the 2.25% variance *during the year the elimination occurred*. Requiring Plaintiffs to wait until the *end* of the academic year in order to challenge Brown's violation of the Joint Agreement *during that year* would render this language null and void—and, of course, yield an absurd result the parties could not have intended.

Brown's argument to the contrary rests on language later in the Joint Agreement that explains how proportionality should be determined in the ordinary course of business, where Brown has not eliminating any women's teams. *See* ECF 357-1 at 139 (Joint Agreement Section III(F)(4)). In that event, compliance with the permitted 3.5% variance is measured by taking the

average of the first and end-of-the-season numbers for total participation. That approach makes sense when Brown has not eliminated any active women's teams (or taken any of the other actions that trigger the 2.25% variance), because it provides a way to calculate "the relative percentage of male and female athletes" in the absence of any dramatic changes to the athletic program. But that's not the correct approach when Brown has actually *eliminated* one or more women's teams and violated the Joint Agreement by doing so. And it makes no sense to read the Agreement that way, because it would tie Plaintiffs' hands until it was too late to avoid irreparable harm.

Rather, the best—and only sensible—reading of the Joint Agreement is that it allows Plaintiffs to move to enforce as soon as it becomes clear that Brown is restructuring its program in a manner that violates the Joint Agreement and is not designed to stay within the permitted variance. That's the only approach that allows this Court to exercise its "broad discretion" to ensure that the "objectives of the decree have been substantially achieved." *Com. of Mass.*, 890 F.2d at 509–10.[5]

Brown could, of course, add or discontinue varsity teams in a manner that did not violate the Joint Agreement. If it did, it would simply report the changes and the resulting participation numbers in its Annual Report. *See* Joint Agreement Section V.B.5. But nothing about that fact precludes Plaintiffs from immediately challenging a decision to add or discontinue varsity teams that puts Brown in violation of the Joint Agreement.

---

[5] Even if this Court were to agree with Brown that the Joint Agreement has not yet been violated, Brown's admissions that reinstatement of the teams would place it in violation of Title IX unless "additional changes were made," and its failure to announce or make any such changes that would comply with the law, constitutes "anticipatory breach" that would give Plaintiffs standing to bring this challenge now.

## II.     THE 2020-21 PRESEASON ROSTERS DO NOT PROVE THAT BROWN IS IN COMPLIANCE WITH THE JOINT AGREEMENT.

Title IX requires that women be afforded a *genuine* opportunity to participate in their chosen sport. *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 965–66 (9th Cir. 2010) ("The number of 'participation opportunities' for women is defined by the number of female athletes who actually participate in varsity athletics"). Padding women's teams to add watered-down participation opportunities, and double-counting women by designating the identical individuals as simultaneous members of separate women's and co-ed teams, offends that requirement. Participation opportunities need to be real, not just names on a paper to make the numbers work.

But that is what's happening here. Brown represents to the Court that the most reliable indicator of the number of female athletes for the upcoming academic year are the 2020-21 preseason rosters. (ECF 380 p. 22) However, as Plaintiffs have briefed, these rosters reflect significant padding of the continuing women's teams and double counting sailing, which does not yet exist as a varsity sport.[6] Brown asserts that the preseason declarations *will be* the true numbers of varsity participants on the first and last day of competition in 2020-21, and that this claim is established by its economic expert, Dr. Ashenfelter. But these assertions are not supported by the evidence or the report of Brown's expert.[7]

---

[6] Plaintiffs continue to maintain that Brown should not be permitted to count sailing as a varsity sport for the purposes of demonstrating compliance with the Joint Agreement for this proceeding because varsity sailing has not started at Brown.

[7] Brown repeatedly observes that Plaintiffs chose not to depose Dr. Ashenfelter, as if that is a concession of his expertise—on these issues—or the unassailability of his findings. In fact, neither is true. Plaintiffs have every right to reserve their challenge to Dr. Ashenfelter's credentials and conclusions until cross-examination at trial, which is what Plaintiffs intend, and always intended, to do.

