# United States Court of Appeals
## For the First Circuit

No. 21-1032

AMY COHEN ET AL., individually and on behalf of all others
similarly situated,

Plaintiffs, Appellees,

v.

BROWN UNIVERSITY ET AL.,

Defendants, Appellees,

ABIGAIL WALSH; LAUREN LAZARO; ROSE DOMONOSKE; MEI LI COSTA; ELLA
POLEY; ALYSSA GARDNER; LAUREN MCKEOWN; ALLISON LOWE; TINA
PAOLILLO; EVA DURANDEAU; MADELINE STOCKFISH; SONJA BJORNSON,

Objectors, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]
[Hon. Patricia Sullivan, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Robert J. Bonsignore, with whom Lisa Sleboda, Bonsignore
Trial Lawyers, PLLC, Anthony J. Gianfrancesco, and Gianfrancesco
& Friedmann LLP were on brief, for objectors.
Lynette Labinger, with whom Arthur H. Bryant, Bailey &
Glasser, LLP, Lori Bullock, and Newkirk Zwagerman were on brief,
for plaintiffs.
Marcella Coburn, with whom Roberta A. Kaplan, Gabrielle E.

Tenzer, Kaplan Hecker & Fink LLP, Robert Clark Corrente, and Whelan
Corrente & Flanders LLP were on brief, for defendants.

_____

October 27, 2021

_____

**SELYA**, <u>Circuit Judge</u>. This landmark Title IX case does not come to us as a stranger. Shortly after a group of women student-athletes brought suit against Brown University (Brown) claiming gender discrimination with respect to the funding and operation of a panoply of varsity athletic programs, the district court certified a class and entered a preliminary injunction sought by the plaintiffs. <u>See</u> <u>Cohen</u> v. <u>Brown Univ.</u> (<u>Cohen I</u>), 809 F. Supp. 978, 980, 1001 (D.R.I. 1992).

We upheld the issuance of the preliminary injunction, concluding (among other things) that the plaintiffs were likely to succeed in their suit. <u>See</u> <u>Cohen</u> v. <u>Brown Univ.</u> (<u>Cohen II</u>), 991 F.2d 888, 904, 907 (1st Cir. 1993). After a bench trial, the district court found that Brown had violated Title IX by failing effectively to accommodate the interests and abilities of women athletes. <u>See</u> <u>Cohen</u> v. <u>Brown Univ.</u> (<u>Cohen III</u>), 879 F. Supp. 185, 200, 211-14 (D.R.I. 1995).

When the district court rejected Brown's proposed compliance plan, Brown again appealed. We affirmed the district court's judgment in part, reversed it in part, and remanded for further proceedings. <u>See</u> <u>Cohen</u> v. <u>Brown Univ.</u> (<u>Cohen IV</u>), 101 F.3d 155, 162, 188 (1st Cir. 1996). The parties subsequently consummated a settlement. That settlement, given bite by the imprimatur of the district court, has remained in effect for over two decades.

As time went by and circumstances changed, Brown unilaterally decided in 2020 to eliminate certain varsity sports and to upgrade sailing to varsity status (open to men and women). With this reshuffling on the table and renewed litigation in the offing, the parties opted to revisit all of the matters embodied in the court-approved settlement. Following protracted negotiations, ably coordinated by a magistrate judge, Brown and the class achieved a meeting of the minds and jointly moved for approval of a revised agreement (the Amended Settlement Agreement). But not all class members were pleased by the terms of the proposed amended settlement: some of them objected (the Objectors), complaining that the named plaintiffs were not adequate representatives of the class and that the settlement's terms gave parts of the class a raw deal. The district court held a fairness hearing and overruled the objections. The court, ruling from the bench, found that the proposed amended settlement was fair, reasonable, and adequate. Dismayed by the district court's approval of the Amended Settlement Agreement, the Objectors appealed.

We are mindful that — especially in institutional reform cases — class-wide relief must be adapted to reflect changing times and circumstances. One such circumstance, relevant here, is that the prophylaxis of Title IX has matured since the class-wide settlement was originally put in place. Another relevant

circumstance is that, over a span of many years, Brown has demonstrated an increased awareness of and sensitivity to the constraints that Title IX imposes upon a university's varsity athletic programs. Last — but surely not least — striking the Title IX balance in a case of this kind is more an art, informed by experience, than a science. District courts are on the front lines when assessing class-wide relief and considerable deference is due to the exercise of their informed discretion. After careful consideration of the genesis of the litigation, its history and objectives, and Brown's evolving response to the demands of Title IX, we conclude that the district court's approval of the Amended Settlement Agreement was within the wide encincture of its discretion. Consequently, we affirm the judgment below.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case starting with its historical roots and proceeding to its present-day posture.

### A.  **The 1990s:  Skirmishes and Settlement**.

In 1991, Brown downgraded four athletic teams — women's volleyball and gymnastics, men's golf and water polo — from full varsity status to intercollegiate club status. See Cohen II, 991 F.2d at 892. The next year, several members of the women's volleyball and gymnastics teams sued Brown under Title IX and its implementing regulations, charging that — with respect to its

athletic programs — Brown did not "effectively accommodate the interests and abilities of members of both sexes." Id. at 892-96 (quoting 34 C.F.R. § 106.41(c)(1)). The district court certified a class of "all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown." Id. at 893. The designated class representatives were women student-athletes then-enrolled at Brown. Those representatives — all of whom have long since graduated — remain the class representatives today, save for two who dropped out along the way. So, too, the original class counsel remain aboard.