A. **The Court Cannot Rely on Brown's 2020-21 Preseason's Rosters to Assess Compliance.**

As Plaintiffs explained in their Supplemental Briefing to the Court (ECF 348), Brown's 2020-21 preseason rosters are a case study in manipulating roster management to try and prove compliance, a practice that is not permitted in either the Joint Agreement or Title IX. *See, e.g.*, *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 976–77 (D. Minn. 2016) (rejecting roster management attempts).

Brown's entire argument is based on the assertion that the 2020-21 preseason roster numbers are going to be the same as, or substantially similar to, the actual 2020-21 end-of-season roster averages. But there is no analytical or empirical basis for that conclusion. In contrast, Brown relies on an analysis of incomplete data which Brown has previously admitted is unreliable and not indicative of the actual number of varsity athletes on the first or last day of competition. ECF 378-3 at 116-123.

Brown's preseason 2020-21 rosters are not just inflated when compared to the actual 2019-2020 rosters. They are *also* inflated when looking at the mean number of athletes over the past nineteen years on each of these teams. *See* Lopiano, Report and Supplemental Report (Ex. 36). By looking at the mean number of athletes, the Court is able to remove the outliers and see the number of athletic opportunities that are typically and realistically provided by that sport at Brown. *Id.* at 8, 10.

The 2020-21 preseason team sizes are also inflated when compared to the NCAA average team sizes for Division I college sports programs. *See* Lopiano, Report and Supplemental Report (Ex. 36). The historical averages at Brown and the NCAA Division I average team sizes are a better indicator of how many genuine participation opportunities each of these sports offer to women at Brown. However, despite this evidence, Brown claims the Court should merely accept

13

that the roster numbers can be increased at Brown's whim. Brown has provided no suggestion or explanation as to what has fundamentally changed in these women's sports that warrants additional genuine athletic opportunities for the women at Brown. It has not provided a single reason—*none*—as to why these teams suddenly need so many more women than they did in 2019-2020. The only logical conclusion is that the increase is solely designed to pad the women's teams in a transparent attempt to manipulate team sizes to show compliance with the Joint Agreement.

The only affirmative argument that Brown makes in support of using the 2020-21 preseason roster declaration numbers purports to rely upon a regression analysis conducted by Dr. Ashenfelter on the 2018-19 and 2019-20 preseason roster data. Defendant's Opposition, ECF 380 at 31, says, "The current [2020-21] Roster Declaration Forms…are an accurate predictor of gender participation ratios for the current year. Ashenfelter Supp. Rep. at 20." But Dr. Ashenfelter's Supplemental Report says no such thing at 20 (or anywhere else). It only makes assertions at 20 about the 2019-20 preseason rosters, not the 2020-21 rosters.

While the 2020-21 preseason rosters cannot be relied upon, the best predictor of legitimate athletic opportunities for each team are the historic and comparator values provided in Dr. Lopiano's report, a recognized expert in sports administration and Title IX compliance, who has previously been accepted as an expert in this case. *Cohen III*, 879 F. Supp. at 204. *See* Lopiano, Report and Supplemental Report (Ex. 36).

Brown also points out that some of the 2020-21 projected teams are smaller than the maximum size those teams have ever been. This demonstrates nothing, as the teams are *all* much larger than the smallest they have ever been. This is precisely *why* Plaintiff's expert Dr. Lopiano, uses the 19-year-mean number of athletes, because it provides a way to negate the effects of the outlying years when analyzing genuine participation opportunities. *See* Lopiano, Report and

14

Supplemental Report (Ex. 36). As the court can see from the chart below, using the minimum outliers provides astonishing results (even more so than the maximum team sizes). The chart that follows is merely a contrast to Defendants' example of historic maximum team sizes and demonstrates that neither good indicators of the size of the women's varsity program that this restructuring is designed to produce.