In late 1992, the district court issued a preliminary injunction in favor of the plaintiffs. See Cohen I, 809 F. Supp. at 1001. Forced to "invade terra incognita" at an untrammeled "crossroads of the law," we affirmed. Cohen II, 991 F.2d at 893, 907. The district court subsequently held a trial on the merits. In the midst of trial, the parties reached a partial settlement regarding the disparate-funding portion of the plaintiffs' claims, and the district court approved that settlement. See Cohen III, 879 F. Supp. at 192-93. What remained were the claims of disparate participation opportunities. See id. At the end of the trial, the district court ruled that Brown had violated Title IX in that

respect and ordered it to submit a compliance plan.  See id. at 213-14.

Brown proposed to cut some men's varsity teams as a means of leveling the playing field between the sexes, but the district court rejected this proposal and instead ordered Brown to elevate and maintain specific women's teams.  See Cohen IV, 101 F.3d at 162, 187.  A divided panel of this court affirmed the district court's ruling that Brown was in violation of Title IX.  See id. at 162.  The panel majority also agreed with the district court that Brown's proposal was not "a good faith effort."  Id. at 187. We nonetheless concluded "that Brown's proposal to cut men's teams [was] a permissible means of effectuating compliance with the statute" and, thus, "the district court was wrong to reject out-of-hand Brown's . . . plan."  Id.  We remanded to give Brown another chance to come up with an acceptable compliance plan.  See id. at 188.

In June of 1998, the parties reached a comprehensive settlement, dubbed the Joint Agreement, which the district court approved.  In major part, that agreement locked in a proportional representation scheme:  the percentage of each gender's athletes at Brown must lie within 3.5% or 2.25% (depending on the circumstances) of each gender's respective undergraduate campus presence.  The Joint Agreement required Brown to submit a compliance report annually to class counsel.  It also created a

mechanism for the parties to exchange objections and replies concerning Brown's compliance or the lack thereof.

By its terms, the Joint Agreement was "indefinite in duration" and provided that the district court would "retain jurisdiction concerning interpretation, enforcement and compliance" with its stipulations.

**B.  The Latest Skirmish and Settlement.**

For twenty-two years, Brown's athletes played on the turf of this Joint Agreement.  Brown dutifully submitted its annual report each August.  On the few occasions when issues surfaced, the parties resolved them without judicial intervention.

In May of 2020, a new era dawned.  Christina Paxson, who had become Brown's president well after the fact and who was a defendant in the case by virtue of her office, announced the "Excellence in Brown Athletics Initiative" (the Initiative).  With a view toward making Brown's programs more competitive overall, the Initiative purposed to downgrade five women's teams and six men's teams from varsity status to club status,[1] while elevating the women's sailing and co-ed sailing teams to varsity status. The planned hit to the men's track, field, and cross country teams, in particular, provoked a fierce backlash.  In a June 6 public

---

[1] The teams that the Initiative placed on the chopping block were men's and women's fencing, men's and women's golf, women's skiing, men's and women's squash, women's equestrian, men's track, men's field, and men's cross country.

statement, President Paxson contended that simply restoring men's track, field, and cross country would place Brown in violation of the Joint Agreement.  Nevertheless, Brown bowed to the pressure three days later:  President Paxson announced that Brown would not downgrade the men's track, field, and cross country teams.  It would achieve compliance with the Joint Agreement "for the time being" by making other (unspecified) programmatic "modifications."

The class representatives were not inclined to acquiesce.  Through class counsel, they asserted that Brown was violating the Joint Agreement and moved for enforcement of the decades-old judgment and for emergency relief.  Expedited litigation ensued.  Each side engaged in document discovery, exchanged expert reports, deposed witnesses, and filed briefs.[2]

In September of 2020, the parties entered into mediation under the auspices of a magistrate judge — a process that class counsel later described as "intense shuttle diplomacy, spanning nearly two dozen conferences."  The mediation resulted in a negotiated settlement.  The Amended Settlement Agreement, styled as a modification of the Joint Agreement, expires by its terms on

---

[2] In one email exchange produced in discovery, Brown's chancellor suggested to President Paxson that they might "go after the Consent Decree once and for all," wondering if they could "channel all this emotion away from anger at Brown to anger at the court and kill this pestilential thing" — a reference to the Joint Agreement.  President Paxson praised the idea, adding that "[t]his might be the perfect moment to petition the court to get us out of this agreement."

August 31, 2024.  Until then, Brown must restore two women's teams to varsity status[3] and may not downgrade any women's varsity team. And should Brown elect to make a permitted upgrade of any men's team to varsity status, it must restore an equal number of women's teams plus two to varsity status.[4]

The parties asked the district court to approve the Amended Settlement Agreement and notice was provided to the members of the class.  See Fed. R. Civ. P. 23(e)(1)-(2).  Twelve members of Brown's varsity women's gymnastics and hockey teams objected to the proposed settlement.  They argued, as relevant here, that the named class representatives were inadequate representatives of the class and that the proposed settlement was not "fair, reasonable, and adequate," as required by Federal Rule of Civil Procedure 23(e)(2).  The district court held a fairness hearing by videoconference on December 15 and approved the Amended Settlement Agreement.  The court singled out for praise the "masterful" work of the magistrate judge and the diligence of both President Paxson and class counsel.  In rejecting the Objectors' contentions, the court pointed out that "[t]he number of objectors represents a

_____

[3] Pursuant to this clause, Brown chose to restore the women's equestrian team and the women's fencing team.