| Women's Teams | June 11, 2020 production | July 17, 2020 production | Minimum Team Sizes Over last 20 years | Difference (between July and minimum team size not including sailing) |
|---|---|---|---|---|
| Basketball | 15 | 15 | 12 | 3 |
| Crew | 53 | 53 | 41 | 12 |
| Field Hockey | 26 | 25 | 19 | 6 |
| Gymnastics | 22 | 22 | 10 | 12 |
| Ice Hockey | 23 | 23 | 18.5 | 4.5 |
| Lacrosse | 36 | 36 | 24 | 12 |
| Rugby | 32 | 33 | 20.5 | 12.5 |
| Sailing (coed) | [25] | [24] | NA | NA |
| Sailing (women's) | [25] | [24] | NA | NA |
| Soccer | 32 | 32 | 22 | 10 |
| Softball | 23 | 23 | 14.5 | 8.5 |
| Swimming & Diving | 38 | 37 | 23 | 14 |
| Tennis | 12 | 12 | 8 | 4 |
| Track & Field | 55 | 58 | 43 | 15 |
| Cross Country | 26 | 27 | 19 | 8 |
| Volleyball | 21 | 21 | 14 | 7 |
| Water Polo | 23 | 23 | 13 | 10 |
| Equestrian | eliminated | | | |
| Fencing | eliminated | | | |
| Golf | eliminated | | | |
| Skiing | eliminated | | | |
| Squash | eliminated | | | |
| **Total without sailing** | **437** | **440** | **301.5** | **138.5** |

As the numbers show, Brown's 2020-21 preseason rosters would result in an increase of *138.5* women over the minimum team sizes, and this increase does not even include sailing.

Brown also points to the increase in the women's track, field, and cross country teams from the 2009-2010 to the 2010-2011 seasons as evidence that the increased numbers Brown projects for the 2020-21 season are well within the norm for this sport. However, what Brown fails to acknowledge is that the increase in the reported sizes of these teams in 2010-2011 came after considerable issues with the team in the 2009-2010 season. (*See* ECF 378-3, p. 116–123). As described in the appended letter, in the 2009 season Brown decided to remove its track coach due to a "large number of complaints and a subsequent investigation" and promoted a new coach mid-year. (*Id.*) This change and the treatment by the previous coach resulted in the loss of a significant number of athletes from its women's teams for those sports. (*Id*. ["When the new coach subsequently reviewed the team rosters submitted by the previous head coach she removed 10 athletes from the women's cross country list and 14 from the indoor track list as being injured and never competing]"). So, it is reasonable, given the situation the year prior, that the number of athletes would increase in 2010-2011. That increase provides no support whatsoever for the increase Brown claims for women's track, field, and cross country in 2020-21.

Brown has previously admitted that preseason rosters are not a reliable indicator of the number of participants at the first and last date of competition. In 2010, Deputy General Counsel James Green of Brown University wrote to Plaintiffs' counsel to discuss Brown's failure to comply with the 3.5% permitted variance for 2009-2010 and how Brown expected to get back into compliance in 2010-2011. (ECF 378-3 at 116-123.) There, Counsel Green explained the purpose of "projected rosters" as "taking all of the non-graduating student-athletes from teams last year and then adding in the recruited first years. Athletics then added in the names of any non-recruited students who had reach out to coaches and expressed an interest in joining the team. Athletics then sent out to each of the identified athletes a request to complete 10 different eligibility forms. *These*

*projected rosters are subject to considerable fluctuation.*" (ECF 378-3 at 118; emphasis added)[8] Thus, 2020-21 preseason rosters cannot be used to prove prospective compliance and provide no basis for concluding that Brown's restructuring of its varsity athletic program will result in women athletic participants within 2.25% of women's undergraduate enrollment.