[4] The Amended Settlement Agreement also resolves a more interstitial dispute.  Under it, each student-sailor counts only once, even when that sailor competes on multiple sailing squads. The Amended Settlement Agreement, though, does not resolve the larger question of whether the women's and co-ed sailing teams are to be regarded as separate teams.

very small fraction of the class members as a whole," and this fact "is in and of itself representative of the settlement's reasonableness." This timely appeal followed.

## II. ANALYSIS

In this venue, the Objectors advance two principal claims of error. First, they assert that the designated class representatives "did not, and could not," adequately represent the class as a whole. Second, they assert that the district court abused its discretion in determining that the Amended Settlement Agreement was fair, reasonable, and adequate. As class members, the Objectors have standing to pursue these claims of error. See Devlin v. Scardelletti, 536 U.S. 1, 14 (2002) (holding that nonnamed class members who objected at fairness hearing may appeal without intervening).

We start with some general principles. A district court may approve a class-action settlement only if that settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Before 2018, the case law refracted this standard into a "laundry list[] of factors." Bezdek v. Vibram USA, Inc., 809 F.3d 78, 82 (1st Cir. 2015) (quoting Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 44 (1st Cir. 2009)). Sensing a need "to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," Congress revised the

rule to highlight four factors.  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments.[5]  Rule 23(e)(2) now requires that the district court "consider[] whether":

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate . . . and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  The Advisory Committee explained that the first two factors are "procedural" in nature, "looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement."  <u>Id.</u> advisory committee's note to 2018 amendments.  As a corollary, the latter two factors guide "a 'substantive' review of the terms of the proposed settlement." <u>Id.</u>

We have observed that "the ultimate decision by the [district court] involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." <u>Nat'l Ass'n of Chain Drug Stores</u>, 582 F.3d at 44.  Consequently, approval or rejection of a class-action settlement is entrusted to the district

---

[5] Importantly, the Advisory Committee noted that the amendment was not intended to "displace any factor" previously in use.  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments.

court's informed discretion. See Robinson v. Nat'l Student Clearinghouse, 14 F.4th 56, 59 (1st Cir. 2021). We review the district court's determination for abuse of that discretion — a multifaceted standard under which we scrutinize embedded legal issues de novo and factual findings for clear error. See id.

    With this backdrop in place, we turn to the specifics of the Objectors' appeal.

### A. __Threshold Issues__.

    At the outset, we must iron out two procedural wrinkles. Both wrinkles relate to class counsel's entreaty that we decline to entertain the Objectors' plaints as to adequacy of representation. Class counsel first submits that this issue was not squarely presented below and, thus, was not preserved for appeal. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). Second, class counsel submits that we are precluded from revisiting the adequacy of class representation where, as here, no motion for either decertification or modification of the class was made below.

    The first of these two procedural barriers is easily scaled. We agree that the Objectors did not make this claim with lapidary precision. But the essence of the argument was advanced,

and the rule that only arguments "actually articulated in the trial court" are preserved for appellate review reflects the insight that "[o]verburdened trial judges cannot be expected to be mind readers." McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991). This does not mean, however, that we should assume that trial judges are dense. Here, we have no reason to doubt that the district court grasped the gist of the Objectors' argument. Cf. United States v. Sineneng-Smith, 140 S. Ct. 1575, 1581 (2020) (observing that "a court is not hidebound by the precise arguments of counsel"). The argument was not waived.

We also conclude that the second procedural barrier does not block our consideration of the Objectors' claim. The class representatives, through class counsel, argue that because the class has been certified since 1992, untouched by any motion to decertify or modify the class, the adequacy of class representation remains "the law of the case." In their view, the Objectors may challenge this "law of the case" only by seeking decertification or modification of the class, which they failed to do.

For this proposition, the class representatives rely primarily on our decision in Voss v. Rolland, 592 F.3d 242 (1st Cir. 2010). That reliance is mislaid. In Voss, we declined to consider objectors' arguments regarding adequacy of representation in the class-action settlement context. See id. at 251. We explained that the class had been certified for a decade before

- 14 -

the objectors moved for decertification and that their failure to appeal the district court's denial of that motion "doom[ed] their attempt to raise the class certification issue before us." Id.

Our refusal to engage with the Voss objectors' class-certification arguments rested primarily on their packaging of those arguments in the district court as a motion for decertification, the denial of which they failed to appeal. See id.[6] So viewed, the Voss decision reflects a conventional application of the longstanding rule that the court of appeals lacks jurisdiction over claims lying outside "a properly targeted notice of appeal or the functional equivalent thereof." Kotler v. Am. Tobacco Co., 981 F.2d 7, 12 (1st Cir. 1992). Here, in contrast, the Objectors offered their adequacy-of-representation objection to the district court in the same guise as it comes to us now and — crucially — timely appealed the district court's adverse order.