   B.  **The Court Should Not Allow Brown to Double-Count Women Sailors.**

In Defendants' Opposition, at 40, Brown proposes a hypothetical to the Court: imagine there were men's-only competitions for sailing, along with coed sailing competitions, with men participating in both. Brown argues that, if that were the case, Plaintiffs would be insisting that the men in both competitions be counted twice. But the facts prove Brown's argument is wrong. There *are* men's-only events and coed sailing events in which men at Brown are participating. Plaintiffs are *still* asking the Court to count all of the men and women on the sailing team only once.[9]

In sailing, there are different disciplines (or events) that teams can compete in—consisting of coed regattas, women's regattas, and men's regattas. As Coach Mollicone testified, there are fall and spring championships in all of these various disciplines, including a Men's Laser National Championship. (Mollicone Depo. at 35–37; 50–51). This is a discipline that is only open to men and that Brown participates in, as evidenced by the fact that a male from Brown placed 5th at Nationals in November 2019. (Mollicone Depo. at 35–37; 50–51) ("A regatta is either coed or it's women's. There's no men's. The only men's event is the men's single-handed national championship and the qualifier for the fall."). However, contrary to Defendants' assertion,

---

[8] Brown's accompanying chart in 2010 contained the following caution: "The Eligibility Requests column represents the number of individuals expected to submit eligibility paperwork as of August 16, 2010. These numbers are expected to fluctuate considerably up until the time of first competition when official rosters will be set." ECF 378-3 at 122.

[9] Plaintiffs continue to assert that sailing, a new varsity sport, should not be counted before it is established.

Plaintiffs are not asking that this discipline and the male student athletes that competed in it be counted as a separate men's team. When varsity sailing at Brown exists, the women and men who participate in it should only be counted once, regardless of which events they participate in.

Finally, Brown's argument that sailing cannot be counted as one sport under the Joint Agreement because that would turn the exception for track and field on its head misses the point. Track is counted as one sport under the Joint Agreement because indoor and outdoor track do not present two separate participation opportunities, like gymnastics, for example, and field hockey. Similarly, as Plaintiffs explained in their Supplemental Brief, at 34-36, sailing does not offer women double the participation opportunities; rather, it allows women and men to compete in the sport of sailing in different events. Therefore, the Court should find that, if Brown is permitted to count sailing for the 2020-21 academic year, it must only be counted as one participation opportunity for each of the men and women who make the team.

## III.   THE COURT SHOULD PRESERVE THE STATUS QUO UNTIL BROWN HAS PROVED IT IS IN COMPLIANCE.

In Part III of Defendants' Opposition, Brown argues that interim relief is unnecessary and/or unavailable. Brown is wrong on both counts. A brief review of the prior proceedings in this case reveals why that is so.

After hearing this matter first on preliminary injunction and then on the merits, the Court made extensive findings of fact, concluding that the elimination of viable varsity teams for women—then, women's gymnastics and volleyball—would cause irreparable harm to the members of Plaintiffs' class, both in terms of the immediate loss of competitive opportunities and the permanent loss of viable teams. *See* discussion in Plaintiff's opening Memorandum of Law, ECF 357-1 at 5-8. It found the teams would be unable to survive without university support in recruitment, access and levels of competitions, and loss of coaching staff. *Id.* The Court entered a

preliminary injunction requiring Brown to restore gymnastics and volleyball and prohibiting Brown from cutting, or reducing the level of support of, any other women's varsity pending decision on the merits. *Cohen I,* 809 F. Supp. at 981–82.

After hearing on the merits, the Court again held Brown in violation of Title IX and directed Brown to submit a plan to come into compliance. *Cohen III,* 879 F. Supp. 185.