In sum, we cannot fault the Objectors for challenging the settlement on a ground expressly contemplated by Rule 23 and then timely appealing the district court's rejection of that challenge. We hold, therefore, that the Objectors were not obliged to channel their class-representation grievances into a motion for

---

[6] Indeed, the district court approved the Voss settlement months before ruling on the objectors' motion to decertify the class, and its opinion approving the settlement did not address the adequacy of representation. See Rolland v. Patrick, 562 F. Supp. 2d 176 (D. Mass. 2008); Rolland v. Patrick, No. 98-30208, 2008 WL 4104488 (D. Mass. Aug. 19, 2008).

decertification or modification of the class.  See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 230-31, 243, 252-53 (3d Cir. 2001).

### B.  Adequacy of Representation.

Having smoothed out the procedural wrinkles, we press on to the gravamen of the Objectors' claim of error.  The Objectors first contend that the named class representatives no longer adequately represent the class.  Before grappling with this contention, we summarize the applicable law.

Whether "the class representatives and class counsel have adequately represented the class" is the first factor that courts must consider in evaluating a proposed class-action settlement.  Fed. R. Civ. P. 23(e)(2)(A).  Because this factor overlaps with other requirements imposed by Rule 23, see 4 William B. Rubenstein, Newberg on Class Actions (Newberg) § 13:49 (5th ed. 2021 Suppl.), we look to case law glossing the stipulation that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).  Such conflicts undermine the indispensable "structural assurance of fair and adequate representation for the diverse groups and individuals affected" by the class-action

- 16 -

litigation or settlement. Id. at 627. This concern has constitutional underpinnings because "the Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985).

The standard, though, is not "perfect symmetry of interest" among the class. Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012). The perfect is sometimes the enemy of the good, and intra-class conflicts breach Rule 23(a)(4)'s adequacy-of-representation standard only when they "are fundamental to the suit and . . . go to the heart of the litigation." Id. (quoting 1 Newberg § 3:58 (5th ed. 2011)).

In this instance, the Objectors start by complaining that the district court committed "legal error" in "fail[ing] to conduct any analysis at all" regarding the adequacy of representation by the class representatives. They assert that Rule 23(e)(2) required the court to make "specific findings as to the adequacy of the Class Representatives" before approving the settlement. This assertion reads more into Rule 23(e)(2) than its text can bear.

Rule 23(e)(2) instructs the district court to "consider[]" the adequacy of representation by the class representatives. It does not direct the court to make specific findings as to adequacy of representation. Although specific

- 17 -

findings are always helpful, they are not obligatory. Here, moreover, there is no basis for assuming that the district court failed to consider this factor, particularly in view of the district court's explicit acknowledgment of the Objectors' protest that "the class representatives are not valid." Surveying the record as a whole, we are satisfied that the district court considered this factor and implicitly found no reason to question the adequacy of representation by the class representatives. Cf. Paraflon Invs., Ltd. v. Fullbridge, Inc., 960 F.3d 17, 29-30 (1st Cir. 2020) (accepting district court's "implicit finding[s]" following bench trial).

This brings us to the heart of the Objectors' argument: that the named representatives could not and did not adequately represent the class of current and future students because the named representatives — who were members of the class when they were appointed — graduated from Brown in the distant past. In the Objectors' view, the "class representatives are no longer members of the class" and "don't have skin in the game." Therefore, the Objectors insist, the class representatives' interests are not "aligned" with those of the class.

Whether the class representatives are disqualified solely by dint of the mootness of their claims is a legal question that we review de novo. See Bezdek, 809 F.3d at 82. To the extent that the Objectors urge us down a path toward a per se rule that

- 18 -

alumnae cannot adequately represent a class of current and future students, the Supreme Court's decision in Sosna v. Iowa obstructs that path. 419 U.S. 393 (1975). Challenging the constitutionality of an Iowa law requiring one year of residency in the state to petition for divorce, Carol Sosna represented a class of under-one-year Iowa residents seeking to end their marriages. See id. at 395-97. But by the time her case reached the Supreme Court, her multi-year Iowa residency was established and, in any event, she had managed to get divorced in New York. See id. at 398-99. Notwithstanding that Sosna's own claim was moot, the Court held that the class action was not moot because "the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by" the named class representative (Sosna), and the controversy remained "very much alive for the class of persons she ha[d] been certified to represent." Id. at 399-401.

The Sosna Court clarified that, wholly apart from mootness, an obligation remained under Rule 23(a)(4) to ensure "that the named representative will adequately protect the interests of the class." Id. at 403. The Court proceeded to hold that Sosna was still an adequate representative both because it was "unlikely" that her interests would conflict with those of the class and because she had performed her representational duties "competently." Id. The decision in Sosna makes it plain that —

at least sometimes — a plaintiff whose own claims are moot may adequately represent a class.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 405 (1980) ("In Sosna v. Iowa it was recognized that a named plaintiff whose claim on the merits expires after class certification may still adequately represent the class.").  There is no per se rule.