In a separate, unpublished Order of August 17, 1995 ("Remedial Order),[10] the Court rejected Brown's proposed compliance plan. Among other things, Brown proposed to strictly enforce team sizes by (1) imposing maximum team sizes on men's teams by striking excess names from the team roster and (2) imposing minimum team sizes on the women's teams. In addition, Brown proposed to create new "junior varsity teams" for certain women's sports and to count their members as well. The Court rejected Brown's proposal in its entirety, as "indicat[ing] a regrettable lack of interest in providing an intercollegiate athletic experience for its female students that is equivalent to that provided to its males students." Remedial Order at 7 (footnote omitted). "An institution does not provide equal opportunity if it caps its men's teams after they are well-stocked with high-caliber recruits while requiring women's teams to boost numbers by accepting walk-ons." Remedial Order at 8. The Court further rejected Brown's proposal to include "junior varsity" teams in the count as not constituting intercollegiate teams. "Counting new women's junior varsity positions as equivalent to men's full varsity positions flagrantly violates the spirit and letter of Title IX; in no sense is an institution providing equal opportunity if it affords varsity positions to men but junior varsity positions to women." [11] Remedial Order at 6 (footnote omitted). The Court

---

[10]   The Court's Remedial Order of August 17, 1995 is attached to the Motion to Enforce as Exhibit B, ECF 357-3.

[11]   Dr. Lopiano, but not Dr. Ashenfelter, limited her historic review to the numbers reported after resolution of Brown's inclusion of junior varsity players on women's teams due to the improper counting these teams.   *See* 2001 Acknowledgement, ECF 378-3 p. 115 (Ex. 32).

did not give Brown another opportunity to submit a new plan, instead ordering Brown to comply with Part Three of the Three-Part Test by elevating women's gymnastics, water polo, skiing and fencing to university-funded status. The Court stayed its remedial order pending appeal and left the preliminary injunction in place.[12]

On appeal, the First Circuit reaffirmed its earlier decision in *Cohen II* as "law of the case" and rejected Brown's constitutional challenges. The Court "agree[d] with the district court that Brown's proposed plan fell short of a good faith effort to meet the requirements of Title IX," *Cohen IV*, 101 F.3d at 187, but reversed the Remedial Order, instead remanding to afford Brown another opportunity to propose a remedial plan. *Id.* at 188. Brown's petition for *certiorari* was denied. 520 U.S. 1186 (1997). The matter returned to this Court for determination of relief. Until the parties proposed and the Court accepted the Joint Agreement to serve as Brown's compliance plan in 1998, the Court's preliminary injunction, issued in 1992, remained in full force and effect.

This Court's and the First Circuit's rejection of Brown's initial plan for compliance as falling "short of a good faith effort to meet the requirements of Title IX," *Cohen IV*, 101 F.3d at 187, is the law of the case. And so is the First Circuit's holding that Brown had a right to determine, *consistent* with Title IX and the Joint Agreement, what varsity sports it will sponsor, if any. Title IX does not require any education institution receiving federal funds to have an intercollegiate athletic program at all—only that it comply with Title IX if it chooses to do so. Thus, Plaintiffs concede that it is Brown's call as to what its varsity program will look like, so long as it complies with the Joint Agreement and Title IX.

Brown states that there is no reason for relief if there is no violation of the Joint Agreement.

---

[12]     Order at 11-12. Brown had previously restored women's volleyball to full varsity status.

Plaintiffs agree. But, as detailed in Plaintiffs' Motion and Memorandum in Support, Supplemental Brief, and this Reply Brief, Brown has violated and is in violation of the Joint Agreement.

Brown states that, even if the Court finds a violation, it "would at most require the restoration of one women's team," such as equestrian. ECF 380 at 47. While Plaintiffs disagree with Brown's math, as detailed above, that is beside the point. As Brown has so clearly demonstrated, it is *Brown's* call, at least initially, to decide how it will comply.

And that is why Plaintiffs seek interim relief preserving the status quo ante. If the Court is persuaded by Plaintiffs' showing, but cannot craft and impose the ultimate plan for Brown (at least in the absence of a protracted refusal or failure by Brown to do so), *Cohen IV*, 101 F.3d at 188, then there are two options: (1) let the teams fail until Brown develops a plan that the parties agree upon or the Court approves or (2) preserve the status quo ante by ordering that the eliminated teams be preserved until such time as Brown develops a plan that the parties agree upon or the Court approves. This is true even if the Court were to rule from the bench in Plaintiffs' favor next week: if it cannot or should not craft a permanent resolution based on such a finding, then what happens in the interim?