Several of our sister circuits have concluded that class members whose claims are no longer live may adequately represent the class on a going-forward basis.[7]  See, e.g., J.D. v. Azar, 925 F.3d 1291, 1313 (D.C. Cir. 2019) (per curiam) ("Mootness alone . . . does not establish [the named plaintiffs'] inadequacy as representatives."); Binta B. ex rel. S.A. v. Gordon, 710 F.3d 608, 619 (6th Cir. 2013) (explaining that class representative with moot claim is adequate "at least until such time that there is a determination that the representative is no longer adequate"); Reed v. Bowen, 849 F.2d 1307, 1312 (10th Cir. 1988) (holding that district court "determine[s] whether mooted named plaintiffs will

---

[7] Two courts of appeals look with more jaundiced eyes upon class representatives whose own claims have become moot.  See Irvin v. Harris, 944 F.3d 63, 71 (2d Cir. 2019) (holding that class of inmates at correctional institution was not adequately represented by named plaintiffs who were "no longer . . . inmates and have not continued to pursue the litigation"); Culver v. City of Milwaukee, 277 F.3d 908, 912 (7th Cir. 2002) (stating that class representatives whose own claims have been rendered moot are "presumptively inadequate").  These cases are distinguishable on their facts:  in each of them, the named plaintiffs — unlike in this case — had failed to pursue class claims diligently.  See Irvin, 944 F.3d at 71; Culver, 277 F.3d at 912.

remain adequate class representatives"); <u>Harris</u> v. <u>Peabody</u>, 611
F.2d 543, 544 (5th Cir. 1980) (per curiam) ("Whether [plaintiff
with moot claims] may continue to represent a class depends upon
the facts of the given case."); <u>Ahrens</u> v. <u>Thomas</u>, 570 F.2d 286,
288-89 (8th Cir. 1978) (holding that plaintiff, no longer a
pretrial detainee, adequately represented class of "all present
and future pretrial detainees" at jail).

We think that this is the proper frame of reference: an
inquiring court should not invoke any presumption against allowing
a plaintiff whose own claim has become moot to continue in place
as a class representative but, rather, should consider the
adequacy-of-representation issue on the facts of the particular
case. That inquiry proceeds along the lines suggested by <u>Sosna</u>:
we must ask whether the representatives' interests meaningfully
conflict with those of the class and whether the representatives
are competent champions of the cause. See <u>Sosna</u>, 419 U.S. at 403;
<u>see also</u> 1 <u>Newberg</u> § 3:54 (5th ed. 2011) (discussing these "two
component inquiries" and suggesting that "the first is by far the
more important").[8]

_____

[8] Just as we reject a per se rule against individuals with
moot claims representing a class, we reject the Objectors' related
argument that the class representatives are barred from that role
because they are no longer members of the class. The same was
said of the former Mrs. Sosna, <u>see</u> <u>Sosna</u>, 419 U.S. at 417 (White,
J., dissenting), but the Supreme Court gave this argument short
shrift. The Court saw no problem with the former Mrs. Sosna — by
then, a divorcée and two-year Iowa resident — adequately

- 21 -

With this framework in place, we now probe the adequacy of representation on the facts at hand and review that aspect of the district court's ruling for abuse of discretion.   See Matamoros, 699 F.2d at 138.   On this score, the Objectors first argue that representation by the designated class representatives was inadequate because those representatives did not participate in negotiating the Amended Settlement Agreement.   Even assuming that such participation is necessary — a matter on which we take no view — class counsel told the district court, in advance of the fairness hearing, that the "representatives . . . were fully informed about, and provided input into, the prosecution and proposed settlement of the case."   Nothing in the record contradicts this statement, and the Objectors did not dispute it below.   The district court was, therefore, free to credit class counsel's statement.   The Objectors' lack-of-participation claim fails.

More broadly, the Objectors argue that the named class representatives were incapable of adequately representing the

---

representing the class of discontented spouses with "less than one year" of Iowa residency "who desire" a divorce.   Id. at 397, 403 (majority opinion).   The Objectors do not dispute that the named representatives were "member[s] of the class . . . at the time the class action [was] certified."   Id. at 403.   Given that membership, we need not decide whether they formally remain part of the class today.   Under Sosna, these representatives — as long as they are competent champions of the class's cause and their interests do not conflict with those of the class members — may continue to represent the class.

class because none of them were currently participating (or eligible to participate, for that matter) in Brown's athletic programs. As the Objectors put it, none of the class representatives had "skin in the game."

In one sense, this argument is merely a variation on an already discredited theme. The bald fact that the class representatives' own claims have been rendered moot by the passage of time does not render them unfit to represent the class. Rather, the determination as to their adequacy remains fact-specific and context-specific. Here, there is every reason to believe that the named class representatives are competent champions of the class's cause. They were the ones who first turned a spotlight on Brown's insensitivity to gender equality in structuring its athletic programs; they have been combatants in this war ever since; they participated in bringing about an armistice in the form of the Joint Agreement; and they have been protagonists in the latest round of hostilities. Finally, no one — not even the Objectors — has suggested that the class representatives have been lackadaisical in the performance of their duties.

It may not be an exaggeration to say that, typically, named representatives play only a "nominal" role because class actions are "in fact entirely managed by class counsel." Phillips v. Asset Acceptance, LLC, 736 F.3d 1076, 1080 (7th Cir. 2013) (Posner, J.). But even a nominal plaintiff may add experience and

continuity to the class-representation equation.  For example, several of the named plaintiffs here testified before a congressional subcommittee in 1993 and, last year, wrote an open letter to Brown in the local paper.[9]  A class is well-served by representatives who are conscious of the case's history and their adversary's past behavior, and who can tell the class's story with a panoramic arc.  The district court was entitled to give weight to these values in deeming these representatives adequate.