Plaintiffs have submitted the declarations of members of the five eliminated teams, as well as a member of the sailing program. ECF 378-2 (exhibits 5-14). While this Court has already found that the elimination of women's varsity opportunities creates irreparable harm, these declarations, also discussed in our Supplemental Brief, ECF 378 at 38-41, detail the harm that will be caused to the women affected by Brown's current actions.

It is worth noting that Defendants, in their Opposition, do not acknowledge, let alone substantively address, these declarations. Defendants' only comment is that no one is playing sports now due to COVID. While it is true that there is no *competition* now, it is not true that all

varsity program activities have also ceased. For the varsity sports, coaches continue to be employed, continue to recruit, and the admissions office continues to give preferences in admissions to recruited varsity athletes. Facilities are maintained for the varsity teams, but may be repurposed for the eliminated teams. The ability of these teams to survive—and for the class members to have competitive opportunities once competition resumes—hangs in the balance.

Since the Joint Agreement is a compliance plan for Brown to remedy its violation of Title IX, allowing Brown to remain out of compliance—with no relief to plaintiff class members—until Brown comes up with an acceptable plan would be to approve an ongoing violation of the Joint Agreement and Title IX. For this reason, nothing short of interim, protective relief, will preserve the status quo and prevent the irreparable harm of the loss of competitive opportunities and viable varsity teams if, in the future, Brown determines that, notwithstanding its threats to cut more men's teams, it will reinstate one, more, or all, of the eliminated women's teams. Nor should Brown be able to take advantage of the harm that it has caused to the viability of the teams by later claiming that they are no longer sustainable or they are unable to schedule varsity competition due to their diminished or non-existent status. *See Cohen I*, 809 F. Supp. at 997-998; *see also Mayerova v. Eastern Michigan University*, 346 F. Supp. 3d 983 (E.D. Mich. 2018); *Portz,* 196 F. Supp. 3d at 972–73; *Biediger v. Quinnipiac Univ*., 616 F. Supp. 2d 277, 291–93 (D. Conn. 2009); *Choike v. Slippery Rock Univ.*, No. 06-622, 2006, WL 2060576 at *9 (W.D. Pa. 2006); *Barrett v. West Chester Univ. of Penn.*, No. 03-cv-4978, 2003 WL 22803477 at *13–14 (E.D. Pa. 2003).

## **CONCLUSION**

For all of the foregoing reasons, the varsity women's equestrian, fencing, golf, skiing, and squash teams should be reinstated until Brown has proven that it is not and will not be violating Title IX, the Joint Agreement, and this Court's Judgment. Brown should be required to comply

with the Joint Agreement and should not be allowed to, in Brown's words, "kill this pestilential

thing."

Respectfully submitted,

*/s/ Lynette Labinger*_____
Lynette Labinger #1645
128 Dorrance St., Box 710
(401) 465-9565
Providence, RI 02903
ll@labingerlaw.com

Cooperating counsel,
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF RHODE ISLAND and
PUBLIC JUSTICE

Arthur H. Bryant
Bailey & Glasser, LLP
1999 Harrison Street
Suite 660
Oakland, CA 94612
510-507-9972
abryant@baileyglasser.com

Leslie Brueckner
Public Justice, P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8205
lbrueckner@publicjustice.net

NEWKIRK ZWAGERMAN, P.L.C.
Jill Zwagerman, AT0000324
Lori Bullock AT0012240
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
Email: jzwagerman@newkirklaw.com
Email: lbullock@newkirklaw.com

**CERTIFICATION**

I hereby certify that on September 8, 2020, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record.

*/s/ Lori A. Bullock*
Lori Bullock