The Objectors have not shown that the interests of the named class representatives actually conflict with the interests of members of the class.  But the Objectors pose a separate problem:  they contend that <u>any</u> representation of the class must be inadequate due to conflicting interests among current students on different teams.  This contention draws its essence from the proposition that adequate representation is impossible in cases in which, "[i]n significant respects, the interests of those within the single class are not aligned."  <u>Amchem</u>, 521 U.S. at 626. Building on this foundation, the Objectors suggest that "the class members whose sports were eliminated clearly would possess an

_____

[9] <u>See Intercollegiate Sports (Part 2): Hearings Before the Subcomm. on Com., Consumer Protec. & Competitiveness of the H. Comm. on Energy & Com.</u>, 103d Cong. 9-20 (1994); Amy Cohen & Karen Hurley, <u>Title IX at Brown: A Missed Opportunity for True Excellence</u>, Providence J. (Sept. 25, 2020, 2:24 PM), https://www.providencejournal.com/story/opinion/2020/09/25/opinioncohen-and-hurley-title-ix-at-brown-missed-opportunity-for-true-excellence/114138498/.

incentive to give up rights and benefits secured by the Joint Agreement in order to gain reinstatement of their sport," whereas other student-athletes (such as the Objectors, who are gymnasts and hockey players whose varsity teams were spared by Brown) would have an incentivize "to retain th[e] Agreement as-is." This misalignment, the Objectors say, constitutes an irredeemable conflict.

In the arena of Title IX athletics litigation, courts have taken divergent views on the issue of intra-class conflicts among collegiate sports teams. Several courts, sparked by the Second Circuit's decision in <u>Boucher</u> v. <u>Syracuse University</u>, 164 F.3d 113 (2d Cir. 1999), have required subclassing to isolate the conflict arising from the recognition that a school's Title IX "compliance might well be achieved by the elevation of one sport and not the other." <u>Id.</u> at 116-17, 119; <u>see</u> <u>Robb</u> v. <u>Lock Haven Univ. of Penn.</u>, No. 17-00964, 2019 WL 2005636, at *12-13 (M.D. Pa. May 7, 2019); <u>S.G. ex rel. Gordon</u> v. <u>Jordan Sch. Dist.</u>, No. 17-00677, 2018 WL 4899098, at *2 (D. Utah Oct. 9, 2018); <u>Miller</u> v. <u>Univ. of Cincinnati</u>, 241 F.R.D. 285, 290 (S.D. Ohio 2006). Other courts, though, have not envisioned this potential conflict among different sports teams as necessarily disrupting the unity of the class (particularly where the conflict is speculative). See <u>A.B. ex rel. C.B.</u> v. <u>Haw. State Dep't of Educ.</u>, 334 F.R.D. 600, 611 (D. Haw. 2019); <u>Portz</u> v. <u>St. Cloud State Univ.</u>, 297 F. Supp. 3d 929,

- 25 -

946-47 (D. Minn. 2018); <u>Foltz</u> v. <u>Del. State Univ.</u>, 269 F.R.D. 419, 423-24 (D. Del. 2010).

In approaching this question, we do not write on an entirely pristine page. Previous opinions in this case (both from this court and from the district court) have proceeded on the implicit understanding that subclassing is not essential. This is the first time, however, that any party has suggested dividing the class into subclasses, and we regard the issue as open in this circuit.

The determinative factor, of course, is whether the conflict among members of Brown's various women's sports teams is "so substantial as to overbalance the common interests of the class members as a whole."[10]  <u>Matamoros</u>, 699 F.3d at 138. Seeking to clear this hurdle, the Objectors note that women students who were members of any of the five varsity teams downgraded by Brown in 2020 found themselves in a more problematic situation than those who were members of teams that were spared. On this basis, their objection may be framed as analogous to the problem in <u>Amchem</u>. The <u>Amchem</u> Court held that a single class was improper because the

_____

[10] Consistent with the Objectors' argument, we consider only the purported intra-class conflict among current students. We do not address the possible use of subclassing as a means of separating current students from future students. Inasmuch as the Objectors have not pursued any such argument on appeal, we deem it waived. <u>See</u> <u>Wills</u> v. <u>Brown Univ.</u>, 184 F.3d 20, 27 (1st Cir. 1999); <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

interest of the "currently injured" plaintiffs (that is, those already suffering from asbestos-related disease) sharply conflicted with that of the "exposure-only plaintiffs" (that is, those who were not yet symptomatic) who wanted to "ensur[e] an ample, inflation-protected fund for the future." Amchem, 521 U.S. at 626. The proposed analogy is that the women students on the five downgraded teams wanted immediate reinstatement, while their peers may have been more inclined to bargain for longer-term concessions.

On further examination, though, the proposed analogy collapses. The single class certified in Amchem included both a group focused on "current payouts" and a group focused on "distant recoveries." Id. at 610-11. That duality created an unacceptable risk that one group would trade away the other group's most cherished benefit. See id.; see also Samuel Issacharoff & Richard Nagareda, Class Settlements Under Attack, 156 U. Pa. L. Rev. 1649, 1680 (2008) ("The intraclass conflict in Amchem mattered . . . because . . . any realistic peace would turn on the making of tradeoffs across critical dividing lines within the proposed plaintiff class.").

The lesson of Amchem is that intra-class conflict is unacceptable when it presents an actual and substantial risk of skewing available relief in favor of some subset of class members. See In re Payment Card Interchange Fee & Merch. Disc. Antitrust

Litig., 827 F.3d 223, 232-33 (2d Cir. 2016); In re Motor Vehicles
Canadian Export Antitrust Litig., 269 F.R.D. 80, 91 (D. Me. 2010).
No such risk is apparent here.  The record simply does not suggest
any reason to believe that the class representatives' negotiations
were apt to be skewed in favor of reinstating certain teams by
jettisoning others.  Consequently, there is no reason to regard
the interests of members of the various teams as so antagonistic
as to demand subclassing.

      In point of fact, the opposite is true.  The interests
of all women athletes presently at Brown are in large part aligned.
Under the Joint Agreement, every varsity team, regardless of
gender, played at Brown's pleasure, knowing that "Title IX does
not require institutions to fund any particular number or type of
athletic opportunities." Cohen II, 991 F.2d at 906; see Cohen IV,
101 F.3d at 187-88 (explaining that "[o]ur respect for academic
freedom . . . counsels that we give universities as much freedom
as possible").  When Brown pulled the plug on certain teams in
2020, women students on the unaffected teams may have breathed a
sigh of relief.  At the same time, however, they must have been
keenly aware that nothing prevented Brown from pulling the plug on
their teams as well.  This precarity was accentuated by Brown's
abrupt flip-flop with respect to the men's track, field, and cross
country teams.  Under the terms of the Joint Agreement, Brown
giveth and Brown taketh away.

It follows inexorably, as night follows day, that a significant interest common to all student-athletes was the imposition of some meaningful limit on Brown's discretion to strip teams of varsity status.  Although this interest may have been less important to students on teams already downgraded, even those students' teams could be elevated in due course.  They would then benefit from negotiated safeguards.  Adequacy of representation is not hollowed out where, as here, the interests are generally shared by the members of the class, albeit "differently weighted."  Gooch v. Life Invs. Ins. Co. of Am., 672 F.3d 402, 429 (6th Cir. 2012); see J.D., 925 F.3d at 1314 ("[T]he presence of uninterested individuals in a class does not compel a finding of inadequacy."). We find, therefore, that the specter of intra-class conflict raised by the Objectors is purely speculative and that no intra-class conflict between sports teams placed the adequacy of representation out of bounds.[11]

That ends this aspect of the matter.  We conclude that the district court considered the quality of the representation

---

[11] This conclusion is also confirmed by the terms of the Amended Settlement Agreement, which — as discussed infra — do not evince prejudice toward particular teams.  Cf. In re Payment Card, 827 F.3d at 236 ("Like the Supreme Court in Amchem, we 'examine a settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs' when 'assessing the adequacy of representation.'" (quoting In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 252 (2d Cir. 2011))).

afforded by the class representatives and supportably found that representation to be adequate.

### C. **The Substance of the Amended Settlement**.

This brings us to the Objectors' second claim of error. The Objectors decry the substance of the settlement as not "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

At the fairness hearing, the district court acknowledged the parties' extensive discovery, spanning "tens of thousands of pages of documents," "six depositions," and "five separate expert reports." The Objectors conceded that "discovery in this particular case was amazing." The district court then commented favorably on the "effective and successful arm's length negotiation" facilitated by the magistrate judge.

When — as in this case — "the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 32-33 (1st Cir. 2009); see Robinson, 14 F.4th at 59. A party seeking to overcome such a presumption faces a steep uphill climb. The Objectors cannot scale those heights.

After balancing the pluses and minuses of the proposed settlement as against other possible outcomes (including the uncertain consequences of a trial), see Nat'l Ass'n of Chain Drug Stores, 582 F.3d at 44, the district court determined that the

Objectors had failed to rebut the presumption of reasonableness. The court went on to determine that the Amended Settlement Agreement was not only reasonable but also fair and adequate.

The Objectors' assault on these findings is easily repulsed. Their chief complaint is that the Amended Settlement Agreement will expire in August of 2024, and this end date "forfeits" the protections of the Joint Agreement without commensurate gains for the class. In their view, the class received very little in exchange for its acquiescence to a 2024 expiration date.

The Objectors' plaint comprises more cry than wool. The Amended Settlement Agreement conferred demonstrable benefits. For instance, the class received immediate reinstatement of the women's equestrian and fencing teams. It also received Brown's commitment not to downgrade any other women's varsity teams to club status for the life of the Amended Settlement Agreement. That is hardly nothing, especially in light of Brown's colorable assertions that its shuffling of its athletic programs through the Initiative was in full compliance with the Joint Agreement.

We add, moreover, that the passage of time had eroded the advantages conferred on the class by the Joint Agreement. Specifically, the principal benefit of the Joint Agreement — Brown's willingness to abide by a 2.25% permissible variance in women's athletic opportunities — has arguably been overtaken by

developing Title IX case law.  Although a 2.25% variance almost
certainly would have passed legal muster in 1998, such a result is
less certain today.  See, e.g., Portz v. St. Cloud State Univ.,
401 F. Supp. 3d 834, 845, 863 (D. Minn. 2019) (finding Title IX
violation for years in which women's athletic participation varied
2.5% and 2.9%, respectively, from women's enrollment); Biediger v.
Quinnipiac Univ., 728 F. Supp. 2d 62, 111-13 (D. Conn. 2010),
aff'd, 691 F.3d 85 (2d Cir. 2012) (concluding that Title IX was
violated when 3.62% variance in women's athletic participation was
considered along with other factors).  Thus, eliminating the 2.25%
benchmark may open Brown up to a more exacting Title IX regime.[12]
Although we leave the underlying question unresolved, we think
that the district court was entitled to weigh these evolutionary
changes in support of the proposed settlement.

There is more.  The Objectors' premise is that the Joint
Agreement should be viewed as immortal and that, therefore, the
class representatives acted foolishly by purchasing a burial plot.
This premise, though, is dead on arrival.  There was never any
realistic prospect that the Joint Agreement would last forever.

---

[12] Another part of the Joint Settlement Agreement also has
become obsolete.  The Joint Agreement's prohibition on retaliation
is now superfluous following the Supreme Court's decision in
Jackson v. Birmingham Board of Education, 544 U.S. 167, 178 (2005)
(holding that "Title IX's private right of action encompasses suits
for retaliation").  So, too, the Joint Agreement's reporting
requirements are essentially mirrored by the federal mandates in
34 C.F.R. § 668.47.

It has for some time been accepted that, "[i]n institutional reform litigation, injunctions should not operate inviolate in perpetuity." <u>In re Pearson</u>, 990 F.2d 653, 658 (1st Cir. 1993). Thus, the district court's "ongoing supervisory responsibility" over the Joint Agreement "carrie[d] with it a certain correlative discretion." <u>Id.</u> In Justice Cardozo's words, "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."[13] <u>United States</u> v. <u>Swift & Co.</u>, 286 U.S. 106, 114 (1932).

In this instance, the district court canvassed the record and supportably concluded that Brown's current leadership is "steadfastly committed to gender equity in athletics at Brown . . . and to Title IX." Given this conclusion and the evolution of Title IX, we think it reasonable to believe that the Joint Agreement had served its core purpose. While there are doubtless some costs to the class incident to the winding up of the Joint Agreement — as an example, future plaintiffs would have to institute new litigation instead of relying on what the

---

[13] We understand that Brown is a private institution and, as such, the "sensitive federalism concerns" and problems of political accountability that haunt public institutional reform litigation are absent here. <u>Horne</u> v. <u>Flores</u>, 557 U.S. 433, 448-49 (2009). But even private consent decrees — when they are long-running — must be reconciled with "changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights" that may "warrant reexamination of the original judgment." <u>Id.</u> at 447-48.

- 33 -

Objectors call the "streamlined" procedures that have been in place — the district court was in the best position to weigh these costs against the benefits of the Amended Settlement Agreement. Viewed in this light, a 2024 expiration date was not inappropriate. There was no abuse of discretion.

In a final gambit, the Objectors argue that the Amended Settlement Agreement does not "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As evidence of unfair disparity, they point out that only the women's fencing and equestrian teams were reinstated to varsity status by the Amended Settlement Agreement and that women students who matriculate after 2024 (who, after all, are class members) will not benefit at all from the settlement.

The district court did not abuse its discretion in rejecting these arguments. As we already have explained, all of Brown's women's athletes will benefit from the settlement until 2024. And even though only two women's varsity teams were reinstated, the record makes pellucid that Brown — not the class representatives or class counsel — chose those two teams. There is simply no indication that either the class representatives or class counsel "have sold out some of the class members at the expense of others." 4 Newberg § 13:56 (5th ed. 2021 Suppl.).

Nor is the settlement inequitable because the class's future members — those women students who will matriculate after

2024 — will not enjoy the protections of the Joint Agreement.  That argument merely reprises the mistaken notion that the original consent decree must live forever.  Because the passage of time works against the Joint Agreement's viability, future students are in this respect not similarly situated to current students.  It was fair for the district court to take that difference into account.  See Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendments (explaining that equitable treatment may take "appropriate account of differences among [class members'] claims").  On this record, the district court acted within the encincture of its discretion in finding that a 2024 end date furnishes insufficient cause for disallowing the settlement.

This conclusion is bolstered by the special context presented here.  Twice in this litigation, we addressed the gnawing "tension" between class-wide Title IX remedies and the "great leeway" our society affords to universities.  Cohen II, 991 F.2d at 906-07; see Cohen IV, 101 F.3d at 187-88 (noting "[o]ur respect for academic freedom and reluctance to interject ourselves into the conduct of university affairs").  The statutory anti-discrimination mandate sometimes compels the court to usurp a university's curricular planning.  But that should be the exception, not the rule.

We add a coda.  Although we uphold the district court's determination that the Amended Settlement Agreement is fair,

reasonable, and adequate, we do not pretend that it is perfect. But "there are unlikely to be ideal solutions to all the vexing problems that might potentially arise" in Title IX class-action litigation involving collegiate programs. <u>Cohen II</u>, 991 F.2d at 907. The settlement reached here, though not perfect, marks a fitting conclusion to decades of judicial intrusion upon Brown's home field.

## III. CONCLUSION

We need go no further. Ensuring gender equality in collegiate athletic programs is serious business. Over nearly three decades, Brown and the class representatives have made considerable strides in this direction, and the need for judicial supervision has diminished. The district court fairly concluded that the finish line is in sight. For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.